# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STANISLAUS FOOD PRODUCTS COMPANY, | CASE NO. CV F 09-0560 LJO SMS |
| | **ORDER ON MOTIONS TO DISMISS** (Doc. 209, 211) |
| Plaintiff, | |
| vs. | *REDACTED* |
| USS-POSCO INDUSTRIES, et al., | |
| Defendant. | |
| _____/ | |

By notice filed on March 22, 2010, defendant USS-POSCO Industries ("UPI") moves to dismiss plaintiff's first amended complaint pursuant to Rule 12(b)(6).  By notice filed on May 10, 2010, Defendants U.S. Steel Corp, Pitcal, Inc., POSCO-California Corp, and POSCO American Steel Corp. filed a joint motion to dismiss the first amended complaint.  The motions were filed under seal and redacted portions of the motions were subsequently filed.  Plaintiff Stanislaus Food Products filed an opposition to the motions on June 8, 2010. The opposition also was filed under seal with redacted portions of the opposition filed.  The defendants filed reply briefs on June 18 and June 21, portions of which were redacted and filed.  The Court then reviewed the moving, opposition and reply papers, determined that the redactions were too extensive and ordered the parties to file "narrowly tailored" papers in support of and in opposition to the motions.  The parties filed such documents on July 12, 2010.  The Court then vacated the hearing on the motions and took the matter under submission pursuant to Local Rule 230(g).  Having considered the moving, opposition, and reply papers, as well as the Court's file, the Court issues the following order.

1

**FACTUAL BACKGROUND**

Plaintiff Stanislaus Food Products ("plaintiff" or "Stanislaus") is a Modesto tomato canner. Stanislaus processes and "fresh packs" tomatoes into tin-plated cans.  Since 2001, Stanislaus has purchased millions of one-gallon tin-plated cans pursuant to a Container Supply Agreement ("Container Agreement") with non-party Silgan Containers Corporation ("Silgan").  (Doc. 216, FAC ¶16, 18, 24.)[1]

Silgan buys "Tin Mill Products" (a tin-plated steel) and manufactures the Tin Mill Products into tin-plated cans which are sold to canners, such as Stanislaus.  (Doc. 216, FAC ¶81.) Defendant USS-POSCO Industries ("UPI") is the manufacturer of the Tin Mill Products. UPI produces cold-rolled sheets, galvanized sheets and tin-plated and tin-free steel from "hot rolled" steel at its plant in Pittsburgh, California.  (Doc. 138, FAC ¶1, 25.) UPI then sells the tin-plated steel to Silgan to make tin cans which Silgan in turn sells to Stanislaus.  UPI is the only Tin Mill Products producer in the Western United States.

This action alleges antitrust conspiracies by defendants to monopolize the Tin Mill Products market and to price-fix Tin Mill Products.

**Alleged Co-Conspirators**

The hot-rolled steel, also known as "hot-band steel," is supplied to UPI by co-defendants U.S. Steel and Pohang Iron & Steel Co., Ltd. ("POSCO") of South Korea.   U.S. Steel and POSCO provide 100% of UPI's requirements of hot-band steel.  (Doc. 216, FAC ¶26.)  U.S. Steel is a Delaware corporation with its principal place of business in Pittsburgh, Pennsylvania.  (Doc. 216, FAC ¶30.) POSCO is a Korean corporation which was a former competitor of U.S. Steel.  (Doc. 216, FAC ¶5, 6.)

In fact, UPI is a joint venture formed in 1986 by U.S. Steel and POSCO, through their holding companies.  (Doc. 216, FAC ¶25.)  The nominal general partners of UPI are Defendants Pitcal, Inc. and POSCO-California Corporation ("POSCAL").   Each of these UPI general partners is wholly owned subsidiary of either U.S. Steel or POSCO.  Defendant Pitcal, Inc. is a wholly-owned subsidiary of U.S. Steel.   POSCAL is a wholly-owned subsidiary of Defendant POSCO American Steel Corporation ("POSAM"), which is in turn a wholly-owned subsidiary of POSCO.  (Doc. 216, FAC ¶25, 31.)

---

[1]  The redacted version of the First Amended Complaint is referenced in this order, unless otherwise noted.

Ultimately, U.S. Steel and POSCO each own a 50% interest in UPI.  (Doc. 216, FAC ¶8.)  The complaint alleges that while Pitcal and POSCAL are nominal partners of UPI, the decision to form and operate UPI were made by U.S. Steel, POSAM and POSCO.  (Doc. 216, FAC ¶29.)

**Tin Mill Products**

Tin Mill Products are finely rolled steel sheets that are coated with a thin protective layer of tin or chrome.  (Doc. 216, FAC ¶35.)  To make Tin Mill Products, UPI takes hot-band steel, provided by U.S. Steel and POSCO, and processes it through preparatory and manufacturing processes, which is not relevant to these motions.[2]  (Doc. 216, FAC ¶36.) Tin can makers, like Silgan, purchase the Tin Mill Products for "resale as tin-plate cans" which in turn are used to package food products, such as fruit and vegetables. (Doc. 216, FAC ¶37.) Products processed by Stanislaus are packaged into Silgan's tin-plate, enamel-coated steel cans.  (Doc. 216, FAC ¶39.)  Tin Mill Products constitute approximately 70% of the cost of tin-plate cans.

**The Container Agreement**

Pursuant to the Container Agreement between Silgan and Stanislaus, Silgan manufactures and sells to Stanislaus Food tin plate and enamel coated cans for fresh packing tomatoes.  (Doc. 216, FAC ¶83.) Silgan and Stanislaus entered into the Container Agreement, or as the FAC refers to it the "Silgan-Stanislaus Agreement" for the supply of tin cans.  Silgan sold tin cans which were "ready to fill tomato and tomato product containers which comply with the provisions of this Agreement . . . comprised of the can bodies enclosed at one end (the "Cans") and ends which are covers to be affixed after the Cans are filled (the 'Ends') (each Can and End collectively constituting a 'Container')." (Doc. 216, FAC ¶84.)

---

[2]     Tin-plate is used by can makers to manufacture cans for food products.  Tin-plate is made by hot rolling steel, removing scale or rust by pickling it in acid, and coating it with a thin tin layer.  A tin-plate manufacturer may coat the can interiors with a thin enamel layer.  For quality, "fresh packed" tomatoes are packed in tin-lined, enamel coated steel cans to resist tomato acid penetrating the steel can.

1  ████████████████████████████████████████████████████

2  ████████████████████████████████████████████████████

3  ████████████

4  **Tin Mill Products Market**

5  UPI is the only Tin Mill Products manufacturer in the western United States and UPI accounts

6  for about 84% of the market share for Tin Mill Products. (Doc. 216, FAC ¶45.) Plaintiff alleges that

7  in 1986, U.S.Steel and POSCO created UPI, and as plaintiff alleges, to "eliminate competition between

8  themselves" and allow them to "monopolize the market for Tin Mill Products." (Doc. 216, FAC ¶59-

9  60.) Plaintiff alleges that U.S. Steel induced POSCO to stop competing and enter into the UPI

10  partnership with U.S. Steel. U.S. Steel contributed millions of dollars to the capitalization of UPI and

11  transferred its plant in Pittsburgh, California, among other assets, to UPI. (Doc. 216, FAC ¶61-62.) The

12  formation of UPI eliminated the tin steel competition between U.S. Steel and POSCO, both of which

13  were previously fierce competitors of one another. Stanislaus alleges that:

14          U.S. Steel and POSCO created UPI as a vehicle to avoid competition
        with each other; to acquire and maintain monopoly power in the Western

15          United States for Tin Mill Products; to fix the prices of Tin Mill
        Products; and to fix the prices at which U.S. Steel and POSCO sold

16          hot-band steel to UPI. (Doc. 216, FAC ¶69.)

17  Plaintiff alleges that "as a result of the formation and operation of UPI," the competitive Tin Mill

18  Products market is now a monopoly. (Doc. 216, FAC ¶71-73.) Plaintiff alleges that, "[t]he formation

19  and operation of UPI was and is not a legitimate, procompetitive joint venture but instead was and is a

20  pretext and sham for U.S. Steel and POSCO to avoid competing with each other, to obtain and maintain

21  monopoly power in the Western United States for Tin Mills Products. . ." (FAC ¶73.)

22  In the first two decades of UPI's existence, from approximately 1986 to 2008, UPI faced

23  competitors in the Tin Mill Products market. These competitors, located inside and outside the U.S.,

24  faced a competitive disadvantage compared to UPI because their plants were geographically distant from

25  the Western United States market. (Doc. 216, FAC ¶ 99.) To compete, these companies absorbed the

26  transportation costs, known as "freight equalization." (Doc. 216, FAC ¶ 14, 99.) At some point prior

27  to 2008, these firms could no longer compete with UPI and abandoned the Tin Mill Products market.

28  (Doc. 216, FAC ¶ 14, 99.) UPI then became the sole manufacturer of Tin Mill Products in the Western

1   United States.

2        Plaintiff alleges that UPI and the other defendants then conspired to fix the prices of hot-band

3   steel and the prices of Tin Mill Products.  Plaintiff alleges that UPI and Silgan agreed to fix the prices

4   of Tin Mill Products sold to Silgan at "supracompetitive" prices.[3]  Plaintiff alleges, as the sole source

5   supplier, UPI had an economic motive to agree on a supracompetitive price for the Tin Mill Products

6   Silgan bought from UPI. Plaintiff alleges that the price for hot band steel and tin went up substantially

7   despite a decrease in raw material prices in the second half of 2008.  Silgan stated that it intends to raise

8   substantially its prices to Stanislaus Food for tin-plated cans for the 2009 pack year based on the prices

9   of Tin Mill Products it purchases from UPI.  The Silgan executive also said "tin-plate steel suppliers are

10  acting like a 'cartel' and in a uniform way with respect to pricing and taking capacity off-line."  (Doc.

11  216, FAC ¶113.)  The prices charged to plaintiff went up dramatically. Stanislaus was forced to pay

12  inflated prices for tin-plate cans.

13                   **Claims in the FAC**

14       The First Amended Complaint alleges the following claims for relief:

15          (1)     First Claim - Section 1 of the Sherman Act, 15 U.S.C. §1 (Restraint of Trade);

16          (2)     Second Claim - Section 2 of the Sherman Act, 15 U.S.C. §2 (Monopolization);

17          (3)     Third Claim - California Cartwright Act, Cal.Bus. & Prof. Code §16720;

18          (4)     Fourth Claim for Relief - Section 1 of the Sherman Act, 15 U.S.C. §1 (Injunctive relief);

19          (5)     Fifth Claim for Relief - Cal.Bus & Prof Code §17200;

20          (6)     Common Law Restitution based upon Unjust Enrichment.

21  Defendants challenge each of the claims on various grounds.

22                 **ANALYSIS AND DISCUSSION**

23  **A.**      **Rule 12(b)(6) - Motion to Dismiss for Failure to State a Claim**

24       A motion to dismiss pursuant to Fed R. Civ. P. 12(b)(6) is a challenge to the sufficiency of the

25  pleadings set forth in the complaint.  A Fed. R. Civ. P. 12(b)(6) dismissal is proper where there is either

26  a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal

27  _____

28        [3] "Supracompetitive" means artificially high. *See Sanders v. Brown*, 504 F.3d 903, 909 (9th Cir. 2007), *cert. denied,*
     553 U.S. 1031 (2008).

1     theory." *Balisteri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990). In considering a motion

2     to dismiss for failure to state a claim, the court generally accepts as true the allegations of the complaint

3     in question, construes the pleading in the light most favorable to the party opposing the motion, and

4     resolves all doubts in the pleader's favor. *Lazy Y. Ranch LTD v. Behrens,* 546 F.3d 580, 588 (9th Cir.

5     2008); *Jenkins v. McKeithen*, 395 U.S. 411, 421, *reh'g denied*, 396 U.S. 869 (1969).

6        To survive a motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief

7     that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1974 (2007)

8     ("*Twombly")*. A claim has facial plausibility,"when the plaintiff pleads factual content that allows the

9     court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*

10    *v. Iqbal*, – U.S. –, 129 S.Ct. 1937 (2009). "[F]or a complaint to survive a motion to dismiss, the

11    non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly

12    suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Service*, 572 F.3d 962, 969

13    (9th Cir. 2009).

14       A court is "free to ignore legal conclusions, unsupported conclusions, unwarranted inferences

15    and sweeping legal conclusions cast in the form of factual allegations." *Farm Credit Services v.*

16    *American State Bank*, 339 F.3d 765, 767 (8th Cir. 2003) (citation omitted). "While a complaint attacked

17    by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation

18    to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a

19    formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. 554,127 S. Ct.

20    1955, 1964-65 (internal citations omitted). Moreover, a court "will dismiss any claim that, even when

21    construed in the light most favorable to plaintiff, fails to plead sufficiently all required elements of a

22    cause of action." *Student Loan Marketing Ass'n v. Hanes*, 181 F.R.D. 629, 634 (S.D. Cal. 1998). In

23    practice, "a complaint . . . must contain either direct or inferential allegations respecting all the material

24    elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562, 127

25    S.Ct. at 1969. If a plaintiff fails to state a claim, a court need not permit an attempt to amend a

26    complaint if "it determines that the pleading could not possibly be cured by allegation of other facts."

27    *Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990).

28    /////

**B.     Overview of Plaintiff's Sherman Act Claims**

Plaintiff alleges claims under §1 and §2 the Sherman Act.  15 U.S.C. §§ 1, 2.  Section 1 prohibits restraint of trade:  "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared to be illegal."   To prevail on a cause of action for violation of 15 U.S.C. § 1, a plaintiff must show, "(1) there was an agreement, conspiracy, or combination between two or more entities; (2) the agreement was an unreasonable restraint of trade under either a per se or rule of reason analysis; and (3) the restraint affected interstate commerce." *American Ad Management, Inc. v. GTE Corp.*, 92 F.3d 781, 784 (9th Cir. 1996).

Plaintiff alleges that the following "unlawful contracts, combinations and conspiracies are in restraint of trade," in violation of §1, by "defendants" agreeing to:

(1)     create and maintain horizontal market allocation agreement whereby U.S. Steel and POSCO agree to exit the Relevant Market in exchange for 50 percent of UPI's monopoly profits,

(2)     fix prices for Tin Mill Products in the Relevant Market;

(3)     fix the prices of the hot-band steel that each sells to UPI and from which UPI produces Tin Mill products, and

(4)     fix the prices of the Tin Mill products that Silgan purchases from UPI and the prices of tin-plate cans that Silgan sells to Stanislaus.

Plaintiff also alleges violation of Section 2 of the Sherman Act.  Section 2 makes it illegal to "to monopolize ... any part of the trade or commerce . . ." 15 U.S.C. § 2.  Plaintiff alleges defendants acquired monopoly power and maintained its power by suppressing competition, by:

(1)     "forming UPI in an anticompetitive manner,"

(2)     fixing the prices of Tin Mill Products and hot-band steel, and

(3)     manipulating the prices UPI pays for hot-band steel to U.S. Steel and POSCO.  (Doc. 216, FAC ¶135.)

**C.     Procedural Challenges to the Complaint**

The defendants challenge the complaint on procedural grounds: (1) lack of antitrust standing (Doc. 220 Reply p.1-2), (2) statute of limitations (Doc. 221 Reply p.2), and (3) inadequate pleading

1    under *Twombly.*

2    **1.    Standing to Sue under Federal Antitrust Law**

3    Defendants argue that plaintiff has no standing to pursue Federal Antitrust claims under the

4    controlling precedent of *Illinois Brick*, because plaintiff is an "indirect purchaser."  Defendants argue

5    that Plaintiff's three federal antitrust claims under the Sherman Act (claims 1, 2, and 4) are barred

6    because plaintiff is not a direct purchaser of any of defendant's products.[4]

7    Plaintiff argues that *Illinois Brick* is inapplicable because plaintiff is a <u>direct</u> purchaser of tin-

8    plate cans from Silgan who is a **co**-conspirator. Therefore, plaintiff participates as a <u>consumer</u>.   A

9    consumer who pays inflated prices is a proper plaintiff.  (Doc. 219, Opposition p.19.)  Further, plaintiff

10   argues that if *Illinois Brick* applies, it does not bar plaintiff's claims because (1) Stanislaus seeks

11   injunctive relief, (2) Stanislaus' damages claims fall within two exceptions to *Illinois Brick*, and (3)

12   Stanislaus may seek damages under California's Cartwright Act.  (Doc. 219, Opposition p. 16.)

13   (A)    <u>*Illinois Brick* and the "Indirect Purchaser" Rule</u>

14   "Indirect purchasers" do not have standing to recover antitrust damages.  In *Illinois Brick Co.*

15   *v. Illinois*, the Supreme Court held that indirect purchasers may not recover in an antitrust suit by

16   proving that an overcharge was passed on to them through the distribution chain. *Illinois Brick Co. v.*

17   *Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).  Simply put, an end user does not have

18   antitrust standing to assert a claim against a manufacturer when a middleman, for example a distributor

19   or a wholesaler, sits between an end user and a manufacturer.  The Supreme Court in *Illinois Brick*

20   denied standing to indirect purchasers in many circumstances. The Court's concern was that allowing

21   indirect purchasers to sue remote price-fixers would open the door to multiple liability for defendants.

22   If the indirect purchaser recovered, trebled, the full amount of the overcharge (or the portion of it that

23   had in fact been passed on to him) from the price-fixer, the direct purchaser (the middleman) could also

24   _____

25   [4] Antitrust standing is distinct from Article III constitutional standing. Antitrust standing examines the connection between the asserted wrongdoing and the claimed injury to limit the class of potential plaintiffs to those who are in the best position to vindicate the antitrust infraction.  *See In re Circuit Breaker Litig.*, 984 F. Supp. 1267, 1273 (C.D. Cal. 1997).

26   "A plaintiff who satisfies the constitutional requirement of injury in fact is not necessarily a proper party to bring a private antitrust action." *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519,

27   535, n. 31, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).  Constitutional standing generally requires a showing that plaintiff has suffered actual loss, damage or injury, or is threatened with impairment of his or her own interests. *Gladstone Realtors v.*

28   *Village of Bellwood*, 441 U.S. 91, 100, 99 S.Ct. 1601, 1608 (1979).

recover, trebled, the full amount of the overcharge.  *Id.* at 730-31.  The role of "private attorneys general" in the antitrust field was restricted by *Illinois Brick* to direct purchasers because of the danger of multiple liability and complexity of proof.[5]  *Royal Printing Co. v. Kimberly Clark Corp.*, 621 F.2d 323, 326 (9th Cir. 1980). The Supreme Court has applied the indirect purchaser rule to section 2 of the Sherman Act.  *See Hanover Shoe*, *Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 492-94, 88 S.Ct. 2224, 2231-32.

Plaintiff is not a direct purchaser of Tin Mill Products from any of the defendants.  Plaintiff does not purchase Tin Mill Products and does not purchase hot-band steel.  Rather, plaintiff purchases finished tin cans from Silgan.  Plaintiff alleges defendants fixed the price of the raw materials, not the tin cans.  Defendants are not parties to the Container Agreement between Silgan and plaintiff, such that any "direct" relationship existed whatsoever. Indeed, plaintiff has cited no authority for the proposition that it could be a direct purchaser where the product has been altered along the distribution channel. Here, Tin Mill Products are transformed into another product, the tin cans, which are then purchased by plaintiff.  Plaintiff ignores the product transformation process, and fails to site any authority that it is a "direct purchaser" of the price-fixed products, Tin Mill Products and hot-band steel.  Plaintiff is not a direct purchaser of any product produced by any defendant.  Plaintiff is an indirect purchaser.

In the cases relied upon by the parties, the price-fixed product at issue in those cases, unlike the price-fixed product in this case, was not "transformed" in the distribution channel. For instance, in *Illinois Brick*, the State of Illinois, the end user, sued manufacturers and distributors of concrete blocks claiming that the manufacturers had engaged in a combination and conspiracy to fix prices. The block manufacturers sold the blocks to masonry contractors who incorporated them in masonry structures that were in turn used in buildings by general contractors. The buildings were then sold to the State.  In *Shamrock Foods Co.*, 729 F.2d 1208 (9th Cir. 1984), consumers sued wholesale dairy producers for price fixing dairy products purchased from grocery stores. In *Kendall v. Visa,* 518 F.3d 1042 (9th Cir. 2008), merchants sued credit card companies and the intermediary banks alleged that the defendants conspired

[5] A single antitrust violation may have both direct and indirect or "ripple" effects on parties that are removed from the actual violation at issue. Von Kalinowski, *Antitrust Law and Trad Regulation*, Ch. XIII, §161.02[3] (2nd ed. Matthew Bender).  Price increases caused by an antitrust violation may affect ultimate prices at several points in the chain of distribution.  *Id.* Nonetheless, *Illinois Brick* bars such indirect purchasers from harm suffered.

to set amounts of payment card transaction fees charged in retail transactions; merchants lacked standing because the fee was set by the credit card companies and not the banks, and the banks were the "middlemen."  In *Delaware Valley Surgical Supply v. Johnson & Johnson*, 523 F.3d 1116 (9th Cir. 2008), a medical center, hospital and medical device distributer sued a device manufacturer for price fixing; medical center and hospital were not direct purchasers.  In *Royal Printing Co v. Kimberly Clark Corp.*, 621 F.2d 323 (9th Cir. 1980), purchasers of paper products, brought suit against paper manufacturers for price-fixing the paper products; indirect purchasers lacked standing.

In none of the cases cited by the parties has the distribution/production process been similar to the facts in this case.  Each of the cases involved a product passed down the distribution line, without transformation or alteration. In Stanislaus' case, in contrast, the product price-fixed has been altered and transformed during the distribution channel, into a different product.  Since the parties have not highlighted this difference, the Court assumes for purposes of this motion only that the transformation process is irrelevant to the antitrust analysis.[6]

(B)      Exception - Silgan as a "Co-Conspirator"

Plaintiff argues that it is a "direct" purchaser because Silgan is an unnamed "co-conspirator." This is an exception recognized by the Ninth Circuit and not specifically mentioned in *Illinois Brick*. Plaintiff argues that there is no "middleman" because non-party Silgan was a conspirator with defendants in price fixing.  Stanislaus was a direct purchaser from Silgan.

(1)      Allegations of price fixing the retail price

The Ninth Circuit has held that an indirect purchaser may bring suit where he establishes a

_____

[6]  *Illinois Brick* is unclear whether a manufacturer who had conspired with his suppliers to fix the price of supplies, raw materials, components or sub-assemblies would be immunized from antitrust damage liability to indirect purchasers of finished products. As one court recognized:

"*Illinois Brick* does not mention, let alone discuss, such a situation. The Supreme Court's obvious concern for the efficacious enforcement of the antitrust laws, which so informed its decision …, further sufficiently indicates the lack of any intention so to immunize such a manufacturer. The mere fact that the allegedly price-fixed product [i.e., the supplies, raw materials, components or sub-assemblies] is only a partial constituent of the ultimate product purchased by the intervening plaintiff—as alleged here, where the oil is converted to electricity—should not bar recovery, where there is an allegation of privity between suppliers of the raw material and the manufacturer … The result would be a loophole in the antitrust laws that would provide immunity for any price-fixing manufacturer which, for whatever reasons, finds it useful to conspire to fix prices with its suppliers. The Court cannot believe that the Supreme Court intended such a result without discussing it." *Florida Power Corp. v. Granlund,* 78 F.R.D. 441, 443 (M.D. Fla. 1978).

price-fixing conspiracy between the manufacturer and the middleman. *See Arizona v. Shamrock Foods Co.*, 729 F.2d 1208, 1211 (9th Cir.1984), *cert. denied*, 469 U.S. 1197 (1985).  In *Shamrock Foods,* plaintiff, a milk consumer class, alleged a price-fixing conspiracy against a dairy product producer.  The defendant dairy producer was not only a producer of milk, but also a retailer who competed with grocery stores. The plaintiff consumers abandoned any wholesale price fixing conspiracy against the producer and confined their claim to products purchased directly from grocery stores in a retail price-fixing conspiracy.  *Shamrock Foods*, 729 F.2d at 1211.  Plaintiffs focused upon the horizontal conspiracy that, in defendant's role as a competitor at the retail level, defendant conspired with the retail outlet grocery stores.  The Court permitted the horizontal conspiracy to proceed.  The Court said that "we would be presented with a conspiracy among horizontal competitors at the retail level to fix retail prices." *Id.* at 1211. Thus, the defendant was acting in the role as a retailer, from whom plaintiff could directly purchase milk. In dictum, the court turned to the vertical conspiracy.  The court stated that "even if a two tier conspiracy" were alleged, the *Illinois Brick* policy against risk of multiple recovery of members in the distribution chain, would not bar standing in the unique facts of the case. 729 F.2d at 1211-12.  The middlemen-grocery stores had settled for damages arising from the two tier price fixing conspiracy and therefore, risk of double recovery was eliminated.  *Id*. at 1213.  *Shamrock* is thus distinguishable.

Here, plaintiff does not allege that Silgan was a co-conspirator in a <u>horizontal</u> conspiracy, like the retail to retail conspiracy in *Shamrock Foods*.  Silgan and UPI compete at different levels.  Plaintiff alleges the manufacturer, UPI, is in a conspiracy with the "wholesaler" Silgan.  Thus, plaintiff alleges a vertical conspiracy.  Further, plaintiff does not allege "unique facts," as in *Shamrock Foods*, which would eliminate the risk of double recovery to defendants.

Here, plaintiff does not allege that Silgan and UPI entered into a conspiracy to fix prices <u>at the retail level</u>, for the tin cans plaintiff purchased.  Plaintiff alleges that Silgan, the "middleman," was in a conspiracy with defendants, the "wholesaler."  Plaintiff alleges that Silgan entered into annual agreements with UPI to set Tin Mill Products prices at a level Silgan knew were inflated illegally so that Silgan could pass that entire inflated price to its customers at supracompetitive prices.  (Doc. 216, FAC ¶¶21, 92.) Plaintiff alleges that pursuant to its contract with Silgan, plaintiff was forced to pay the artificially inflated prices. (Doc. 216, FAC ¶91-92.)  The conspiracy is at the wholesale level.

1    Plaintiff alleges the defendants conspired to fix the price of the raw materials for tin cans, not

2    the product plaintiff purchases. "*Illinois Brick* [is] inapplicable to claims against remote sellers when

3    the plaintiffs allege that the sellers conspired with intermediaries in the distribution chain to fix the price

4    at which the plaintiffs purchased." *Shamrock Foods*, 729 F.2d at 1213.  Thus, the products purchased

5    by plaintiffs must be the subject of the price fixing conspiracy.  Nothing in the allegations claim that the

6    co-conspirators conspired to fix the retail price of the tin cans.  *Compare Shamrock Food*, 729 F.2d at

7    1211 (plaintiff alleged the conspiracy was to fix the prices of the dairy products at the retail level).  By

8    analogy, if Stanislaus is the consumer, than plaintiff must allege that there was a conspiracy to fix the

9    price at the retail level; the price of the tin cans.

10                             (2)      Naming Silgan as a co-defendant

11    Defendant UPI argues that plaintiff cannot avail itself of the "co-conspirator" exception set forth

12    in *Shamrock Foods,* 729 F.2d 1208 because plaintiff has not named Silgan as a defendant.  Defendant

13    cites out of circuit cases to support its opposition.  (Doc. 217, UPI motion p.4.)

14    There are recognized times when a co-conspirator does not need to be named as a defendant.

15    A co-conspirator does not need to be named if the co-conspirator is a subsidiary of another defendant.

16    In *Royal Printing*, the Ninth Circuit held that *Illinois Brick* does not bar an indirect purchaser's suit

17    where the direct purchaser is a division or subsidiary of a co-conspirator.  *Royal Printing Co. v.*

18    *Kimberly-Clark Corp.*, 621 F.2d 323 (9th Cir.1980).  In *Royal Printing,* a printing company and other

19    small businesses brought suit against ten manufacturers of paper products. *Id.* at 324. The plaintiffs had

20    never bought paper products directly from any of the defendants, but instead purchased through various

21    wholesalers. *Id.* The Ninth Circuit permitted the suit to proceed only on the basis that plaintiffs could

22    demonstrate that the wholesaler was a subsidiary of a defendant. *Id.* at 326. For those independent

23    wholesalers that were not owned or controlled by any defendant, plaintiffs were indirect purchasers and

24    had no standing. *Id.* at 327-28.  In *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1145-46 (9th

25    Cir.2003), *cert. denied*, 540 U.S. 940 (2003), the Ninth Circuit explained that the *Royal Printing*

26    exception applies when "there is no realistic possibility that the direct purchaser will sue its supplier over

27    the antitrust violation." There is no realistic probably that the direct purchaser will sue if the direct

28    purchaser is "a subsidiary or division of a co-conspirator." *Royal Printing*, 621 F.2d at 326; *Kendall v.*

1  *Visa*, 518 F.3d at 1050 (motion to dismiss affirmed where plaintiff failed to allege facts establishing that

2  there is no realistic possibility the direct purchaser will sue.)

3        Here, plaintiff has alleged a vertical conspiracy between UPI, as the indirect seller, and Silgan,

4  the direct seller.   However, plaintiff fails to allege that Silgan is controlled by UPI or any other

5  defendant, such that the co-conspirator need not be named. The exception to naming a co-conspirator

6  requires allegations of a vertically integrated single entity - such as parent-subsidiary or division.  *See*

7  *Royal Printing,* 621 F.2d at 326.  Silgan is not alleged to be a subsidiary or controlled by UPI such that

8  they are, *de facto*, the same entity.

9        The Court's research has located that the Ninth Circuit *In re Coordinated Pretrial Proceedings*

10 *in Petroleum Products*, 691 F.2d 1335, 1341 (9th Cir. 1982), affirmed a district court decision, 497

11 F.Supp. 218 (D.C. Cal. 1980), *on reconsideration*, 1992 WL 220753 (C.D. Cal. 1992), dismissing a

12 complaint where plaintiff failed to join co-conspirators.  *In re Coordinated Pretrial Proceedings in*

13 *Petroleum Products*, 691 F.2d 1335, 1341 (9th Cir. 1982), *cert denied*, 464 U.S. 1068 (1984).  In that

14 case, plaintiffs sought to amend their complaint to allege a "two-tier conspiracy," like the vertical

15 conspiracy alleged by plaintiff, one between the supplier and the retail outlets. The district court had

16 ruled that "plaintiff's could amend their complaints to allege that defendants conspired with retail dealers

17 of petroleum products only if the retail dealers were joined as parties defendant."  The Ninth Circuit

18 affirmed,

19        "Absent joinder of retail dealers, serious risks of duplicative recovery and
         inconsistent adjudications would ensue.  If plaintiffs recovered damages
20       for a vertical conspiracy between defendants and non-party retail dealers,
         any of those dealers could prove in a subsequent action that they were not
21       conspirators and, as direct purchasers, were entitled to damages arising
         out of the same events."  *Petroleum Products*, 691 F.3d at 1342.
22

23 The Ninth Circuit held that if a proper vertical conspiracy claim is alleged, joinder of retail dealers is

24 required to prevent a serious risk of multiple liability.  *Petroleum Products*, 691 F.2d at 1342. In

25 contrast, in *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014 (9th

26 Cir.1981), *cert. denied*, 459 U.S. 825 (1982), the Ninth Circuit stated that a plaintiff was "not required

27 to sue all of the alleged coconspirators inasmuch as antitrust coconspirators are jointly and severally

28 liable for all damages caused by the conspiracy." *Id.* at 1053. However, in *William Inglis*, the plaintiff

13

did not allege a vertical conspiracy, as does plaintiff in the instant case and as did plaintiffs in *Petroleum Products.  See also In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1163 (5th Cir.1979) ("[W]e do not think that the reasoning of *Illinois Brick* permits recognizing the exception when, as here, the alleged co-conspirator middlemen are not named as parties defendant.").

Plaintiff argues that Silgan does not need to be named because there is no risk of duplicative recovery.  (Doc. 219, Opposition p.18 n.13.)  Plaintiff argues that "Silgan will not bring its own antitrust claim concerning the purchases at issue."  (Doc. 219, Opposition p.18 n.13.)  Plaintiff argues this exception applies because there is no realistic probability Silgan will sue UPI.

Whether plaintiff believes Silgan will sue for antitrust claims, or will not sue, is not determinative for pleading standards.  In a vertical conspiracy, plaintiff must name the direct seller as a party defendant.  To maintain a vertical conspiracy, plaintiff must name Silgan as a party defendant for standing under *Illinois Brick.*

<div align="center">(3)   <u>*Twombly* and the Vertical Conspiracy</u></div>

UPI argues that the co-conspirator exception does not apply because the vertical conspiracy claim, between Silgan and UPI, is inherently "implausible" under *Twombly*.  (Doc. 217, UPI motion p.4-5.)  UPI argues that the allegations are implausible because it would be against Silgan's economic interest to agree to pay supracompetitive prices for the Tin Mill Products necessary for Silgan's production.

Here, however, the Court must assume the truth of the facts alleged.  Plaintiff alleges that by 2008, UPI was the only supplier of Tin Mill Products from which Silgan could purchase its raw materials.  It is plausible that, assuming the truth of plaintiff's allegations, UPI decided to charge supracompetitive prices, for Silgan to agree to its sole supplier's demands.  Further, it is plausible that this allege Silgan-UPI agreement is palatable because of the terms of the Container Agreement between Silgan and plaintiff which would "force" Stanislaus "to pay artificially inflated prices for tin plate cans." (Doc. 216, FAC ¶92.)  Accordingly, the allegation of the co-conspiracy between Silgan and UPI does not fail under *Twombly*.



[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

1  ████████████████████████████████████████████████████████

2  ████████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████

6  ██████████████████████████████████████████

7  ██████    ████████████████████████████

8  ███████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████

10 ████████████  █  ██████████████████████████████████████

11 ████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████

13 ██████████████████████████████████████████

14 ████████████████████████████████████████████████████████

15 ██████████████████████████

16          (D)     Exception to "Indirect Purchaser" Rule - Injunctive Relief

17          Another exception to *Illinois Brick* is if plaintiff seeks only injunctive relief.  The Ninth Circuit

18 has distinguished between an antitrust claim that seeks damages and one that seeks injunctive relief,

19 noting that the "direct purchaser" doctrine applies only to the former. *Lucas Automotive,* 140 F.3d at

20 1235 (observing that "indirect purchasers are not barred from bringing an antitrust claim for injunctive

21 relief against manufacturers").

22          The Clayton Act "provides a vehicle for private enforcement of the [Sherman Act]." *Cargill,*

23 *Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 109, 107 S.Ct. 484 (1986).  Under §16 of the Clayton

24 Act, "[any] person, firm, corporation, or association shall be entitled to sue for and have injunctive relief

25 ... against threatened loss or damage by a violation of the antitrust laws."  To have standing to seek

26 injunctive relief under section 16 of the Clayton Act, a private plaintiff must allege that the plaintiff has

27 "suffered loss or damage of a type the antitrust laws were designed to prevent and that flows from that

28 which makes defendants' acts unlawful." *Cargill*, 479 U.S. at 113.

16

1     The clearest form of standing for injunctive purposes is if plaintiff is a "consumer" or

2  "competitor." *See, e.g., Lucas Automotive,* 140 F.3d at 1235 (Standing is inappropriate when the

3  plaintiff is a competitor challenging the expansive or competitive behavior or a rival.).  Plaintiff does

4  not allege it has antitrust standing as a "competitor" in the market of Tin-Mill Products or hot-band steel.

5  It does not allege it is a direct consumer of Tin Mill Products or hot-band steel, which are the products

6  defendants produce.

7     To seek injunctive relief, plaintiff must show, as relevant to this motion, that it suffered "an

8  antitrust injury." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000) (requires

9  a showing of "antitrust injury," i.e., "injury of the type the antitrust laws were intended to prevent and

10  that flows from that which makes defendants' acts unlawful").  Antitrust injury requires that the "injured

11  party be a participant in the same market as the alleged malefactors." *Knevelbaard Dairies*, 232 F.3d at

12  987, citing *American Ad Management*, 190 F.3d at 1057; *Glen Holly Entertainment, Inc. v. Tektronix,*

13  *Inc.*, 352 F.3d 367, 372 (9th Cir. 2003) (we impose a requirement, that "the injured party be a participant

14  in the same market as the alleged malefactors."); *Associated General Contractors of California, Inc. v.*

15  *California State Council of Carpenters*, 459 U.S. 519, 539, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)

16  (denying antitrust standing to party that was "neither a consumer nor a competitor in the market in which

17  trade was restrained").  Thus, to have an "antitrust injury," plaintiff must be in the same relevant market.

18     Defendants challenge whether plaintiff is in the "relevant market" such that plaintiff may seek

19  injunctive relief.  Defendants argue that plaintiff is not in the "relevant market."  Defendants argue that

20  plaintiff is in the tin can market, and defendants are in the tin-plated steel market.  Plaintiff argues that

21  it is a "market participant" because it participates in the market where competition is being restrained.

22  (Doc. 219, Opposition p.17.)

23     There is no controlling authority as to the definition of a "relevant market" for purposes of

24  injunctive relief.  In *Knevelbaard Dairies*, the relevant market was a common product. The defendants

25  had argued plaintiffs were in a different relevant market; defendants were in one market (cheese) while

26  the plaintiff were in another (fluid milk). The Court rejected that distinction because the complaint

27  "unmistakably placed all parties in the milk market." *Knevelbaard Dairies*, 232 F.3d at 989.  In *Glen*

28  *Holly Entertainment*, plaintiff was a business that offered film editing services and leased film editing

1   equipment to film companies.  Plaintiff obtained its equipment from two manufacturers; the smaller of

2   which agreed with the larger company to cease selling to plaintiff, in violation of antitrust laws.  The

3   Court held that plaintiff had standing for injunctive relief because it alleged it was a consumer of the

4   defendant's product.  *Glen Holly Entertainment*, 352 F.3d at 371.  In *Lucas Automotive*, 140 F.3d 1229,

5   plaintiff, a tire distributor, had standing to bring an antitrust action under the Clayton Act against a

6   competitor and supplier because plaintiff was both a distributor and downstream purchaser of vintage

7   automobile tires.  *Id.* at 1230.  *Am. Ad. Mgmt.*, 190 F.3d at 1058 ("it is not the status as a consumer or

8   competitor that confers antitrust standing, but the relationship between the defendant's alleged unlawful

9   conduct and the resulting harm to the plaintiff").

10   These cases provide guidance as to what, in limited contexts, may be considered a "relevant

11   market."  None of these cases, however, dealt with factual allegations such as before this Court, where

12   plaintiff seeks injunctive relief for price fixing "component" parts.

13   Several cases have addressed whether a component part manufacture may be sued for injunctive

14   relief by the consumer of the assembled product. *In re Dynamic Random Access Memory*, 536 F.Supp.2d

15   1129 (N.D.Cal. 2008), *motion to certify appeal granted by*, *re Dynamic Random Access Memory*

16   *(DRAM) Antitrust Litigation*, 2008 WL 863994 (N.D.Cal. Mar 28, 2008), provides some guidance.

17   Indirect purchasers of computer component, dynamic random access memory ("DRAM"), alleged that

18   they purchased DRAM at artificially inflated prices as a result of defendants' unlawful conspiracy to fix

19   prices.  Defendants manufactured and sold DRAM.  Defendants moved to dismiss the claims of the

20   plaintiffs who purchased DRAM as a component of computers ("desktops, laptops (or notebooks),

21   servers and workstations") as indirect purchasers. *DRAM*, 536 F.Supp.2d at 1134.[7]  In evaluating

22   whether plaintiffs were in the "relevant market," the court concluded that plaintiffs had alleged only that

23   they were consumers in secondary markets (e.g., computer markets) incidental to the market for DRAM

24   itself.  *Id.*  The court rejected defendants' argument that the relevant market was determined by the

25   product's "interchangeability of use or cross-elasticity."  *Id.* at 1137-38. The Court acknowledged that

26   whether plaintiffs are "consumers or competitors" in the market was also not determinative: "the fact

27

28   _____

[7] Defendants did not move to dismiss those claims by plaintiffs who purchased free-standing DRAM modules as direct purchasers.

that they are neither consumers nor competitors in the market for DRAM poses no bar to a finding of antitrust injury." The Court reasoned that a plaintiff suffers antitrust injury when a plaintiff is the direct victim of the conspiracy, and thus, a target of the conspiracy. *DRAM*, 536 F.Supp.2d at 1139-1140. An "antitrust injury can be satisfied when a plaintiff is the direct victim of a conspiracy, or the actual means by which the defendants' allegedly anticompetitive conduct is carried out." *DRAM*, 536 F.Supp.2d at 1139-1140, citing *Blue Shield v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) and *Ostrofe v. H.S. Crocker Co.*, 740 F.2d 739, 745-46 (9th Cir.1984).) The Court found that plaintiffs lacked standing. The Court held that the plaintiffs purchasing computers which contained DRAMs were not in the same market as defendant DRAM manufacturers because they were neither consumers nor competitors in the restrained market, and did not have a direct relationship with, or are the direct victims of, the alleged conspiracy.

A similar case, *In re TFT-LCD (Flat Panel) Antitrust Litigation*, 586 F.Supp.2d 1109 (N.D.Cal. 2008), held the opposite. In *TFT-LCD*, indirect purchasers brought §16 injunctive relief class action against manufacturers, sellers, and distributors of thin film transistor liquid crystal display (TFT-LCD) panels and products. *Id.* at 1114. Defendants argued that plaintiffs lack standing because they were not participants in the allegedly restrained markets for TFT-LCD panels, and instead only participated in the markets for finished products (computers) containing TFT-LCD panels. Plaintiffs argued that TFT-LCD panels are "identifiable, discrete physical objects that do not change form or become an indistinguishable part of the TVs, computer monitors, laptops, or other products in which they are contained." 586 F.Supp.2d at 1123. The Court found plaintiffs' allegations sufficient where they alleged that the market for LCD panels and the market for the products into which the panels are placed are "inextricably linked and intertwined," and as a result, the demand for LCD panels directly derives from the demand for such products. Thus, the product provided the same functionality in all markets. The Court held that the allegations "slightly favored standing" notwithstanding that "the indirect plaintiffs may not participate in the relevant market." *Id.; Accord In re Flash Memory Antitrust Litigation*, 643 F.Supp.2d 1133, 1154 (N.D.Cal. 2009) (regardless of how the product is sold, the product provides essentially the same functionality).

Component part plaintiffs may participate in the "relevant market" if the markets are "linked"

or the product's functionality is the same in both markets. *See DRAM* and *TFT-LCD* (Flat Panel)

*Antitrust Litigation*, 586 F.Supp.2d 1109. Otherwise, a plaintiff needs to allege they are consumers or

competitors in the restrained market, or had a direct relationship with, or are the direct victims of, the

alleged conspiracy.

The FAC is unclear whether the Tin-Mill Products is the same relevant market as tin cans.

Plaintiff alleges that "Can Makers, such as Silgan, purchase Tin Mill Products for resale as tin-plate

cans." (Doc. 216, FAC ¶37.)  Plaintiff has failed to allege that "relevant market" because plaintiff must

allege that the markets are "linked" or the product, as sold, provides essentially the same functionality

throughout the distributions channel.   Plaintiff must allege that it is in the same relevant market as the

defendants.

### 2.        Statute of Limitations

Defendants contend that all of plaintiff's antitrust claims, state and federal (claims 1, 2, 3, and

4), are barred by the four year statute of limitations. Defendants argue that at the heart of plaintiff's

federal and state claims is the creation of UPI.  Plaintiff alleges that the agreement between U.S.Steel

and POSCO in 1986 to form UPI constituted an unlawful market allocation agreement and a conspiracy

to monopolize. (Doc. 216, FAC ¶¶4-8, 10, 59-74, 123.)  Defendants argue that the controlling event for

statute of limitations purposes is the date when UPI was formed.  (Joint Motion P&A p. 9.)  Defendants

argue that plaintiff has not alleged "ongoing" activity - plaintiff alleges that defendant had monopoly

power with the formation of UPI in 1986, but did not exercise that power until after UPI's competitor

stopped offering competitive prices 22 years later in 2008.  (Joint Motion P&A p.10 citing FAC §§14,

105-112.)

Plaintiff argues that the it was not harmed until UPI raised the prices in 2008.  Plaintiff argues

that the claims accrued when plaintiff was injured, which is when UPI raised its prices to

supracompetitive levels.

The statute of limitations under both the Sherman Act, and state law, the Cartwright Act, is four

years.  "Any action . . . shall be forever barred unless commenced within four years after the cause of

action has accrued."  15 U.S.C. §15b; Cal.Bus.& Prof. Code §17208 (four years).  Generally, a cause

of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's

business. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338, 91 S.Ct. 795, 806 (1971). Where the allege antitrust injury is caused by a single act, the statute of limitation begins to run at the time the injurious act was committed, even if the act inflicts injury over a prolonged period of time. *Zenith Radio*, 401 U.S. at 338 (the statute of limitations runs from the commission of the injurious act rather than from the recognition of the resulting injury).  "[P]rivate civil antitrust actions are founded, not upon the mere existence of a conspiracy, but upon injuries which result from the commission of forbidden 'overt acts' by the conspirators." *Suckow Borax Mines Consolidated v. Borax Consolidated*, 185 F.2d 196, 208 (9th Cir. 1951), *cert. denied*, 340 U.S. 943 (1951).

(A)    The Injury of Forming UPI

In plaintiff's §1 claim, plaintiff challenges the horizontal market allocation agreement which resulted from the formation of UPI. (Doc. 216, FAC ¶123.) Plaintiff alleges that U.S. Steel and POSCO formed UPI by agreement to exit the Tin Mill Products market.  Plaintiff alleges that the exit was unreasonable in light of the constricted market in Tin Mill Products which was reduced by making one producer, UPI, out of two former competitors, U.S. Steel and POSCO.  In its §2 claim, plaintiff challenges the conspiracy to monopolize the Tin Mill Products by forming UPI. (Doc. 216, FAC ¶135.) Plaintiff alleges that U.S. Steel and POSCO agreed to leave the Tin Mill Products when U.S. Steel and POSCO created UPI.  Plaintiff alleges that once UPI was formed, U.S. Steel and POSCO exited the Tin Mill Products market and competition was lessened by half.  (Doc. 216, FAC ¶70-72.)  Plaintiff alleges that the "formation and operation of UPI was and is not a legitimate procompetitive joint venture but instead was and is a pretext and sham for U.S. Steel and POSCO to avoid competing with each other." (Doc. 216, FAC ¶73.)  Thus, this conduct is alleged to be both horizontal market allocation and conspiracy to monopolize.

Competitors who divide territories of customers among themselves are considered to have no purpose other than to eliminate competition. *U.S. v. Topco Assocs. Inc*, 405 U.S. 596, 608, 92 S.Ct. 1126 (1972).  Generally, all horizontal market allocations have been held *per se* illegal.  *Topco Assoc.*, 405 U.S. at 609; *U.S. v. Sealy, Inc.*, 388 U.S. 350 (1967).  The essence of a market allocation violation is that the competitors apportion the market among themselves and cease competing in another's territory or for another's customers. *Mid-West Storage, Inc. v. Porter*, 717 F.2d 493 (10th Cir. 1983).  Thus, the very

1   nature of a horizontal market allocation is a restraint on competition, and therefore injurious to those

2   who participate in that market.  *Les Shockley Racing, Inc. v. National Hot Rod Ass'n*, 884 F.2d 504, 508

3   (9th Cir. 1989) (§1 claimants must plead and prove a reduction of competition in the market in general

4   and not mere injury to their own positions as competitors in the market).

5          Likewise, plaintiff's §2 claim is based upon market injury. *See generally Freeman v. San Diego*

6   *Ass'n of Realtors*, 322 F.3d 1133, 1154 (9th Cir. 2003) (In a conspiracy to monopolize, plaintiff must

7   show intent to monopolize and anticompetitive acts designed to harm the market), *cert. denied* 540 U.s.

8   940 (2003).  Indeed, the Supreme Court has maintained a long and consistent adherence to the principle

9   that the antitrust laws protect the process of competition, and not the pursuits of any particular

10  competitor.  *Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701

11  (1977).  Antitrust laws focus on protecting the competitive process and not on the success or failure of

12  individual competitors. *See, e.g.*, *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458, 113 S.Ct. 884

13  (1993) ("The purpose of the [Sherman] Act is not to protect businesses from the working of the market;

14  it is to protect the public from the failure of the market. The law directs itself not against conduct which

15  is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself.")

16         Here, the act which harmed plaintiff was the formation of UPI and the conspiracy to monopolize

17  the Tin Mill Products market.  Market competition, the relevant Tin Mill Market, and correspondently,

18  plaintiff were injured by the formation of UPI.  The complaint alleges that competition and plaintiff's

19  interests were harmed when the market participants exited the market. The market was harmed and

20  competition suffered when UPI was formed.  Thus, for challenging the formation and maintenance of

21  UPI, the four year statute of limitations began to run upon completion of UPI's formation.[8]

22                  (B)     Act Injurious to Plaintiff's Business

23         Plaintiff argues that the statute of limitations began when it was damaged by the "agreement,

24  contract, or combination" in 2008 when the prices where raised.  Plaintiff argues that each sale to

25  plaintiff starts anew the limitations period.  Plaintiff argues that the statute of limitations does not begin

26  to run until "an act that injures a plaintiff's business" occurs. (Doc. 219, Opposition p.20.)  Plaintiff

27

28         [8] This is not to say that plaintiff may not challenge subsequent acts by UPI which violate antitrust laws, such as the alleged price fixing.

1   argues that the injury occurred in 2008 when defendants acquired monopoly power  and when their

2   pricing of tin plate steel drove out the East Coast competitors.  (Doc 219, Opposition p.21 n.16.)

3         Defendant argues that the "controlling event for statute of limitations purposes is the date when

4   UPI was formed." (Doc. 218, Joint Motion p.9.)  Defendants argue that the formation, and alleged

5   benefits defendants derived from the formation, do not continue the violation because the harm arises

6   from the formation, which was decades prior.  (Doc. 218, Joint Motion p.9.)

7         Plaintiff counters that the statute has not run citing *In re Multidistrict Vehicle Air Pollution*  591

8   F.2d 68, 71 (9th Cir. 1979), *cert. denied*, 444 U.S. 900 (1979).  Plaintiff states that a claim for damages

9   under the antitrust laws is not barred simply because the conspiracy was formed outside the limitations

10  period.  (Doc. 219, Opposition p. 20.)  However, that "act" challenged in *Vehicle Air Pollution* is

11  dissimilar to the act challenged by plaintiff.  In *Vehicle Air Pollution,* the Ninth Circuit held that the

12  statute of limitations barred the action because the last overt act occurred years before the plaintiff filed

13  suit.  Defendants had combined to act cooperatively to study and remedy problems generated by

14  emissions from internal combustion engines.  Plaintiff filed suit in 1970 against several auto

15  corporations and their trade association which, in 1964, had rejected plaintiff's product. The court held

16  that the statute of limitations had run because the manufacturers' rejection of plaintiff's product in 1964

17  was "irrevocable, immutable, permanent and final" when it excluded plaintiff from the market. *Id.* at 72.

18  The injury was complete at that time. Unlike the plaintiff here, the plaintiff in *Vehicle Air Pollution*  did

19  not challenge the defendants' "formation and maintenance" of their agreement to act cooperatively.

20        Plaintiff argues that in *American Needle, Inc. v. National Football League*, - U.S. -, 130 S.Ct.

21  2201, 2010 WL 2025207 (2010), the Supreme Court did not bar the claims "though the NFL as formed

22  nearly a century ago and [NFL Properties] was formed in 1963."  (Doc. 219, Opposition p. 13 n.7.)

23  Again, the claims in *American Needle* are dissimilar to the claim plaintiff makes in the FAC.   In

24  *American Needle*, the plaintiff did not allege that NFL Properties was formed as a conspiracy.  Rather,

25  the plaintiff in *American Needle* challenged an exclusive licensing agreement entered into by NFL

26  Properties executed in 2000 and filed suit on that licensing agreement in 2004.

27        Here, plaintiff challenges the creation of UPI in 1986 as a restraint of trade and as a conspiracy

28

to monopolize.[9]  Plaintiff alleges that the mere formation of UPI unreasonably restrained competition in the Tin Mill Products market because two fierce competitors, U. S. Steel and POSCO, now formed into one jointly operated enterprise.  The FAC alleges that "UPI's rose to monopoly power began with an unlawful conspiracy to allocate territorial marks during the mid-1980s . . ." (Doc. 116, Sealed Complaint ¶4.)  And that "in late 1985 U.S. Steel reached an agreement with POSCO that immediately terminated all competition in the Western United States between them." (Doc. 116, Sealed Complaint ¶7.)  Plaintiff alleges that U.S. Steel and POSAM ceased competing with each other in the relevant market and operated through the newly formed UPI in 1986.  (Doc. 116, Sealed Complaint ¶8, 59-60.)  Implicit in plaintiff's allegations is that it was damaged by UPI's dominant position in the market and the exit of two competitors.

Plaintiff argues that the continuing violations doctrine saves its claims.  Each time it purchased Tin Mill Products, it was injured.  "A continuing violation is one in which the plaintiff's interests are repeatedly invaded and a cause of action arises each time the plaintiff is injured." *Pace Industries, Inc. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir.1987).  When a continuing violation exists, the limitations period runs from the "last overt act" by the defendant, which must be (1) a new and independent act that is not merely a reaffirmation of a previous decision that (2) inflicts "new and accumulating" injury on the plaintiff. *Id.* at 238.  "New and independent acts" may include active enforcement of policies first put into place outside the limitations period.  *Columbia Steel Casting Co. v. Portland General Elec. Co.*, 111 F.3d 1427 (9th Cir.1996), *cert. denied*, 523 U.S. 1112 (1996).

The acts of purchasing the defendants' products over 22 years is not a "continuing act" for purposes of restarting the statute of limitations.  Continual purchasing of the products is merely an affirmation of  defendants' prior conduct and does not inflict a "new and accumulating" injury on plaintiff. *Aurora Enter. v. NBC*, 688 F.2d 689, 694 (9th Cir.1982) ("[T]hat defendants receive a benefit today as a result of a[n anticompetitive] contract executed in 1966 ... is not enough to restart the statute of limitations.").  Plaintiff does not allege a series of illegal acts, as they relate to the formation of UPI.

This case is more like *Vehicle Air Pollution.*  The formation of UPI was a "irrevocable,

---

[9] As explained, *infra*, plaintiff has dropped and does not argue that it has any other §2 claim, such as a claim for "monopolization" or for "attempted monopolization."

immutable, permanent and final" decision in 1986. *Vehicle Air Pollution*, 591 F.2d at 72. The market was allocated at that time. The competitors were joined at that time. The competition was eliminated at that time. *See Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299, 1301 (9th Cir.1986) (where the act outside the limitations period operates to exclude a plaintiff from the market completely and permanently, subsequent acts within the period do not operate to restart the clock), *cert. denied,* 479 U.S. 886 (1986). Thus, the injury was complete at that time.

No matter how plaintiff argues its allegation on this point, plaintiff undoubtedly challenges UPI's formation as a restraint of trade and a conspiracy. It is this restraint of trade that plaintiff alleges was unlawful and harmed competition. That plaintiff also alleges additional, later restraints of trade, does not alter that statute of limitations has run on the formation and maintenance of UPI. That allegedly illegal act occurred but one, single time, in 1986. The four year statute of limitations bars a challenge to that conduct.

<div align="center">(C)     Remaining Conduct</div>

In plaintiff's §1 claim and §2 claim, plaintiff alleges additional wrongful conduct: (1) fix prices for Tin Mill Products in the relevant market (2) fix prices of the hot band steel that is sold to UPI, (3) fix the prices of Tin Mill Products that Silgan purchases from UPI. (Doc. 219, FAC ¶123, 135.) Defendants do not challenge, specifically, these allegations on statute of limitations grounds. Defendants argue that all of plaintiff's §1 and §2 claims should be dismissed because they are based on the formation of UPI which is time-barred. Defendants argue that the controlling event for all statute of limitations purposes is "the date when UPI was formed." (Doc. 218 Joint Moving papers p.9-10; Doc. 217, UPI Moving papers p. 10.)

Here, plaintiff alleges that this conduct occurred in 2008, when competitors left the market due to freight equalization prices. The parties have not fully addressed the statute of limitations as it regards this alleged conduct. Accordingly, for purposes this motion only, the Court will deny the motion without prejudice on the statute of limitations.

**3.     Challenge to the FAC under *Twombly***

Defendant argues that the allegations are not factually specific as to the alleged conspiracy and that the allegations of conspiracy are ambiguous.

<div align="center">25</div>

1    The Court agrees with UPI's statement that the allegations of conspiracy are ambiguous.  (See

2 Doc. 217, UPI Moving papers p.6 n.2.)  The allegations as to the wrongful conduct of each of the

3 defendants are factually insufficient. The Court agrees that combining four distinct alleged conspiracies

4 in a single count without specifying who is a party to each is ambiguous and unclear.  Plaintiff alleges:

5           "Defendants and their co-conspirators …illegally agree[d] to: (I) create
            and maintain horizontal market allocation agreements whereby U.S. Steel
6           and POSCO agree to exit the Relevant Market in exchange for 50 percent
            of UPI's ill-gotten monopoly profits; (ii) fix the prices for Tin-Mill
7           Products in the Relevant Market; (iii) fix the prices of the hot-band steel
            that each sells to UPI and from which UPI produces the Tin Mill
8           Products; and (iv) fix the prices of the tin-plate cans that Silgan sells to
            Stanislaus." (Doc. 216, FAC ¶123, and comparable allegation in ¶135.)

9

10 Plaintiff has not set out which defendant is alleged to have done what wrongful conduct.  For instance,

11 plaintiff alleges that UPI is in an alleged conspiracy to "fix the prices of hot-band steel that each sells

12 to UPI."  It is unclear whether plaintiff truly means that UPI, as the buyer of hot band steel, is an alleged

13 conspiracy to sell itself hot band steel. (See Doc. 216, FAC ¶123.)  The allegations fail to identify the

14 conduct by each of the defendants for which plaintiff seeks to hold them liable.  The allegations do not

15 identify what defendant did what, and fail to identify the wrongful conduct by each defendant.

16    Fed.R.Civ.P. 8(a)(2) requires a complaint to contain "a short plain statement of the claim

17 showing that the pleader is entitled to relief."  To comply with Fed.R.Civ.P. 8(a)(2), a plaintiff "must

18 plead a short and plain statement of the elements of his or her claim, identifying the transactions or

19 occurrence giving rise to the claim and the elements of the prima facie case."  *Bautista v. Los Angeles

20 County*, 216 F.3d 837, 840 (9th Cir. 2000).  Although Fed.R.Civ.P. 8 "encourages brevity, the complaint

21 must say enough to give the defendant 'fair notice of what the plaintiff's claim is and the grounds upon

22 which it rests.'"  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S.Ct. 2499, 2507 (2007)

23 (quoting *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 346, 125 S.Ct. 1627 (2005)).  *See

24 Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1948-49 ("Plaintiff's amended complaint should be brief, Fed.R.Civ.P.

25 8(a), but must state what each named defendant did that led to the deprivation of Plaintiff's constitutional

26 or other federal rights").

27    The allegations in the FAC are anything but brief, as required under Rule 8.  The FAC is over

28 40 pages in 171 paragraphs.  Regardless of the length, the allegations are insufficient because they do

not give defendants fair notice of their specific wrongful conduct.  Accordingly, leave to amend will be granted.  It is highly encouraged that plaintiff identify each conspiracy separately, the specific conduct alleged to be violative of the antitrust laws, and the alleged co-conspirator for each conspiracy.

Next, defendants argue that the FAC should be dismissed as "implausible" under *Twombly*. Defendants argue that it is not "plausible" that UPI was formed as a monopoly in 1986, only to cause injury to plaintiff twenty-two (22) years later in 2008.  (Doc. 217, UPI Moving papers, p. 21; Doc. 221, Reply p.4.)  Defendant argues that it is implausible that a monopoly formed in the distant past, only to wait to exercise its monopoly power years later.

In light of the Court's ruling on the statute of limitations, the Court does not address defendants' "UPI formation plausibility" argument.

**D.      Plaintiff's Claims under Section 1 of the Sherman Act**

As stated above, plaintiff alleges four acts which are in violation of §1:

(1)     create and maintain horizontal market allocation agreement whereby U.S. Steel and POSCO agree to exit the Relevant Market in exchange for 50 percent of UPI's monopoly profits,

(2)     fix prices for Tin Mill Products in the Relevant Market;

(3)     fix the prices of the hot-band steel that each sells to UPI and from which UPI produces Tin Mill products, and

(4)     fix the prices of the Tin Mill products that Silgan purchases from UPI and the prices of tin-plate cans that Silgan sells to Stanislaus.

Section 1 of the Sherman Act prohibits "[e]very contract, combination...or conspiracy in restraint of trade or commerce among the several States." 15 U.S.C. §1.  To state a claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, claimants must plead not just ultimate facts (such as a conspiracy), but evidentiary facts which, if true, will prove: (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce, (3) which actually injures competition. *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir.2008).

/////

27

1      **1.      Count I Dismissal under *Copperweld***

2      Defendants argue that the §1 claim must fail because a joint venture, such as UPI, and its parent

3  corporations constitute a single entity under antitrust law, and therefore, are incapable of conspiring.

4  *Copperweld Co. v. Independence Tube Co.*, 467 U.S. 752, 769 (1984).

5          "Section 1, like the tango, requires multiplicity: A company cannot conspire with itself."

6  *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d at 1147 (citing *Copperweld Co. v. Independence Tube*

7  *Co.*, 467 U.S. 752, 769 (1984)).  The requirement of concerted conduct is based on the fact that the focus

8  of a Section 1 violation is the existence of an agreement that brings together the economic power of

9  actors who were previously pursuing divergent goals.  *Copperweld,* 467 U.S. at 769.  "If two erstwhile

10  competitors combine to become a single economic entity–by merger or acquisition, for example–the act

11  of combination may violate the antitrust laws, but their subsequent relations are generally immune from

12  section 1." *Id.*[10]  The existence of more than one entity sufficient to conspire is a required element in a

13  § 1 violation. *Jack Russell Terrier Network of Northern Ca. v. American Kennel Club, Inc.*, 407 F.3d

14  1027, 1034 (9th Cir. 2005).

15          (A)      "Economically Integrated Joint Venture" under *Copperweld* and its Progeny

16      In *Copperweld*, the Supreme Court ruled that a parent corporation and its wholly owned

17  subsidiary, or a corporation and its unincorporated division, cannot "conspire" for Section 1 purposes.

18  *Id*.  The Court reasoned that to do so would "treat[] as the concerted activity of two entities what is really

19  unilateral behavior flowing from decisions of a single entity." *Id*. at 766-67.  "Because coordination

20  between a corporation and its division does not represent a sudden joining of two independent sources

21  of economic power previously pursuing separate interests, it is not activity that warrants §1 scrutiny."

22  *Id*. at 771.  As to a parent corporation and its wholly owned subsidiary, "[t]heir objectives are common,

23  not disparate; their general corporate actions are guided or determined not by two separate corporate

24  consciousness, but one....If a parent and a wholly owned subsidiary do 'agree' to a course of action, there

25  is no sudden joining of economic resources that had previously served different interests, and there is

26  no justification for §1 scrutiny." *Id*.

27

28      [10] Their subsequent actions may *not* be immune from 15 U.S.C. §2, as discussed more fully below.

The single-entity rule set forth in *Copperweld* extends beyond the parent-subsidiary relationship:

> It applies to a company and its officers, employees and wholly owned subsidiaries. It also applies to subsidiaries controlled by a common parent, firms owned by the same person, and a firm owned by a subset of the owners of another. It applies to principal-agent relationships, and to partnerships or other joint arrangements in which persons who would other-wise be competitors pool their capital and share the risks of loss as well as the opportunities for profit. The theme in these cases is economic unity. Where there is substantial common ownership, a fiduciary obligation to act for another entity's economic benefit or an agreement to divide profits and losses, individual firms function as an economic unit and are generally treated as a single entity.

*Freeman*, 322 F.3d at 1147-48 (citations omitted).

Apart from economic unity, courts consider whether the entities compete to determine application of Section 1. For example, in *Williams v. I.B. Fischer Nevada*, 999 F.2d 445 (9th Cir. 1993), the Ninth Circuit determined that a franchisor and its franchisees are a single entity for Section 1 purposes, because the inherent nature of the relationship between franchisor and its franchisees is a "non-competitive environment." On the other hand, in *Los Angeles Memorial Coliseum*, 726 F.2d 1381 (9th Cir. 1984), *cert. denied*, 469 U.S. 990 (1984), the Ninth Circuit held that the teams of the NFL are not a single entity, because the "member clubs are all independently owned...the profits and losses are not shared...and the NFL clubs do compete with one another off the field as well as on to acquire players, coaches, and management personnel." *Id*. at 1389-90.

Defendants argue that the price-fixing decisions, between UPI and its corporate partners, are consistent with the operation of a lawful joint venture. Defendants argue that UPI, a joint venture, must have flexibility to set the prices for the products it sells. Defendants argue that plaintiff's allegations of horizontal price fixing for UPI's Tin Mill Products cannot support a §1 claim because it is not actionable for business partners, U.S. Steel and POSCO, to meet and discuss prices for the partnership's products. (Doc. 218, Joint Moving papers p.17.) In contrast, plaintiff alleges that these price fixing decision between UPI and U.S. Steel and POSCO are "restraint on trade."

*Texaco Inc. v. Dagher*, 547 U.S. 1, 5-7 (2006) extended *Copperweld* to joint ventures. *Dagher* held that price fixing agreements between members of "an economically integrated joint venture" is not a "per se" violation of the antitrust laws. *See Texaco Inc. v. Dagher*, 547 U.S. 1, 5-7, 126 S.Ct. 1276, 164 L.Ed.2d 1 (2006) (noting that a *per se* claim and a "rule of reason" claim are distinct). *Dagher* involved a joint venture between Texaco and Shell to refine and sell gasoline. The joint venture

29

continued to use the two original brand names for the gasoline, but it also set a single price for both brands. The Supreme Court reversed a Ninth Circuit decision which had held it is *per se* illegal under Section 1 for an economically integrated joint venture to set the prices for its products.

> When persons who would otherwise be competitors pool their capital and share the risks of loss as well as the opportunities for profit ... such joint ventures [are] regarded as a single firm competing with other sellers in the market. As such, though [the joint venture's] pricing policy may be price fixing in a literal sense, it is not price fixing in the antitrust sense (citations omitted)… As a single entity, a joint venture, like any other firm, must have the discretion to determine the prices of the products that it sells..." *Dagher*, 547 U.S. at 5.

The Court held that the joint venture price fixing was not a violation of §1. The Court stated that the challenged pricing policy "amounts to little more than price setting by a single entity-albeit within the context of a joint venture-and not a pricing agreement between competing entities with respect to their competing products." *Id.* at 5-6.

In *Freeman v. San Diego Association of Realtors*, 322 F.3d 1133 (9th Cir.2003), the court noted that "[w]here there is substantial common ownership, a fiduciary obligation to act for another entity's economic benefit or an agreement to divide profits and losses, individual firms function as an economic unit and are generally treated as a single entity" under the antitrust statutes. *Id.* at 1148.

Thus, controlling authority holds that an economically integrated joint venture is a "single entity" under *Copperweld* which is incapable of "conspiring" for purposes of the Sherman Act.

### (B)      Allegations of Economic Unity

Here, plaintiff alleges several factors that show economic unity between UPI and its partners and their parent corporations. Plaintiff alleges joint ownership: that UPI is comprised of its joint venture partners, Pitcal and POSCAL, and the parent corporations of its joint venture partners, U.S. Steel and POSCO. Plaintiff alleges that both Pitcal and POSCAL each own 50% of UPI, as their only business enterprise. (Doc. 216, FAC ¶25, 27.) Both partners are wholly owned subsidiaries. Indeed, Pitcal is a wholly owned subsidiary of U.S. Steel. (Doc. 216, FAC ¶25.) POSCAL is a wholly owned subsidiary of POSCO. (Doc. 216, FAC ¶25.) Thus, there is common ownership.

Plaintiff also alleges common control. Plaintiff alleges that while Pitcal and POSCAL are nominal partners, all business decisions regarding UPI are made by U.S. Steel and POSCO. (Doc. 216,

FAC ¶29.) Plaintiff alleges that U.S. Steel and POSCO jointly created, and jointly funded UPI. Plaintiff alleges that both parent corporations funded UPI through either the contribution of operating facilities, capital or both. (Doc. 216, FAC ¶61, 63.) Plaintiff alleges that U.S. Steel and POSCO have "joint control over all aspects of UPI's operations." (Doc. 216, FAC ¶62.) A wide variety of UPI's operating assets and books and records are under "the joint control of U.S. Steel and POSCO." (Doc. 216, FAC ¶64.) Thus, plaintiff alleges that U.S. Steel and POSCO jointly operate UPI.[11]

Plaintiff alleges the members divide profits. Plaintiff alleges each has contributed to the capitalization of UPI and that each joint venturer shares in 50% of the profits of UPI. (Doc. 216, FAC ¶72.) Thus, from the allegations of the FAC, numerous factors weigh in favor of finding an economic unity between the defendants. *See Perinatal Medical Group, Inc. v. Children's Hosp. Cent*., 2009 WL 3756367 (E.D.Cal. 2009) (complaint dismissed where plaintiff failed to allege defendants were "separate entities pursuing different economic goals").

(C)     Independent Management/Separate Decision Making

Plaintiff argues that *Copperweld* has been rejected by *American Needle, Inc. v. National Football League*, - U.S. -, 130 S.Ct. 2201, 2010 WL 2025207 (2010). Plaintiff argues that its allegations are similar to *American Needle* because both U.S. Steel and POSCO are independently managed public corporations with separate centers of decision making.

In *American Needle*, the Court stated that to determine whether alleged conspirators are capable of "concerted action," the court looks to a "functional consideration of how they actually operate." In *American Needle,* the National Football League formed an organization, NFLP, to develop, license and market NFL intellectual property. NFLP had granted nonexclusive licenses to a number of vendors to manufacture and sell apparel with team insignias. Plaintiff was one such vendor. Later, the teams voted to allow NFLP to grant exclusive licenses to Reebok, thereby shutting out plaintiff. Plaintiff sued for antitrust violations. In determining whether there was concerted action under § 1, the Supreme Court looked at how the parties involved in the alleged anticompetitive conduct actually operate. The Court

---

[11] Plaintiff alleges that both U.S. Steel and POSCO had separate facilities which could have produced Tin Mill Produce, but which did not, because U.S. Steel and POSCO agreed to combine to form UPI and to exit the market. (Doc. 216, FAC ¶67.)

reaffirmed its prior *Copperweld* position that an agreement between a parent corporation and its wholly owned subsidiary is joint conduct which does not deprive the marketplace of independent centers of decision making which would restrain trade. *American Needle*, 130 S.Ct at 2211. A parent corporation and its wholly owned subsidiary control a single aggregation of economic power. Therefore, joint conduct by two such entities does not deprive the marketplace of independent centers of decision making. The Court focused the inquiry for a §1 violation on whether the violative agreement joins together independent centers of decision making or economic power previously pursuing separate interests. "The relevant inquiry, therefore, is whether there is a 'contract, combination ... or conspiracy' amongst separate economic actors pursuing separate economic interests, such that the agreement deprives the marketplace of independent centers of decision making, and therefore of diversity of entrepreneurial interests, and thus of actual or potential competition." *Id.*

Turning to the facts of the case, the *American Needle* Court noted that the NFL teams do not possess either "the unitary decision-making quality or the single aggregation of economic power characteristic of independent action." *Id.* at 2212. Each of the teams is a substantial, independently owned, and independently managed business. The teams compete with one another, not only on the playing field, but to attract fans, for gate receipts and for contracts with managerial and playing personnel. The teams were not acting for the "common interest of the whole league" but "instead pursuing interest of each corporation itself." *American Needle*, 130 S.Ct at 2213. The Court held that the licensing activities for individual teams' intellectual property constituted concerted action that is not categorically beyond the coverage of § 1 of the Sherman Act, 15 U.S.C.A. § 1. Dispositive for the Court was that the individual teams were competitors in every other respect, and including the licensing of the teams' intellectual property. 130 S.Ct at 2213.

(D)     Conflicting Allegations

Here, plaintiff's opposition papers state one thing while plaintiff's allegations state another. Plaintiff's opposition papers state that U.S. Steel and POSCO both independently manufacture Tin Mill Products and but for their agreement to the contrary are potential competitors in the Western U.S. (Doc. 219, Opposition p. 14 citing, FAC 52-79, 93-121.) Plaintiff argues that U.S. Steel and POSCO are separate corporations that manufacture and sell Tin Mill Products at independently owned facilities and

1    are independent decision makers.  (Doc. 219, Opposition p.14 citing FAC 30, 34, 65-67.)

2        The allegations in the FAC do not support that independent decision makers conspired to fix

3    prices.  In fact, the allegations are internally inconsistent with plaintiff's argument.  For instance,

4    plaintiff alleges that U.S. Steel and POSCO formed UPI to "avoid competing with each other" in the Tin

5    Mill Products.  (Doc. 216, ¶73.)  They have a "shared economic interest," albeit to exact monopoly

6    prices for Tin Mill Products.  (Doc. 216, FAC ¶71.)  They acted in cooperation for pricing until other

7    competitors exited the Tin Mill Products market due to freight line pricing.  Thus, the allegations show

8    that the defendants were in fact acting in concert for the joint venture.  Plaintiff does not allege that the

9    defendants compete with one another or were acting on interests separate from the joint venture.  There

10   are no allegations that defendants are "independent centers of decision making," as it pertain to the

11   alleged wrongful conduct, which permit concerted conduct under the *American Needle* functional

12   evaluation.  *American Needle, Inc. v. National Football League*, 130 S.Ct. at 2215 ("Agreements made

13   within a firm can constitute concerted action covered by § 1 when the parties to the agreement act on

14   interests separate from those of the firm itself.")

15                    (E)      "Rule of Reason" or "Per Se" Violation

16       Joint ventures are evaluated under the rule of reason.  *American Needle*, 130 S.Ct at 2216-17;

17   *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 99 S. Ct. 1551, 60 L. Ed. 2d

18   1 (1979) (efficiency-enhancing cooperation between horizontal competitors evaluated under the rule of

19   reason, although it inherently involved some horizontal price-fixing).

20       Plaintiff argues that the rule of reason should not apply because plaintiff challenges the legality

21   of UPI's "initial formation" and "has alleged facts from which a jury could conclude that U.S. Steel and

22   POSCO created UPI as an illegal joint venture."  (Doc. 219, Opposition p.23.)

23       Plaintiff has failed to allege factual support that the "initial formation" of UPI violated either the

24   rule of reason or was *per se* violation.[12]  The Court agrees with defendants's motion that merely labeling

25   _____

26       [12] This argument is largely moot in light of the Court's ruling on the statute of limitations.  The Court addresses the
     argument in light of plaintiff's other allegations of restraint of trade by the joint venture.  The *Dagher* Court held that the rule
27   of reason presumptively applied with *per se* liability reserved only for those agreements that were plainly anticompetitive.
     For a rule of reason claim, "the finder of fact must decide whether the questioned practice imposes an unreasonable restraint
28   on competition, taking into account a variety of factors, including specific information about the relevant business, its

UPI as a "sham" or "pretextual" organization does not factually support that it was per se violation. Plaintiff's allegations are replete with facts that UPI was formed and operated for legitimate business purposes. (Strong competition from POSCO in the 1980s, deteriorating market share as a result, etc.) From plaintiff's own allegations, it is alleged that after formation, UPI legitimately operated and competed with other Tin Mill Manufacturers without antitrust implications. UPI was formed and operated with adequate funding, facilities and capacity to produce Tin Mill Products in a competitive market for two decades. Plaintiff has not alleged UPI, or its joint venturers, engaged in anticompetitive conduct during the time from 1986 until 2008. Thus, plaintiff has not alleged that UPI was *per se* illegal, as it contends in its opposition.

Further, plaintiff has not alleged factual support that, under the rule of reason, UPI operated to unreasonably restrain trade. Plaintiff must allege that it operated to produce anticompetitive effects.[13] Plaintiff alleges that the competitors in Tin Mill Products exited the market for reasons unrelated to UPI's conduct - due to freight equalization. Plaintiff does not allege that the operation of UPI resulted in the competitors exiting the market. Only when the competitors independently exited, did UPI raise prices. *See Mularkey v. Holsum Bakery, Inc.*, 146 F.3d 1064, 1065 (9th Cir.1998) (unilateral conduct in fixing prices is not a violation of §1); *Sicor Ltd v. Cetus Corp.*, 51 F.3d 848, 854 (9th Cir. 1995) (Plaintiff must show injury to competition, not just injury to plaintiff's business), *cert. denied*, 516 U.S. 861 (1995); *Crowley v. Braen Indus.* 613 F.2d 751 (9th Cir. 1980) (restraints improved market efficiency and had no detrimental effect on competition), *cert. denied*, 446 U.S. 965 (1980); *Bhan v. NME Hosp., Inc.*, 929 F.2d 1404, 1413 (9th Cir.1991) (rule of reason requires the fact-finder to examine the anti-competitive effects of the defendant's challenged practice to determine whether the practice is unreasonable), *cert. denied*, 502 U.S. 994 (1991). Plaintiff fails to allege that anticompetitive effect from operation of UPI.

---

condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *State Oil Co. v. Khan,* 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997).

[13] Plaintiff argues if it failed to allege anticompetitive conduct which violates antitrust law, plaintiff alleged defendants violation of tax and environmental laws as anticompetitive conduct. (Doc. 219, Opposition p. 29.) The allegations that the restraint of trade, or monopoly power, resulted from violations of tax or environmental laws are conclusory and vague and do not tie the conduct to anticompetitive effects.

1          **2.       Vertical Price Fixing Conspiracy with Non-Defendant Silgan**

2          Plaintiff also alleges a price fixing conspiracy between UPI and Silgan in violation of §1.

3    Plaintiff alleges that UPI and Silgan entered into an agreement, and the result of which was

4    supracompetitive prices for Tin Mill Products sold by UPI to Silgan and supracompetitive prices for tin-

5    plate cans ultimately sold to plaintiff.  (Doc. 219, Opposition p.30:12-19.)

6          Defendants argue that there can not be a vertical price fixing between UPI and Silgan because

7    Silgan is not a reseller of the product sold by UPI.  Rather, Silgan is a purchaser of raw materials, which

8    Silgan manufactures into products, such as tin cans. The tin cans are then purchased by plaintiff.

9          Section 1 prohibits price-fixing arrangements between two or more actors. Four types of

10   price-fixing arrangements are generally recognized: horizontal minimum price-fixing, horizontal

11   maximum price-fixing, vertical minimum price-fixing, and vertical maximum price-fixing. *Knevelbaard*

12   *Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir.2000).  Vertical price fixing is resale prices

13   imposed by a manufacturer on its distributors.  *Knevelbaard Dairies*, 232 F.3d at 988.  Vertical price

14   fixing is not a *per se* violation of the Sherman Act.  *State Oil Co. v. Khan*, 522 U.S. 3, 118 S.Ct 275

15   (1997).  A vertical agreement will be illegal where the manufacturer or supplier sets minimum resale

16   prices to be charged by the distributor.  *Mularkey v. Holsum Bakery, Inc.,* 146 F.3d 1064, 1065 (9th Cir.

17   1998) (a negotiated price with a retailer is not a vertical price agreement).  In *Holsum Bakery*, the Ninth

18   Circuit held that there is no conspiracy where a manufacturer of a product dictates prices at which a

19   distributor must sell the product: "[Plaintiffs] argue that they have evidence that 'Holsum dictated prices

20   to its distributors,' and 'threatened them if the prices were not followed.' Even if true, this allegation

21   points only to unilateral conduct, which is not prohibited by § 1." The Sherman Act Section 1 does not

22   prohibit an individual business, acting alone, from unilaterally setting its own prices, even if the prices

23   are artificially high or artificially low.  *Holsum Bakery, Inc.*, 146 F.3d at 1065.  In *Holsum Bakery*, the

24   court found no vertical conspiracy was shown because the evidence showed "a negotiated price with one

25   of its retailers."

26          In  *Fisher v. City of Berkeley*, 475 U.S. 260, 266, 106 S.Ct. 1045, 89 L.Ed.2d 206 (1986), the

27   City of Berkeley was alleged to have headed a price-fixing conspiracy in the residential rental market.

28   The Supreme Court found that there was no conspiracy to fix lower rents in Berkeley where landlords

35

1    were forced to charge lower rents by a city ordinance. Id. at 266-67, 106 S.Ct. 1045.  There must be a

2    "meeting of the minds." *Id.* at 267.

3           There are two pleading deficiencies in plaintiff's vertical price fixing claim between Silgan and

4    defendants.  First, plaintiff has not alleged that Silgan agreed with defendants to fix prices.  Plaintiff, in

5    order to succeed on a vertical price-fixing claim, must allege that there is a conspiracy or a concerted

6    action between two or more actors to fix prices and that the price-fixing conspiracy is illegal pursuant

7    to the applicable legal standard.  *Holsum Bakery*, 146 F.3d at 1065.  The Sherman Act only prohibits

8    concerted action among separate entities.  (See Doc. 116, FAC (unredacted) ¶91-92, 109-113, 123-127.)

9    The allegations are ambiguous as to whether Silgan agreed to fix prices. The allegations state that the

10   prices for Tin Mill Products increased and that UPI was acting in a "if you don't like [the prices] tough"

11   way.   While plaintiff alleges that Silgan "agreed to prices for Tin Mill Products that were

12   supracompetitive," the allegations are that the prices were dictated to Silgan. See FAC *id.*  The FAC is

13   ambiguous where UPI dictated the prices to Silgan or whether Silgan and UPI agreed to fix prices.

14          Next, plaintiff's allegations fail to allege the vertical price fixing arrangement.  Plaintiff does not

15   allege that the defendants fixed the price of the product, <u>the tin cans</u>, purchased by plaintiff. Rather,

16   plaintiff alleges that  defendants mandated, required, or dictated the price of Tin Mill Products, but does

17   not allege the defendants and Silgan agreed to fix prices of the product plaintiff purchases, tin cans. (See

18   Doc. 116, FAC (unredacted) ¶109-113.)

19   **E.      Section 2 of the Sherman Act - Monopolization**

20          Unlike Section 1, Section 2 of the Sherman Act prohibits antitrust activity of a single entity.

21   Section 2 makes it an offense for any person to "monopolize, or attempt to monopolize, or combine or

22   conspire with any other persons, to monopolize any part of the trade or commerce among the several

23   states."  15 U.S.C. § 2. The offense of monopoly has two elements: (1) the possession of monopoly

24   power in the relevant market and (2) the willful acquisition or maintenance of that power as

25   distinguished from growth or development as a consequence of a superior product, business acumen,

26   or historic accident.  *United States v. Grinnell Corp*., 384 U.S. 563, 570-71 (1966).

27          The Sherman Act §2 is directed at three distinct activities:

28          (1)      Monopolization,

36

1   (2)      Attempts to monopolize, and

2   (3)      Conspiracies or combinations to monopolize.

3   *See generally Coalition For ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, (9th Cir. 2010)

4   (monopolization and attempted monopolization); *Paladin Associates, Inc. v. Montana Power Co.*, 328

5   F.3d 1145 (9th Cir. 2003) (conspiracy to monopolize).

6        **1.      No Monopolization Claim is pending**

7        Defendants move to dismiss plaintiff's monopolization claim.  In its opposition, plaintiff does

8   not oppose the motion to dismiss the monopolization claim.  Rather, plaintiff argues that it alleges "a

9   claim for *conspiracy to monopolize* by the defendants, principally U.S. Steel and POSCO, while UPI's

10  argument is based upon its apparent belief that the claim is for monopolization against UPI." (Doc. 219,

11  Opposition, p.27.)  Plaintiff thus takes the position that its Second Claim is one for "conspiracy to

12  monopolize" and not a claim for "monopolization."  Accordingly, based upon plaintiff's representation

13  that its FAC does not allege a "monopolization" claim, the Court finds the motion to dismiss on the

14  "monopolization" claim is moot.

15       **2.      Conspiracy to Monopolize**

16       Defendants argue that plaintiff alleges an "attempted monopolization" claim while plaintiff

17  argues it alleges a "conspiracy to monopolize."  Each theory is slightly different.  *See Syufy Enterprises

18  v. American Multicinema, Inc.*, 793 F.2d 990 (9th Cir. 1986), *cert. denied,* 479 U.S. 1031 (1987).  An

19  attempted monopolization requires the following elements: (1) specific intent to monopolize, (2)

20  predatory or anticompetitive conduct directed to accomplishing the unlawful  purpose, and (3) causal

21  antitrust injury. *Syufy Enterprises*, 793 F.2d at 998 -999.  An attempt requires a deliberate, intentional

22  act directed toward achieving the unlawful aim of monopolization.  *Swift &Co. v. U.S. ,* 196 U.S. 375

23  (1905).  To prove a conspiracy to monopolize in violation of § 2, Plaintiff must show four elements: (1)

24  the existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the

25  conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury.  *Paladin Associates,

26  Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003).

27       **3.      Allegations regarding the elements**

28       Plaintiff argues that the FAC alleges that the defendants conspired to and acquired monopoly

37

power in the market for tin plate steel. Plaintiff argues that the FAC alleges that the co-conspirators sought and obtained monopoly power by the following acts: (1) the formation and operation of UPI, (2) the horizontal agreements between U.S. Steel and POSCO to refrain from competing with each other, (3) an agreement to fix the prices at which each sold hot band steel to UPI, and (4) agreement to fix UPI's prices for tin plate steel at supracompetitive prices. (Doc. 219, Opposition p. 28.)

Defendant UPI argues that for the Section 2 claim to proceed, plaintiff must allege "predatory" or "exclusionary" conduct, to show the element "an overt act in furtherance of the conspiracy." (Doc. 220, UPI Reply p.3.) UPI argues that none of the alleged "anticompetititve conduct" (formation of UPI, fixing prices for tin mill products and hot-band steel) is predatory or exclusionary. (Doc. 131, P&A p.12-13.) The joint reply argues that Plaintiff fails to allege the element of "specific intent to monopolize." (Doc. 221, Joint Reply p.8.)

### (A)   Specific Intent and AntiCompetitive Acts

To prevail on a conspiracy to monopolize, plaintiff must show "specific intent to monopolize and anticompetitive acts designed to effect that intent." *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 926 (9th Cir.1980), *cert. denied*, 450 U.S. 921 (1981). "[S]pecific intent to monopolize and anticompetitive acts designed to effect that intent" are required for a conspiracy to monopolize claim. *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d at 1154; *Syufy Enterprises v. American Multicinema, Inc.*, 793 F.2d at 1001 ("But we know of no authority that a Section 2 conspiracy may be established without some showing that more than one of the alleged co-conspirators had at least some awareness that the underlying conduct was anticompetitive or monopolistic").

A "specific intent to monopolize" means an intent to exclude competition or control prices. *Carpet Seaming Tape Licensing Corp. v. Best Seam. Inc.*, 616 F.2d 1133, 1141 (9th Cir. 1980); see *American Tobacco Co. v. United States*, 328 U.S. 781, 789 (1945) (object of a combination or conspiracy to monopolize is the exclusion of actual and potential competitors).

Anticompetitive conduct also is required to establish a section 2 violation. *NYNEX Corp. v. Disc. Inc.* 525 U.S. 129, 139, 119 S.Ct. 493 (1998) (unless the agreements alleged in a Section 2 conspiracy case "harmed the competitive process, they did not amount to a conspiracy to monopolize.") Anticompetitive conduct may take a variety of forms, but it is generally defined as conduct to obtain or

maintain monopoly power as a result of competition on some basis other than the merits. Conduct that impairs the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way may be deemed anticompetitive. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 604-05 & n. 32, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985); *Freeman*, 322 F.3d at 1155 (Evidence failed to show that adoption of shareholder agreements were "anticompetitive acts" to supported conspiracy to monopolize.); S*ee also Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1363-64 (Fed. Cir. 1999) (dismissing §1 and §2 conspiracy claims because  Intel's practice of agreeing to make joint sales presentations to prospective end-use customers on behalf of some customers but not others could not be a conspiracy to monopolize where there was no evidence that the presentations had any adverse effect on competition in a market); *see Truck-Rail Handling Inc. v. Burlington Northern Santa Fe R. Co.*, 2005 WL 1629949, 2 (N.D.Cal. 2005) (rejecting a conspiracy to monopolize claims because plaintiffs could not establish that defendant "engaged in anti-competitive acts designed to effectuate the alleged intent to monopolize."); *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 246 (2d Cir. 1997) (dismissing a conspiracy to monopolize claim when the plaintiff could not prove that the agreement harmed overall competition)."). Thus, plaintiff must allege "specific intent" to ultimately seize monopoly power within the relevant market through "anti-competitive" means.

Plaintiff argues that it has alleged specific intent to monopolize. In its opposition, plaintiff cites to the FAC ¶¶77 and 136 (Doc. 219, Opposition p.28:12) for its allegations of "specific intent." Paragraph 77 states conclusory allegations of pricing Tin Mill Products and the "ongoing and continuous conspiracy." Paragraph 136 states certain listed agreements "evince a specific intent to monopolize the Relevant Market." Plaintiff has not alleged defendants wilfully acquired monopoly power or any effect on the market of the competition - plaintiff has not alleged what anti-competitive acts defendants engaged in to impair competition. Rather, plaintiff alleges that other market competitors, who were geographically distant, exited the Tin Mill Products market when they forewent the freight stabilization prices. Plaintiff alleges that UPI dictated prices "around 2008" when "all foreign and eastern United States Tin Mill Product producers abandoned attempting to compete with UPI" with their "freight equalization" prices. (FAC ¶14.) These other competitors did not have factories in the Western United

1  States, and competed through lowering freight costs and absorbed freight prices.

2       Plaintiff alleges that as a result of <u>independent</u> market conditions, the freight stabilization,

3  defendants became a monopoly. Simply possessing monopoly power and charging monopoly prices does

4  not violate § 2; rather, the statute targets "the willful acquisition or maintenance of that power as

5  distinguished from growth or development as a consequence of a superior product, business acumen,

6  or historic accident." *Pacific Bell Telephone Co. v. Linkline Communications, Inc.*, - U.S. -,  129 S.Ct.

7  1109, 1118 (2009). Plaintiff does not allege that the defendants' conduct was the anti-competitive

8  conduct that could have lead to the monopoly in 2008.  Plaintiff's allegations of specific intent are

9  conclusory and superficial. Plaintiff must allege specific intent to seize monopoly power with the

10  relevant market.

11            (B)     Overt Acts

12       The performance of an overt act in furtherance of a conspiracy is an essential element. *American*

13  *Tobacco Co. v. United States,* 328 U.S. 781, 809 (1946).  The overt act need not itself be unlawful.

14  *American Tobacco*, 328 U.S. 781 at 809 ("It is not of importance whether the means used to accomplish

15  the unlawful objective are in themself lawful or unlawful.  Acts done to give effect to the conspiracy may

16  be themselves wholly innocent acts.") *Compare Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 113

17  S. Ct. 884, 122 L. Ed. 2d 247 (1993) (The element of specific intent <u>in an attempted monopolization</u> case

18  may be established by evidence of unfair or predatory tactics on the part of the defendant.)

19       Defendants cite certain district court cases for the proposition that plaintiff must allege overt acts

20  of anticompetitive or predatory conduct.  *See e.g., Morton v. Rank America, Inc.*, 812 F.Supp. 1062

21  (C.D.Cal. 1993) (an attempted monopolization claim where the court stated, "To establish a claim for

22  attempted monopolization under Section 2 of the Sherman Act, a plaintiff must demonstrate that the

23  defendant has committed anticompetitive acts resulting in an antitrust injury"); *Truck-Rail Handling Inc.*

24  *v. Burlington Northern Santa Fe R. Co.*, 2005 WL 1629949, 1 (N.D.Cal. 2005) (Plaintiffs must establish

25  the existence of a combination or conspiracy to monopolize, the specific intent to monopolize, and

26  anti-competitive acts designed to effect that intent).

27       The overt act, in a conspiracy claim as opposed to an attempted monopolization claim, need not

28  be unlawful.  Defendants have this element confused with a claims based upon "attempted

40

1  monopolization."  But, the absence of unlawful acts may preclude a showing of specific intent to

2  monopolize. (As discussed *supra.*)

3                    (C)      No Geographic Market

4        Defendant UPI argues that the plaintiff fails to state a relevant market under the Sherman Act.

5  Defendant argues that the FAC acknowledges that the market was open for tin-mill products from 1986

6  until "just recently." (Doc. 218, Joint Motion p.13.)  The market is defined in conclusory terms as

7  "international" and "national."

8        The "relevant market" and "market power" requirements are not pleading requirements for a

9  conspiracy to monopolize claim. "[N]o particular level of market power or 'dangerous probability of

10  success' has to be alleged or proved in a conspiracy claim where the specific intent to monopolize is

11  otherwise apparent from the character of the actions taken." *Hunt-Wesson Foods,* 627 F.2d at 926 (the

12  existence and extent of market power may make the inference of specific intent from conduct more or

13  less plausible); *Accord Freeman,* 322 F.3d at 1154 (same).[14]

14        Here, whether plaintiff alleged the appropriate relevant market - either a product market or a

15  geographic market - is not an issue for a conspiracy to monopolize claim.

16  **F.      Cartwright Act**

17        Defendant UPI argues that plaintiff's California Cartwright Act claim fails for the same reasons

18  as Count 1 under the Sherman Act. Defendants also argue *Copperweld* also bars the claim under the

19  Cartwright Act.  Only separate entities pursuing separate economic interests can conspire for price fixing

20  combinations.  In addition, defendants argue that plaintiff cannot prevail on a vertical price fixing

21  conspiracy because UPI does not sell the same product that plaintiff purchases.  (Doc. 217, UPI moving

22  papers p.16.)  Plaintiff acknowledges that its arguments under the Cartwright Act would be the same as

23  for the Sherman Act.  (Doc. 219, Opposition p.29.)

24        The Cartwright Act is California's antitrust statute.  Bus. &Prof Code §§16700-16770.  Cases

25

26        [14]   In a monopolization claim or an attempted monopolization claim, relevant market is a necessary element. A
27  complaint may be dismissed under Rule 12(b)(6) for either of these claims if the complaint's "relevant market" definition is
   facially unsustainable, but the relevant market is a factual rather than a legal inquiry.  *Newcal Industries, Inc. v. Ikon Office
28  Solution,* 513 F.3d 1038, 1045 (9th Cir. 2008), *cert. denied,* 129 S.Ct 2788 (2009).

decided under the Sherman Act are applicable to interpreting the Cartwright Act. *See Marin County Bd. Of Realtors, Inc. v. Palsson*, 16 Cal.3d 920, 130 Cal.Rptr.1 (1976). Indeed, the analysis under California's antitrust law mirrors the analysis under federal law because the Cartwright Act was modeled after the Sherman Act. *County of Tuolumne v. Sonora Community Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001). Therefore, the analysis and conclusions would be the same under the Cartwright Act, as under the federal claims.

Given the analyses and conclusions regarding the federal claims, the Court incorporates those rulings for the state Cartwright Act antitrust claim as well.

The analysis is different on the issue of standing, however. The Cartwright Act permits indirect purchasers to have standing. Pursuant to §16750 of the Cartwright Act, an action may be brought by a person injured "regardless of whether such injured person dealt <u>directly or indirectly</u> with the defendant." Bus.&Prof. Code §16750 (emphasis added). Unlike the federal Sherman Act, the Cartwright Act grants indirect purchasers standing to sue, as well as direct purchasers. *Clayworth v. Pfizer, Inc.*, 49 Cal.4th 758, 763, 111 Cal.Rptr.3d 666, 671 (2010); *see also Knevelbaard*, 232 F.3d at 991, citing *Cellular Plus, Inc. v. Superior Court*, 14 Cal.App.4th 1224, 1234, 18 Cal.Rptr.2d 308 (1993) ("[t]he exact parameters of 'antitrust injury' under section 16750 have not yet been established" but that "the scope of that term is broader" than under federal law.) Thus, to the extent that the motion has been granted for lack of standing, that ruling is inapplicable to the Cartwright Act.

## G.      Unfair Competition Claim

Plaintiff's count 5 alleges a claim under California's Unfair Practices Act, also called the Unfair Competition Act ("UCL").[15]   The purposes of the UCL are "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition, by prohibiting unfair, dishonest, deceptive, destructive, fraudulent and discriminatory practices by which fair and honest competition is destroyed or prevented." Cal.Bus.&Prof.Code § 17001.   "The UC[L] works by 'borrowing' violations of other laws and treating those transgressions, when committed as a business activity, as  'unlawful

---

[15] The Unfair Practices Act has also been called the Unfair Business Practices Act and the Unfair Competition Act. *Bay Guardian Co. v. New Times Media, LLC*, 2010 WL 3156631, 24 n.10 (2010).  The parties refer to the Act as the "Unfair Competition Law" ("UCL") and the Court will adopt the parties' terminology at this point.

business practices.'"  *Stevens v. Superior Court*, 75 Cal.App.4th 594, 602 (1999).  These "unlawful business practices" are "independently actionable under section 17200 et seq. and subject to the distinct remedies provided thereunder." *Id.*

### 1.    Predicate Acts of Antitrust Violations

Defendants argue that the UCL claim should be dismissed because plaintiff fails to allege an antitrust violation.

The UCL claim predicates liability based on the Sherman Act and the Cartwright Act. (See Doc. 216, FAC ¶165.)  Plaintiff alleges that the agreements, combination and conspiracies alleged in the Sherman Act claims and the Cartwright Act claims "constitute unlawful and unfair business practices." (Doc. 216, FAC ¶165-166.)

Given the analyses and conclusions regarding the federal and state claims, the Court incorporates those rulings for the UCL claim as well.

### 2.    Restitution under the UCL

Defendants argue that plaintiff's claim for restitution under the UCL also fails because plaintiff did not pay any money to UPI and plaintiff has no ownership interest in any funds held by UPI.  (Doc. 217 UPI Opposition p. 18.)

Restitution is an appropriate remedy under the UCL.  *See People ex rel. Kennedy v. Beaumont Investment, Ltd.*, 111 Cal.App.4th 102, 134, 3 Cal.Rptr.3d 429 (2003).  Restitution may refer to the disgorging of something which has been taken or compensation for injury done.  *Beaumont Investment*, 111 Cal.App.4th at 134.  In a UCL action, restitution generally compels a defendant to return money obtained through an unfair business practice. "In a suit for violation of the unfair competition law, 'orders for restitution' are those 'compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken....'" *Id.* at 134.

Here, as defendants note, plaintiff alleges that "defendants have acquired money from Stanislaus Food by means of unlawful and unfair business practices described above." (Doc. 216, FAC ¶168.) The UCL may use as a predicate act, violations of the Cartwright Act.  Since the Cartwright Act permits recovery by <u>indirect</u> purchasers, such as plaintiff, and restitution is a proper remedy under the UCL, the Court cannot find as a matter of law that restitution is an impermissible remedy, at the pleading stage.

1   "[I]n contrast to contract restitution, statutory restitution is not solely intended to benefit the [victims]

2   by the return of money, but instead is designed to penalize a defendant for past unlawful conduct and

3   thereby deter future violations." *Kennedy v. Beaumont*, 111 Cal.App.4th at 135.

4   **H.     Unjust Enrichment**

5        Plaintiff's sixth count is styled as a "Common law restitution based upon Unjust Enrichment."

6   (Doc. 216, FAC p.39.)  Defendants argue that claim 6 should be dismissed because there is no cause of

7   action for "unjust enrichment" in California.  (Doc. 217, UPI Moving papers p. 19.)  Plaintiff argues that

8   claim 6 incorporates all of the prior allegations,[16] and alleges that the defendants have been unjustly

9   enriched and that by their conduct, "the law therefore implies a contract under which defendants are

10  obligated to make restitution." (Doc. 219, Opposition p. 33.)  Plaintiff alleges that "each time Stanislaus

11  paid for tin-plate cans at supracompetitive prices . . ., the common law of California created an 'implied

12  in law' contract by which Defendants had a duty to make restitution to Stanislaus."  (Doc. 216, FAC

13  ¶176.)

14       There is apparently a split of authority in California on whether unjust enrichment an be an

15  independent claim or whether it is merely an equitable remedy.  *See  Melchior v. New Line Prods., Inc.*,

16  106 Cal.App.4th 779, 793, 131 Cal.Rptr.2d 347 (2003) (unjust enrichment does not describe a theory

17  of recovery, but an effect: the result of a failure to make restitution under circumstances where it is

18  equitable to do so.)   Unjust enrichment is synonymous with restitution.  *Durell v. Sharp Healthcare*,

19  183 Cal.App.4th 1350, 1370, 108 Cal.Rptr.3d 682, 699 (2010). Other courts have permitted a claim for

20  unjust enrichment where other remedies are inadequate. *Ghirardo v. Antonioli*, 14 Cal.4th 39, 50, 57

21  Cal.Rptr.2d 687, 924 P.2d 996 (1996). The elements of an unjust enrichment claim are receipt of a

22  _____

23       [16]  While not an argument made by defendants, this Court raises the concern of potential "shot-gun pleading."
    Plaintiff incorporates all preceding allegations.  Incorporation of prior allegations by reference is a valuable tool.  It is
24  common practice to incorporate by reference in later claims for relief various allegations made in earlier claims (typically
    allegations as to jurisdiction, venue, parties, sequence of events). Properly used, such incorporation promotes simple, concise
25  pleadings. *Fontana v. Haskin*, 262 F.3d 871, 877 (9th Cir. 2001). Allegations, however, which incorporate each preceding
    paragraph, regardless of relevancy, are not permitted.  This practice has been harshly criticized as a form of "shotgun
26  pleading" that violates Rule 8's requirement of a "short and plain statement" and interferes with the court's ability to
    administer justice. *See generally*, *Byrne v. Nezhat*, 261 F.3d 1075, 1129–1130 (11th Cir. 2001).  The allegations in this FAC
27  are complex and span a significant time period.  Avoidance of "shot-gun" pleadings goes hand-in-hand with the Court's ruling
    that plaintiff must allege conduct, by conspiracy and by defendants.  Generalized grouping of allegations and overall
28  incorporation will not survive an appropriate motion.

benefit and unjust retention of the benefit at the expense of another. *Peterson v. Cellco Partnership*, 164 Cal.App.4th 1583, 1593, 80 Cal.Rptr.3d 316 (2008); *Lectrodryer v. SeoulBank*, 77 Cal.App.4th 723, 726, 91 Cal.Rptr.2d 881 (2000). However, "the mere fact that a person benefits another is not of itself sufficient to require the other to make restitution therefor." *Peterson*, 164 Cal.App.4th at 1593, 80 Cal.Rptr.3d 316. Unjust enrichment is typically sought in connection with a "quasi-contractual" claim in order to avoid unjustly conferring a benefit upon a defendant where there is no valid contract. *McBride v. Boughton*, 123 Cal.App.4th 379, 388, 20 Cal.Rptr.3d 115 (2004).

In *County of San Bernardino v. Walsh*, 158 Cal.App.4th 533, 542, 69 Cal.Rptr.3d 848 (2007), the court recognized the maxim that "restitution should be required only when it involves no violation or frustration of law or opposition to public policy, either directly or indirectly." *Accord  Falk v. General Motors Corp.*, 496 F.Supp.2d 1088, 1099 (N.D.Cal. 2007) (plaintiff had stated CLRA, UCL, and fraud by omission claims, "there will be no occasion to resort to unjust enrichment").  Where plaintiff could pursue a UCL claim, including restitution, "a separate cause of action for unjust enrichment is unnecessary." *Shein v. Canon U.S.A., Inc.*, 2009 WL 1774287 (C.D.Cal. 2009).  Other district court cases have dismissed unjust enrichment cases for failure to state an independent cause of action. *Id., citing Walker v. Equity 1 Lenders Group.* 2009 WL 1364430, 9 (S.D.Cal. 2009) ("[t]here is no cause of action in California for unjust enrichment ... Unjust enrichment is typically sought in connection with a 'quasi-contractual' claim in order to avoid unjustly conferring a benefit upon a defendant where there is no valid contract"); *Swanson v. USProtect Corp.*, 2007 WL 1394485 (N.D.Cal. 2007) ("[T]here is no cause of action in California for unjust enrichment ... Unjust enrichment is a general principle, underlying various legal doctrines and remedies, rather than a remedy itself."); *Newson v. Countrywide Home Loans, Inc.*, 2010 WL 2034769, 7 (N.D.Cal. 2010) (even if Plaintiffs are entitled to seek restitution under a different claim, "that still would not establish that a legal basis exists for stating an independent claim for unjust enrichment."); *Swain v. CACH, LLC*, 699 F.Supp.2d 1109, 1116 (N.D.Cal. 2009) (Plaintiff cannot assert unjust enrichment as a separate cause of action under California law).

Assuming the facts of the complaint to be true, no circumstances are present to necessitate a remedy in equity.  Plaintiff merely states conclusory allegations that it was in a quasi contractual

45

relationship with defendants. Regardless, plaintiff is fully protected for restitution.  Plaintiff alleges numerous statutory violations which protect it from the same alleged harm as contained in plaintiff's unjust enrichment claim. *See In re Facebook PPC Advertising Litigation*, 2010 WL 1746143, 5 (N.D.Cal. 2010) (the remedy for unjust enrichment applies only in the absence of an adequate remedy at law.)  This ruling is without prejudice to plaintiff seeking restitution in connection with its other claim under the UCL.  Accordingly, the claim for unjust enrichment is dismissed.

## **CONCLUSION**

For the foregoing reason, the motions to dismiss the complaint are GRANTED with leave to amend in strict conformance with this order.


IT IS SO ORDERED.

**Dated:**   **September 3, 2010**              /s/ Lawrence J. O'Neill
                                    UNITED STATES DISTRICT JUDGE

46