1

2

3

4

5

6

7 **IN THE UNITED STATES DISTRICT COURT**

8 **FOR THE EASTERN DISTRICT OF CALIFORNIA**

9

10 STANISLAUS FOOD PRODUCTS      CASE NO. CV F 09-0560 LJO SMS
   COMPANY,

11                                **ORDER ON JOINT MOTION TO DISMISS**
                                   (Doc. 241)

12                Plaintiff,
         vs.

13 USS-POSCO INDUSTRIES, et al.,

14                Defendant.

15 _____/

16        By notice filed on December 10, 2010, defendants USS-POSCO Industries ("UPI"), U.S. Steel

17 Corp, Pitcal, Inc., POSCO-California Corp, and POSCO American Steel Corp. (Collectively

18 "defendants") filed a joint motion to dismiss the plaintiff's second amended complaint ("SAC").  The

19 motions were filed under seal and redacted portions of the motions were subsequently filed.  Plaintiff

20 Stanislaus Food Products filed an opposition to the motions on January 18, 2011.  The opposition also

21 was filed under seal with a redacted version also filed.  The defendants filed reply briefs on February 2,

22 2011 and a redacted version was also filed.  Pursuant to order, the motion was set without a hearing date.

23  Having considered the moving, opposition, and reply papers, as well as the Court's file, the Court issues

24 the following order.

25                        **FACTUAL BACKGROUND**

26        Plaintiff Stanislaus Food Products ("plaintiff" or "Stanislaus") is a Modesto tomato canner.

27 Stanislaus processes and "fresh packs" tomatoes into tin-plated cans.  Since 2001, Stanislaus has

28 purchased millions of one-gallon tin-plated cans pursuant to a Container Supply Agreement ("Container

                                    1

Agreement") with non-party Silgan Containers Corporation ("Silgan"). (Doc. 235, SAC ¶15 .)[1] Silgan buys "Tin Mill Products" (tin-plated steel) and manufactures the Tin Mill Products into tin-plated cans which are sold to canners, such as Stanislaus. (Doc. 235, SAC ¶17 .) Defendant USS-POSCO Industries ("UPI") is the manufacturer of the Tin Mill Products. UPI produces cold-rolled sheets, galvanized sheets and tin-plated and tin-free steel from "hot rolled" steel at its plant in Pittsburgh, California. (Doc. 235, SAC ¶17.) UPI then sells the tin-plated steel to Silgan to make tin cans which Silgan in turn sells to Stanislaus. UPI is the only Tin Mill Products producer in the Western United States.

This action alleges antitrust conspiracies by defendants to monopolize the Tin Mill Products market and to price-fix Tin Mill Products.

### Alleged Co-Conspirators

The hot-rolled steel, also known as "hot-band steel," is supplied to UPI by co-defendant U.S. Steel and non-party Pohang Iron & Steel Co., Ltd. ("POSCO") of South Korea. U.S. Steel is a Delaware corporation with its principal place of business in Pittsburgh, Pennsylvania. (Doc. 235, SAC ¶16.) POSCO is a Korean corporation. (Doc. 235, SAC ¶21.) UPI is a joint venture formed in 1986 by U.S. Steel and POSCO, through their holding companies. (Doc. 235, SAC ¶6.) The nominal general partners of UPI are Defendants Pitcal, Inc. and POSCO-California Corporation ("POSCAL"). Each of these UPI general partners is wholly owned subsidiary of either U.S. Steel or POSCO. Defendant Pitcal, Inc. is a wholly-owned subsidiary of U.S. Steel. POSCAL is a wholly-owned subsidiary of Defendant POSCO American Steel Corporation ("POSAM"), which is in turn a wholly-owned subsidiary of POSCO. (Doc. 235, SAC ¶18, 19, 20.) Ultimately, U.S. Steel and POSCO each own a 50% interest in UPI. (Doc. 235, SAC ¶6.) The SAC alleges that while Pitcal and POSCAL are nominal partners of UPI, the decision to form and operate UPI were made by U.S. Steel, POSAM and POSCO.

### Tin Mill Products

Tin Mill Products are finely rolled steel sheets that are coated with a thin protective layer of tin or chrome. (Doc. 235, SAC ¶22.) To make Tin Mill Products, UPI takes hot-band steel, provided by U.S. Steel and POSCO, and processes it through preparatory and manufacturing processes, which is not

---

[1] The redacted version of the Second Amended Complaint is referenced in this order, unless otherwise noted.

2

relevant to these motions.  (Doc. 235, SAC ¶23.) Tin can makers, like Silgan, purchase the Tin Mill Products for "resale as tin-plate cans" which in turn are used to package food products, such as fruit and vegetables. (Doc. 235, SAC ¶24.) Products processed by Stanislaus are packaged into Silgan's tin-plate, enamel-coated steel cans. (Doc. 235, SAC ¶26.) Plaintiff alleges Tin Mill Products have no independent utility or value other than to be formed into tin-plate cans.  (Doc. 235, SAC ¶27.)  The demand for Tin Mill Products is directly derived from the demand for tin-plate cans.  (Doc. 235, SAC ¶27.)

**The Container Agreement**

Pursuant to the Container Agreement between Silgan and Stanislaus, Silgan manufactures and sells to Stanislaus Food tin plate and enamel coated cans for fresh packing tomatoes.  (Doc. 235, SAC ¶83.)  Silgan sells tin cans which were "ready to fill tomato and tomato product containers which comply with the provisions of this Agreement . . . comprised of the can bodies enclosed at one end (the "Cans") and ends which are covers to be affixed after the Cans are filled (the 'Ends') (each Can and End collectively constituting a 'Container')."  (Doc. 235, SAC ¶74.)

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█  █         █        █         █              █

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████

**Tin Mill Products Market**

UPI is the only Tin Mill Products manufacturer in the Western United States.  (Doc. 235, SAC ¶30.)  Companies outside the Western United States have higher transportation costs for their Tin Mill Products. Until 2006, U.S. Steel sold Tin Mill Products in the Western United States by competitively pricing its products compared to UPI.  Both U.S. Steel and POSCO own and operate facilities separate from UPI that produce Tin Mill Products.  (Doc. 235, SAC ¶37.)  Plaintiff alleges that until 2006, U.S. Steel competed directly with UPI for sales of Tin Mill Products in the Western United States.  (Doc. 235, SAC ¶41.)  After 2006, the competition ceased pursuant of the Market Allocation Agreement.

1   Plaintiff alleges UPI, U.S. Steel and POSAM all agreed to allocate the market in 2006, "in order

2   to create a monopoly." (Doc. 235, SAC ¶48.)  Plaintiff refer to this agreement the "Market Allocation

3   Agreement."  Plaintiff alleges defendants "held regular in-person meeting and otherwise directly

4   communicated to maintain and police it." (Doc. 235, SAC ¶54.)

5   In 2006, as a result of the Market Allocation Agreement, an "immediate and dramatic increase

6   in the price of Tin Mill Products in the Relevant Market occurred." (Doc. 235, SAC ¶12.)  U.S. Steel

7   agreed that once it exited the market, it would increase UPI's prices to monopoly levels, in coordination

8   with POSCO. (Doc. 235, SAC ¶¶ 43, 48, 55, 59, 65.)  POSCO agreed to stay out of the market and

9   increase UPI's prices to monopoly levels while UPI's costs decreased, in coordination with U.S. Steel.

10  (Doc. 235, SAC ¶¶ 43, 48, 55, 59, 65.)  Plaintiff alleges, as the sole source supplier, UPI had an

11  economic motive to agree on a supracompetitive price for the Tin Mill Products Silgan bought from UPI.

12  Plaintiff alleges that the price for hot band steel and tin went up substantially despite a decrease in raw

13  material prices.  The prices charged to plaintiff went up dramatically, and Stanislaus was forced to pay

14  inflated prices for tin-plate cans.

15  **Claims in the SAC**

16  The Second Amended Complaint alleges the following claims for relief:

17  (1)   First Claim - California Cartwright Act, Cal.Bus. & Prof. Code §16720;

18  (2)   Second Claim -  Section 1 of the Sherman Act, 15 U.S.C. §1 (Restraint of Trade);

19  (3)   Third Claim -  Section 2 of the Sherman Act, 15 U.S.C. §2 (Monopolization);

20  (4)   Fourth Claim for Relief - Unfair Competition, Cal.Bus & Prof Code §17200.

21  Defendants challenge each of the claims on various grounds.  Defendants contend the First Claim fails

22  because (1) Plaintiff does not have antitrust standing since plaintiff has not plead it suffered antitrust

23  injury in the relevant market, and (2) the claim is not plead with particularity under *Twombly*.

24  Defendants contend the Second Claim fails because (1) plaintiff does not have standing since it is an

25  indirect purchaser and (2) the claim is not plead with particularity under *Twombly*.  Defendants contend

26  the Third Claim fails because (1) plaintiff does not have standing, and (2) plaintiff failed to allege

27  defendants intended to monopolize and the conspiracy allegations fail under *Twombly.* Defendant

28  contends that Fourth Claim fails because it is based upon deficient antitrust allegations in claims 1 to

4

3.

# ANALYSIS AND DISCUSSION

### A.      Rule 12(b)(6) - Motion to Dismiss for Failure to State a Claim

A motion to dismiss pursuant to Fed R. Civ. P. 12(b)(6) is a challenge to the sufficiency of the pleadings set forth in the complaint.  A Fed. R. Civ. P. 12(b)(6) dismissal is proper where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balisteri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990).  In considering a motion to dismiss for failure to state a claim, the court generally accepts as true the allegations of the complaint in question, construes the pleading in the light most favorable to the party opposing the motion, and resolves all doubts in the pleader's favor.  *Lazy Y. Ranch LTD v. Behrens,* 546 F.3d 580, 588 (9th Cir. 2008); *Jenkins v. McKeithen*, 395 U.S. 411, 421, *reh'g denied*, 396 U.S. 869 (1969).

To survive a motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1974 (2007) ("*Twombly")*.  A claim has facial plausibility,"when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, – U.S. –, 129 S.Ct. 1937 (2009).  "[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009).

A court is "free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations." *Farm Credit Services v. American State Bank*, 339 F.3d 765, 767 (8th Cir. 2003) (citation omitted).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. 554,127 S. Ct. 1955, 1964-65 (internal citations omitted).  Moreover, a court "will dismiss any claim that, even when construed in the light most favorable to plaintiff, fails to plead sufficiently all required elements of a cause of action." *Student Loan Marketing Ass'n v. Hanes*, 181 F.R.D. 629, 634 (S.D. Cal. 1998).  In

practice, "a complaint . . . must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562, 127 S.Ct. at 1969.  If a plaintiff fails to state a claim, a court need not permit an attempt to amend a complaint if "it determines that the pleading could not possibly be cured by allegation of other facts." *Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990).

**B.      Overview of Sherman Act Claims**

Plaintiff alleges the Market Allocation Agreement violates §1 and §2 the Sherman Act.  15 U.S.C. §§ 1, 2.  Section 1 prohibits restraint of trade:  "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared to be illegal."  To prevail on a cause of action for violation of 15 U.S.C. § 1, a plaintiff must show, "(1) there was an agreement, conspiracy, or combination between two or more entities; (2) the agreement was an unreasonable restraint of trade under either a per se or rule of reason analysis; and (3) the restraint affected interstate commerce." *American Ad Management, Inc. v. GTE Corp.*, 92 F.3d 781, 784 (9th Cir. 1996).

Plaintiff also alleges violation of Section 2 of the Sherman Act.  Section 2 makes it illegal to "to monopolize ... any part of the trade or commerce . . ." 15 U.S.C. § 2. Plaintiff alleges a conspiracy to monopolize.  To prove a conspiracy to monopolize in violation of § 2, Plaintiff must show four elements: (1) the existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury. *Paladin Associates, Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003).

**C.      Procedural Challenges to the Complaint**

The defendants challenge the complaint on procedural grounds: (1) lack of antitrust standing, and (2) inadequate pleading under *Twombly.*

**1.      Standing to Sue under the Sherman Act**

Defendants argue that plaintiff has no standing to pursue Federal Antitrust claims under the controlling precedent of *Illinois Brick*, because plaintiff is an "indirect purchaser."  Defendants argue that Plaintiff's federal antitrust claims under the Sherman Act (claims 1 and 2) are barred because

1   plaintiff is not a direct purchaser of any of defendants' products.[2]

2        Plaintiff argues that if *Illinois Brick* applies, it does not bar plaintiff's claims because (1)

3   Stanislaus seeks injunctive relief, and (2) Stanislaus' damages claims fall within two exceptions to

4   *Illinois Brick*.  (Doc. 252, Opposition p. 23.)

5        (A)   <u>*Illinois Brick* and the "Indirect Purchaser" Rule</u>

6        "Indirect purchasers" do not have standing to recover antitrust damages.  In *Illinois Brick Co.*

7   *v. Illinois*, the Supreme Court held that indirect purchasers may not recover in an antitrust suit by

8   proving that an overcharge was passed on to them through the distribution chain.  *Illinois Brick Co. v.*

9   *Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).  An end user does not have antitrust

10  standing to assert a claim against a manufacturer when a middleman, for example a distributor or a

11  wholesaler, sits between an end user and a manufacturer.  The Supreme Court in *Illinois Brick* denied

12  standing action to indirect purchasers in many circumstances. The Court's concern was that allowing indirect

13  purchasers to sue remote price-fixers would open the door to multiple liability for defendants. If the

14  indirect purchaser recovered, trebled, the full amount of the overcharge (or the portion of it that had in

15  fact been passed on to him) from the price-fixer, the direct purchaser (the middleman) could also

16  recover, trebled, the full amount of the overcharge.  *Id.* at 730-31.  The role of "private attorneys

17  general" in the antitrust field was restricted by *Illinois Brick* to direct purchasers because of the danger

18  of multiple liability and complexity of proof.[3]  *Royal Printing Co. v. Kimberly Clark Corp.*, 621 F.2d

19  323, 326 (9th Cir. 1980). The Supreme Court has applied the indirect purchaser rule to section 2 of the

20  Sherman Act.  *See Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 492-94, 88 S.Ct.

21

---

22       [2] Antitrust standing is distinct from Article III constitutional standing. Antitrust standing examines the connection

23  between the asserted wrongdoing and the claimed injury to limit the class of potential plaintiffs to those who are in the best position to vindicate the antitrust infraction.  *See In re Circuit Breaker Litig.*, 984 F. Supp. 1267, 1273 (C.D. Cal. 1997).

24  "A plaintiff who satisfies the constitutional requirement of injury in fact is not necessarily a proper party to bring a private antitrust action." *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519,

25  535, n. 31, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).  Constitutional standing generally requires a showing that plaintiff has suffered actual loss, damage or injury, or is threatened with impairment of his or her own interests. *Gladstone Realtors v.*

26  *Village of Bellwood*, 441 U.S. 91, 100, 99 S.Ct. 1601, 1608 (1979).

27       [3] A single antitrust violation may have both direct and indirect or "ripple" effects on parties that are removed from the actual violation at issue. Von Kalinowski, *Antitrust Law and Trade Regulation*, Ch. XIII, §161.02[3] (2nd ed. Matthew

28  Bender).  Price increases caused by an antitrust violation may affect ultimate prices at several points in the chain of distribution.  *Id.* Nonetheless, *Illinois Brick* bars such indirect purchasers from harm suffered.

1  2224, 2231-32.

2      As in this Court found in the prior motion to dismiss, plaintiff is not a direct purchaser of Tin

3  Mill Products from any of the defendants.  (See Doc. 224, Order p.9.)  Plaintiff does not purchase Tin

4  Mill Products and does not purchase hot-band steel.  Rather, plaintiff purchases finished tin cans from

5  Silgan.  Plaintiff alleges defendants fixed the price of the raw materials, not the tin cans.  Defendants

6  are not parties to the Container Agreement between Silgan and plaintiff, such that any "direct"

7  relationship existed.  Indeed, plaintiff has abandoned its prior argument that it is a direct purchaser.

8  Plaintiff is not a direct purchaser of any product produced by any defendant.  Thus, plaintiff is an indirect

9  purchaser.

10          (B)  Cost-Plus Contract as Exception to *Illinois Brick*

11      Plaintiff argues that, as an indirect purchaser, it has standing under *Illinois Brick* because it falls

12  within the "cost-plus" contract exception.

13      In *Illinois Brick*, the Supreme Court suggested an exception where the indirect purchaser, like

14  plaintiff, purchased goods from a direct purchaser, like Silgan, according to a preexisting "cost-plus

15  contract." *Illinois Brick*, 431 U.S. at 726 n. 2, 736 n. 16.  The Supreme Court later clarified that these

16  exceptions should be read narrowly and not expanded.  *Kansas v. Utilicorp United, Inc.*, 497 U.S. 199,

17  216-18, 110 S.Ct. 2807 (1990) (we might allow indirect purchaser to sue only when, by hypothesis, the

18  direct purchaser will bear no portion of the overcharge and otherwise suffer no injury). In a "cost-plus"

19  contract, the customer is committed to buying a fixed quantity regardless of the price.  Under a cost-plus

20  contract, in setting the price at which to sell to indirect purchasers, the direct purchaser automatically

21  adds a contractually predetermined sum to the price he paid the supplier. Under these circumstances,

22  "the pre-existing cost-plus contract makes easy the normally complicated task of demonstrating that the

23  overcharge has not been absorbed by the direct purchaser."  *State of Arizona v. Shamrock Foods Co.*,

24  729 F.2d 1208, 1213 (9th Cir. 1984).

25  ████████████████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████████████████

27  ██████████████████████████████████████████████████████████████ (Doc. 241,

28  P&A p. 9-10.)

8

(1)    Pleading Fixed Quantity

The *Illinois Brick* "cost-plus"exception requires an allegation that plaintiff was required to purchase a "fixed quantity of goods."

> "In [a cost-plus contract] situation, the [direct] purchaser is insulated from any decrease in its sales as a result of attempting to pass on the overcharge, because its <u>customer is committed to buying a fixed quantity</u> regardless of price. The effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case." *Illinois Brick,* 431 U.S. at 736 (Emphasis added.)

*See also Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 217, 110 S.Ct. 2807, 2817 (1990) (affirming summary judgment where customers had no commitment to purchase any particular quantity of goods). In *Kansas v. Utilicorp*, a public utility, the direct purchaser, and its customers (represented by the state attorney general) who were the indirect purchasers, sued the utility's suppliers of natural gas for unlawful price increases.  The public utility passed on 100% of the increased costs to its customers.  The Court declined to extend the cost-plus exception to the customers and dismissed the customers as indirect purchasers.  The Court stated that the customers did not fall within the "cost plus contract" exception because the "utility customers made no commitment to purchase any particular quantity of gas."  *Id.* at 218.

1   ███████████████████████████████████████████████████Defendant relies

2   upon *Lefrak v. Arabian Am. Oil Co.*, 487 F.Supp. 808, 823 n.21 (E.D.N.Y 1980).[4]

3        *Lefrak* is distinguishable, and is helpful to plaintiff's position.  The plaintiff in *Lefrak* owned

4   apartment buildings and brought an antitrust action against his suppliers of fuel oil.  Lefrak purchased

5   his fuel oil from distributors who purchased from the suppliers.  As does plaintiff here, Lefrak argued

6   he fell within the cost plus exception of *Illinois Brick.* The court there disagreed. The plaintiff was not

7   able to present "contracts which locked him into buying a fixed quantity regardless of price fluctuations

8   in the market. Indeed, the contracts expressly permitted Lefrak to buy from other distributors so as to

9   take advantage of more favorable prices."  Further, the court found "there was no rigid pricing formulas

10  in the contracts such that the entire overcharges was passed on without reference to the forces of the

11  marketplace."  *Lefrak,* 487 F.Supp.at 82-0-821. Thus, *Lefrak* did not involve "pass through" contracts

12  which locked the purchaser into a fixed quantity or to a particular supplier.

13      ███████████████████████████████████████████████████████████

14  ███████████████████████████████████████████████████████████████

15  ███████████████████████████████████████████████████████████████

16  ███████████████████████████████████████████████████████████████

17  ████████████████████*Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 608 F.Supp.2d 1166, 1182

18  (N.D.Cal. 2009) (facts indicating that market forces have been suspended may show case fits within

19  exception); *see In re Wyoming Tight Sands Antitrust Cases*, 866 F.2d 1286 (10th Cir.1989) (construing

20  "fixed quantity" to be an amount); *County of Oakland v. City of Detroit*, 866 F.2d 839, 849 (6th Cir.

21  1989) (holding that a county's routine attachment of a fixed markup to sludge treatment fees did not

22  amount to a pre-existing, fixed-markup, fixed-quantity contract).  See Hovenkamp, *The Indirect*

23  *Purchaser Rule and Cost-plus Sales* (1990) 103 Harv. L.Rev. 1717, 1720, 1722 (cost plus contracts

24  involve both a fixed markup and a fixed quantity to be delivered: "[i]f the contract does not fix the

25  markup in advance, a monopoly price increase will force the direct purchaser either to reduce its own

26  markup or to sell less of the product, again absorbing part of the overcharge. Finally, if the contract does

27  ────────────────

28      [4] *Lefrak* was a summary judgment case and not an attack on the pleadings case.  It has not been cited or relied upon in this Circuit.

1   not fix the quantity in advance, the direct purchaser will presumably buy less in response to the

2   monopoly price increase and both direct purchaser and indirect purchaser will share in the injury." ); *See*

3   *State of Ill. ex rel. Hartigan v. Panhandle Eastern Pipe*, 852 F.2d 891, 898 (7th Cir.1988) (finding that

4   cost plus contract, not for a fixed quantity (but a requirements contract) was adequate for indirect

5   purchaser to sue), (en banc ), *cert. denied*, 488 U.S. 986 (1988), *overruled on other grounds*, *Illinois ex*

6   *rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469 (7th Cir.1991).

7   ████████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████████████████

10  █   █        █            █              █                      █

11  ████████████████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████████████

15  *Doe v. Arizona Hosp. and Healthcare Ass'n*s, 2009 WL 1423378, *8 (D.Ariz. 2009) (Denying motion

16  to dismiss; holding that without examining the contracts between the parties, the court could not

17  ascertain on a motion to dismiss whether the contracts were cost plus arrangements with an exception

18  to the indirect purchaser rule. )

19                  (2) <u>Contract "automatically" adds a "predetermined sum"</u>

20  ████████████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████████████

24  ██████████████████████████████████████████████Defendants rely upon *Shamrock*

25  *Foods.*

26       In a footnote, *Shamrock Foods*, 729 F.2d at 1212 n.2 described a "cost plus contract" as one

27  where a predetermined quantity of goods is purchased to which a predetermined sum is added to the

28  price.

"[T]he *Illinois Brick* rule does not apply where an indirect purchaser buys a predetermined quantity of goods subject to an illegal price-fixing arrangement from a direct purchaser operating under a 'cost-plus' contract.  Under such a contract, in setting the price at which to sell to indirect purchasers, the direct purchaser automatically adds a contractually predetermined sum to the price he paid the seller."

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████ *Illinois Brick*, 431 U.S. at 733 n.12.

### (C)       Exception - No "Co-Conspirator" Allegation

In the FAC, plaintiff alleged that it is a "direct" purchaser because Silgan who was an unnamed "co-conspirator."  In the SAC, Plaintiff has abandoned Silgan as a co-conspirator and therefore this exception to *Illinois Brick* and it progeny does not apply.  Plaintiff has abandoned the vertical conspiracy between Silgan and the other defendants.[5]

### (D)       Exception to "Indirect Purchaser" Rule - Injunctive Relief

Another exception to *Illinois Brick*  is if plaintiff seeks only injunctive relief.  The Ninth Circuit has distinguished between an antitrust claim that seeks damages and one that seeks injunctive relief,

---

[5] Plaintiff argues that another exception to *Illinois Brick* applies because "Silgan will not sue defendants."  In *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1145-46 (9th Cir. 2003), *cert. denied*, 540 U.S. 940 (2003), the Ninth Circuit explained that an exception applies when "there is no realistic possibility that the direct purchaser will sue its supplier over the antitrust violation." This Court addressed the argument that "Silgan will not sue" in its prior order, and dismissed this argument for failure to allege Silgan was controlled by any defendant.  (See Doc. 224, Order, p. 12-13.)  As was fatal in the prior motion,  plaintiff again fails to allege that Silgan is controlled by UPI or any other defendant.  No allegations in the SAC allege the requisite control by defendants.  Whether plaintiff believes Silgan will sue for antitrust claims, or will not sue, is not determinative for pleading standards. Accordingly, plaintiff does not fall within this exception.

1  noting that the "direct purchaser" doctrine applies only to the former. *Lucas Automotive Engineering,*

2  *Inc. v. Bridgestone/Firestone, Inc.,* 140 F.3d 1228, 1235 (9th Cir. 1998) (observing that "indirect

3  purchasers are not barred from bringing an antitrust claim for injunctive relief against manufacturers").

4      As they did in the motion to dismiss the FAC, Defendants again challenge whether plaintiff is

5  in the "relevant market" such that plaintiff may seek injunctive relief.  Defendants argue that plaintiff

6  is not in the "relevant market."  Defendants argue that plaintiff is in the tin can market, and defendants

7  are in the tin-plated steel market.  They argue that plaintiff fails to satisfy the "same functionality"

8  requirement, that tin-plated steels plates have the same functionality as tin cans.  (Doc. 241, P&A p.11.)

9  Thus, because Plaintiff purchases "transformed" tin cans produced by Silgan, plaintiff cannot allege that

10  it participates and was injured in defendants' market for tin-mill products.

11      The Clayton Act "provides a vehicle for private enforcement of the [Sherman Act]." *Cargill,*

12  *Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 109, 107 S.Ct. 484 (1986).  Under §16 of the Clayton

13  Act, "[any] person, firm, corporation, or association shall be entitled to sue for and have injunctive relief

14  ... against threatened loss or damage by a violation of the antitrust laws."  To have standing to seek

15  injunctive relief under section 16 of the Clayton Act, a private plaintiff must allege that the plaintiff has

16  "suffered loss or damage of a type the antitrust laws were designed to prevent and that flows from that

17  which makes defendants' acts unlawful." *Cargill*, 479 U.S. at 113.

18      To seek injunctive relief, plaintiff must show, as relevant to this motion, that it suffered "an

19  antitrust injury." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000).  Antitrust

20  injury requires that the "injured party be a participant in the same market as the alleged malefactors."

21  *Knevelbaard Dairies*, 232 F.3d at 987 (emphasis added), citing *American Ad Management*, 190 F.3d at

22  1057; *Glen Holly Entertainment, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 372 (9th Cir. 2003) (we impose

23  a requirement, that "the injured party be a participant in the same market as the alleged malefactors.");

24  *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S.

25  519, 539, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (denying antitrust standing to party that was "neither

26  a consumer nor a competitor in the market in which trade was restrained").  Thus, to have an "antitrust

27  injury," plaintiff must be in the same relevant market.

28      Defendants challenge whether plaintiff is in the "relevant market" such that plaintiff may seek

1  injunctive relief.  Defendants argue that plaintiff's conclusory allegation that Tin Mill Products and tin

2  cans "provide essentially the same functionality" does not allege how tin plated steel plates can possibly

3  be the same function as tin cans.  (Doc. 241, Moving papers p.12.)  The two products do not provide

4  the same functionality because tomatoes cannot be packaged in "steel sheets."

5          In this Court's prior order on the motions to dismiss, this court held that component part

6  plaintiffs may participate in the "relevant market" if the markets are "linked" or the product's

7  functionality is the same in both markets, relying upon *In re Dynamic Random Access Memory*, 536

8  F.Supp.2d 1129 (N.D.Cal. 2008) and *In re TFT-LCD (Flat Panel) Antitrust Litigation*, 586 F.Supp.2d

9  1109 (N.D.Cal. 2008), among others.  (See Doc. 224, Order p.19-20.)

10         Plaintiff argues that it adequately has alleged that Tin Mill Products are "directly and intimately

11  linked with sales of tin-plate cans."  Plaintiff argues that it has alleged the same kind of allegations

12  which were held sufficient in *TFT-LCD (Flat Panel)*.  (Doc. 252, Opposition p. 27.)  Plaintiff alleges:

13             - the Tin Mill Products exists to serve the market for tin cans,

14             - Tin Mill Products have no independent utility other than to make tin cans,

15             - the demand for Tin Mill Products is derived from demand for tin cans,

16             - there is a traceable physical chain from manufacturer to Stanislaus.  (Doc. 252, Opposition

17  p.27.)

18         In *TFT-LCD (Flat Panel)*, the defendant manufacturers of crystal display panels argued that the

19  indirect plaintiffs could not be considered participants in the relevant market for LCDs, since they

20  purchased finished products containing LCD panels.  The court held that plaintiffs adequately alleged

21  the relevant market.  In *TFT-LCD*, plaintiff had alleged that the products were "inextricably linked and

22  intertwined between the markets" and that products "have no independent utility and have value only

23  as components for other products."  *Id.* at 1123.  The court found that the allegations were sufficient to

24  survive a motion to dismiss.  The Court found plaintiffs' allegations sufficient where they alleged that

25  the market for LCD panels and the market for the products into which the panels are placed are

26  "inextricably linked and intertwined," and as a result, the demand for LCD panels directly derives from

27  the demand for such products: "just as LCD panels can be physically traced through the supply chain,

28  so can their price be traced to show that changes in the prices paid by direct purchasers of LCD panels

14

1   affect prices paid by indirect purchasers of products containing LCD panels."  Thus, the product

2   provided the same functionality in all markets. *TFT-LCD (Flat Panel)*, 586 F.Supp.2d at 1123.

3          In *In re Flash Memory Antitrust Litigation*, 643 F.Supp.2d 1133 (N.D.Cal.2009),  indirect

4   purchasers sued manufacturers of NAND flash memory products (used in computers, consoles, etc).

5   Manufacturers moved to dismiss contending indirect purchasers were not in the same market because

6   they purchased the NAND flash memory as part of finished products.  The Court did not dismiss the

7   complaint, because while the flash memory has a variety of applications, it provides essentially the same

8   functionality, digital storage. *Id*. At 1154.  "[W]hile the markets for NAND flash memory and products

9   that contain NAND flash memory technically may be different, in practice, both markets are inextricably

10  intertwined and there is inherent cross-elasticity of demand between the two." *Id.*

11         In *In re Graphics Processing Units Antitrust Litig. ("GPU II")*, 540 F.Supp.2d 1085, 1092-1093

12  (N.D.Cal. 2007), indirect purchasers purchased computer chips as a component part of another product.

13  The Court declined to dismiss finding that plaintiffs alleged that as separate components of a computer,

14  any costs are traceable through the chain of distribution.  *Id.* At 1098.

15         In *In re Cathode Ray Tube (CRT) Antitrust Litigation*, --- F.Supp.2d ----, 2010 WL 3632775

16  (N.D.Cal. 2010), the court held that indirect purchasers had adequately alleged standing.  In direct

17  purchasers of cathode ray tubes (CRTs) and products incorporating CRTs alleged a conspiracy to fix

18  prices.  They alleged that the price of the end products was directly correlated to the price of the CRTS

19  that the markets are "inextricably linked and cannot be considered separately; and they are discreet

20  component that can easily be traced."  2010 WL 3632775 *10.

21         Here, the SAC contains similar allegations held sufficient regarding the same relevant market:

22              "Since substantially all Tin Mill Products are used to make tin-plate cans
                and all tin-plate cans are made from Tin Mill Products, Tin Mill Products
23              and tin-plate cans are inextricably linked and intertwined and proved
                essentially the same functionality throughout the distribution channel and
24              accordingly, are in the same relevant market.  (Doc. 235 SAC ¶16.)

25  The Court finds that the allegations are stated sufficiently that plaintiffs are in the same relevant market.

26  In its previous order, the Court stated that the products are transformed in the distribution chain.  This

27  statement this does not mean that the products are not inextricably linked and intertwined.  Plaintiff

28  alleges that the primary use of Tin Mill Products is to make tin-plate cans.  Plaintiff alleges that the

15

1   functionality of Tin Mill Products is to serve the purpose of making tin-plate cans to the exclusion of

2   other purposes.  As the court stated in *TFT-LCD*, "it would be inappropriate to determine 'complex and

3   intensely factual' damages issues without 'a more fully [sic] developed factual record.'" *TFT-LCD*, 586

4   F. Supp.2d at 1124.

5        Defendants's reliance upon *Lorenzo v. Qualcomm Inc.,* 603 F.Supp.2d 1291 (S.D. Cal. 2009)

6   is not persuasive because this case is distinguishable.  In a series of challenges to a patent owner's

7   licensing practices, several cases dealt with "remote" indirect purchaser as not in the same "relevant

8   market."  In *Lorenzo v. Qualcomm Inc.,* plaintiffs were end consumers of cellular telephone and

9   telephone service markets.  They sued defendant Qualcomm, the patent owner who had licensed

10  certain chip components to various manufacturers.  The plaintiffs were indirect purchasers who were

11  injured by Qualcomm's licensing practices which indirectly caused Plaintiffs to pay supracompetitive

12  prices for cell phones and cellular service.  The court held that the end consumers in the "chip

13  market" were not in the same market.  Plaintiffs were in the cell phone and cellular service market

14  while Qualcomm was in the market for chip patents and technology.  603 F.Supp.2d at 1303.

15  Plaintiff's injury was too remote to patent owner's alleged unlawful licensing practices.  The

16  customer's injury was traced through three levels of the supply chain and the company's technology

17  was only a component of the technology that the customer complained was overpriced due to the

18  company's licensing practices. Thus, end users did not have standing.  *See also Valikhani v.*

19  *Qualcomm Inc.*, 2009 WL 539915, *6, (S.D.Cal. 2009); *Meyer v. Qualcomm Inc.*, 2009 WL 539902,

20  *8 (S.D.Cal. 2009).

21        These cases are distinguishable because of the allegations in the SAC in which plaintiff

22  alleges that the primary use of Tin Mill Products is to make tin-plate cans.

23        **2.      Statute of Limitations**

24        In this Court' previous order, the Court held that various allegations were barred by the

25  applicable statute of limitations.  In their current motion, Defendants state, in a footnote, that the

26  SAC fails under the statute of limitations.  (Doc. 241, Motion p. 16 n.8.)  Without specific argument

27  on this issue, the Court will not address the statute of limitations.

28        **3.      Challenge to the SAC under *Twombly***

16

1   Defendants argue that plaintiff fails to allege a viable conspiracy claim.  The basis for the

2   conspiracy claim is the "Market Allocation Agreement."  Defendants argue that other than saying the

3   "Market Allocation Agreement" was made in 2006 to allocate the tin-plate market to UPI, plaintiff

4   fails to provide details for the Market Allocation Agreement, citing SAC §11, 48.  Defendants argue

5   the SAC fails to allege the existence of a conspiracy to monopolize and specific intent to

6   monopolize.  (Doc. 241, Moving paper p.20.)  Defendants further argue that the conspiracy claim

7   amounts to a vague accusation of an agreement without any specificity of persons who made the

8   agreement, when they made it or where.

9   (A) Adequacy of Pleading the "Market Allocation Agreement"

10   Plaintiff argues it alleges the Market Allocation Agreement with specificity.  (Doc. 252,

11   Opposition p.14-15, citing SAC ¶¶48-52, 56).  Plaintiff argues that it alleged the agreement began in

12   2006, allocated all customers of Tin Mill Products in the Western U.S. to UPI, and involved specific

13   roles for each defendant.  Plaintiff argues that it alleges the Market Allocation Agreement resulted in

14   two dramatic changes in the Relevant Market: (1) U.S. Steel ended freight equalization and quarter-

15   inch width surplus discounting, and (2) the prices of Tin Mill Products skyrocketed to level well

16   above marginal costs.  (Doc. 252, Opposition p. 14.)  Plaintiff argues that it is not required to plead

17   the "who, what, when and where" of the Market Allocation Agreement.

18   "[A] district court must retain the power to insist upon some specificity in pleading before

19   allowing a potentially massive factual controversy to proceed."  *Bell Atlantic Corp. v. Twombly*, 550

20   U.S. 544, 558, 127 S.Ct. 1955, 1967 (2007).   The complaint must allege "enough facts to state a

21   claim to relief that is plausible on its face."  *Twombly*, 550 US at 570. A claim of Sherman Act

22   violation requires enough factual allegations to suggest an illegal agreement was made.

23   The allegations in the SAC regarding the Market Allocation Agreement, in substance, are

24   that "defendants and co-conspirator POSCO entered into an illegal agreement to allocate the

25   Relevant Market to UPI."  (Doc. 235, redacted SAC ¶11.)  Plaintiff calls this agreement the "Market

26   Allocation Agreement."  U.S. Steel agreed with POSCO and UPI to exit the Relevant Market by

27   ending U.S. Steel's decades-long practice of discount pricing for "quarter-inch width surplus" and

28   "freight equalization."  (Doc. 235 redacted SAC ¶¶11-13.)  The specifics of the agreement are

17

alleged as follows:

48.     In 2006, U.S. Steel, UPI, Pitcal, POSCAL, POSAM and POSCO agreed to allocate the Relevant Market fully to UPI in order to create a monopoly.

49.     U.S. Steel agreed to exit the Relevant Market by no longer offering customers in the Western United States "quarter-inch width surplus" and "freight equalization" pricing.[6]  With ending this pricing, customers had no choice but to purchase all their Tin Mill Products from UPI.

50.     POSCO (and POSAM and POSCAL) agreed to refrain from selling to the Western United States Tin Mill Products.

51.      U.S. Steel, UPI, Pitcal, POSCAL, POSAM and POSCO "agree to eliminate the diversity of entrepreneurial interests"

52.     UPI participated in the anticompetitive agreement "with specific intent of monopolizing the Relevant Market" and increasing the price of Tin Mill Products. (Doc. 235 redacted SAC ¶¶11-13, 48-52.)

Plaintiff alleges that POSCO and U.S.Steel "entered into this agreement with the specific intent to eliminate competition and monopolize the Relevant Market."  (Doc. 235,SAC ¶49, 50.)

In *Twombly*, the Supreme Court found allegations that the defendant telephone companies "entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets and have agreed not to compete with one another and otherwise allocated customers and markets to one another" insufficient because no evidentiary facts were pleaded which could prove the conspiracy.  *Twombly*, 550 U.S. at 565.  The Court stated, in dicta, that "the pleadings mentioned no specific time, place, or person involved in the alleged conspiracies." 550 U.S. at 565 n. 10 ("the complaint here furnishes no clue as to which of the four [defendants] (much less which of their employees) supposedly agreed, or when and where

---

[6] Plaintiff alleges that until 2006, U.S.Steel competed with UPI in Tin Mill Products in the Western United States. Its prices were competitive with UPI because U.S.Steel had 2 forms of price reduction.  U.S. Steel offered competitive pricing by "quarter-inch width surplus" which excludes from the price, the cost of certain material lost in the process of making Tin Mill Products.  The other means of price competition was through "freight equalization" which removed the price disadvantage resulting from transportation costs incurred from transporting Tin Mill Products to the Western United States. (Doc. 235, SAC ¶8.)

the illicit agreement took place.").  Allegations of an agreement would normally include details about the formation of that agreement. See *Twombly*, 550 U.S. 565 n. 10. Accord *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) ("There are no facts alleged to support [the conclusion that a conspiracy existed]. Even after the depositions taken, the complaint does not answer the basic questions: who, did what, to whom (or with whom), where, and when?")

In *Kendall*, 518 F.3d at 1047, a class of retailers failed to plead sufficient evidentiary facts to survive dismissal under *Twombly* of a price-fixing claim against Visa, MasterCard and banks belonging to the two systems.  Plaintiffs alleged that the defendants had conspired to fix the bank fees charged to retailers for processing credit card sales.  The court found that plaintiffs offered no evidentiary facts as to the banks individually beyond the collective legal conclusion that the "banks" knowingly participated in the alleged scheme.  *Id.* at 1048. The court stated that plaintiffs allegation of an agreement that the "Banks knowingly, intentionally and actively participated in an individual capacity in the alleged scheme" to fix the fees, was factually insufficient.  *Kendall*, 518 F.3d at 1048. Without more factual content the "banks," which were large institutions with hundreds of employees, entering into contracts and agreements daily, would have no idea how to begin to respond to the allegations of a conspiracy.  *Id.* at 1047. The court held the complaint was properly dismissed because plaintiffs did not allege factual specifics that would "answer [such] basic questions [as]: who, did what, to whom (or with whom), where, and when?" *Id.* at 1049.

*Twombly* does not require that plaintiff prove their case or include every factual detail in support of their claims in their complaints. Rather, *Twombly* requires plaintiff to include sufficient facts supporting the existence of a conspiracy, beyond the conclusory allegation that a conspiracy did exist.  Under *Twombly*, plaintiff cannot simply allege a conspiracy beginning at a particular time; rather, they must allege facts to support the existence of a conspiracy during the entire period. Plaintiff must at least provide a factual basis for their starting date, to show an entitlement to relief beginning on that date.

Plaintiff cites *Flash Memory*, 643 F.Supp.2d at 1148 for the proposition that it does not have to allege the "who, what, or how" of the alleged improper agreement, because "specific facts" are not necessary.  *In re Flash Memory Antitrust Litigation*, 643 F.Supp.2d 1133, 1148 (N.D.Cal. 2009). In

19

*Flash Memory*, plaintiff alleged a conspiracy to fix the price of memory chips which was formed when defendants participated in trade associations at which it was possible for the agreements to be made.  The Court found that participating in trade associations, alone, was not sufficient to state a claim, but considered other allegations in the complaint.  The court rejected defendants argument that the complaint should be dismissed because plaintiff had failed to identify who had attended the trade shows and trade association meetings at which prices were fixed.   The court rejected the argument that complaint should be dismissed for  "fail[ure] to identify who attended these meetings, what was discussed at them, or how they purportedly related to the conspiracy other than providing an opportunity for the parties to talk to one another."  The Court stated that the "complaint in this case contains extensive, detailed allegations as to when, where and who engaged in at least some of the meetings that gave rise to the alleged conspiracy."  *Flash Memory*, 643 F.Supp.2d at 1147.

*In re Static Random Access Memory (SRAM) Litig.*, 580 F.Supp.2d 896 (N.D.Cal.2008), the court held that evidence of guilty pleas in markets not directly involved in the claims before it supported a reasonable inference of conspiratorial behavior in the markets in the case before it.  The plaintiff had alleged the agreement was communicated through various emails and other correspondence. Plaintiff alleged the specific communications and contents of the emails regarding the agreement to exchange and set prices.  *SRAM*, 580 F.Supp.2d 900-901.  Plaintiffs also alleged other communications between defendants for exchange of price information.  In addition, plaintiffs alleged guilty pleas by defendants' representative which the court stated was "not sufficient to support Plaintiffs' claims standing on their own, [but] they do support an inference of a conspiracy in the SRAM industry" and thus these allegations supported the plausibility of the alleged conspiracy involved.  In *In re Late Fee and Over-Limit Fee Litig.*, 528 F.Supp.2d 953 (N.D.Cal.2007), credit card holders sued large credit card issuers in the United States alleging excessive late-fees.  The court held that stray statements, attributed to no one in particular, without any suggestion as to content or circumstances, failed to satisfy the *Twombly* plausibility requirement. *Id.* at 962. The court held that plaintiffs failed to place their allegations "in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 963 (quoting *Twombly*).

1    In a similarly plead case, the Court held that conclusory allegations did not survive motion to

2 dismiss. *In re Elevator Antitrust Litigation*, 502 F.3d 47 (2nd Cir. 2007). Specifically, plaintiffs

3 alleged that, in order to effect the conspiracy, defendants:

4    (a) Participated in meetings in the United States and Europe to discuss pricing and

5    market divisions;

6    (b) Agreed to fix prices for elevators and services;

7    (c) Rigged bids for sales and maintenance;

8    (d) Exchanged price quotes;

9    (e) Allocated markets for sales and maintenance;

10    (f) "Collusively" required customers to enter long-term maintenance contracts; and

11    (g) Collectively took actions to drive independent repair companies out of business.

12 The Court affirmed dismissal because that the allegations were "in entirely general terms without any

13 specification of any particular activities by an particular defendant." 502 F.3d at 51.

14    Here, the Court finds that plaintiff's allegations of the Market Allocation Agreement are

15 conclusory and non-specific.  Plaintiffs' allegations do not put Defendants on notice with enough

16 sufficiency to form the basis for a response.  From the allegations of the SAC, plaintiff alleges that

17 the defendants, all of them and in equal parts, entered into the "Market Allocation Agreement" in

18 2006.  U.S. Steel, for its part, agreed to exit the Relevant Market by no longer offering discount

19 pricing. No specifics are given.  No specific agreements among and between defendants are alleged.

20 All defendants agreed to all agreements, notwithstanding their different corporate roles in and

21 between themselves.  For instance, plaintiff does not allege the specific corporate players along with

22 names of key executives.  Plaintiff does not allege where the agreement was made, or if there were

23 multiple agreements or one global agreement made at one time.  Specific allegations of the terms of

24 the Market Allocation Agreement are particularly significant in this case.  Here, plaintiff alleges

25 2006 agreement to exit the market and dramatically increased prices, yet plaintiff's pricing chart

26 shows prices did not "dramatically" increase until 2009, three years later.  (Doc. 235, SAC ¶¶48, 61.)

27 The terms of the agreement therefore become factually significant.

28    Further, the Court notes that the agreement alleged in the SAC is not the same as the

1   agreement alleged in the most-recent prior pleading (First Amended Complaint).[7]  The agreement

2   alleged in the prior pleading was to form UPI and monopolize the market upon formation, in 1986.

3   The prior pleading alleged that U.S. Steel and POSCO entered into a market allocation agreement, in

4   1986, to exit the Tin Mill Products market in 1986 and allocate all customers to UPI. This Court

5   found that agreement was barred by the statute of limitations and thus the new SAC pleading

6   changes the agreement. In the SAC, plaintiff alleges that the Market Allocation Agreement occurred

7   in 2006, among other differences.  The Court does not ignore the prior allegations in determining the

8   plausibility of the current pleadings.  *Ellingson v. Burlington Northern, Inc.*, 653 F.2d 1327, 1329

9   (9th Cir. 1981) (a court need not accept as true allegation in an amended complaint that contradict an

10   earlier complaint without explanation).  The Court, however, acknowledges that there is nothing in

11   the Federal Rules of Civil Procedure to prevent a party from filing successive pleadings that make

12   inconsistent or even contradictory allegations. *PAW government Serv., Inc. v. MPRI, Inc.*, 514 F.3d

13   856, 860 (9th Cir. 2007).  Thus, plaintiff permissibly may alter the challenged conduct in an amended

14   complaint, but the Court finds that in light of the prior allegations, the plaintiff must allege more

15   factual support for the Market Allocation Agreement.[8]

16         Plaintiff argues that the SAC alleges the agreement was subject to "specific enforcement and

17   monitoring activities."  The "enforcement and monitoring" allegations, however, do not allege how

18   the agreement <u>was formed</u>, the specific terms of the agreement and by whom.  The allegations of the

19   "specific enforcement and monitoring activities" address what occurred after the agreement was

20   formed.  (Doc. 235, SAC ¶56: "After entering into the Market Allocation Agreement, U.S. Steel,

21   UPI and POSCO held regular in-person meetings.")

22

---

23         [7] Plaintiff alleged a market allocation agreement which resulted from the formation of UPI.  (Doc. 216, FAC ¶123.)

24         [8] Plaintiff cites *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877 (N.D. Ill. 2009).  In *Standard Iron*, the
25   court denied a motion to dismiss finding that plaintiffs, direct purchasers of steel, adequately alleged that the domestic steel
     market is concentrated in the hands of a relatively few producers, and that defendants' coordinated production cuts further
26   exacerbated a steel supply shortage, thus squeezing the market and inflating the prevailing market price for steel.  The court
     found that plaintiffs, although alleging no specific evidence for a conspiracy, adequately distinguished defendants' acts from
27   that of parallel conduct in plausibly alleging that the domestic steel production market was ripe for collusion, that acts of
     cutting back on supply represented an abrupt departure from the previous acts of defendants, and that those acts were contrary
28   to the independent financial interests of the defendants. This Court does not find *Standard Iron* persuasive.  Plaintiff alleges
     a direct agreement and does not seek to show it solely through circumstantial evidence.

22

1          (B)      Plausibility of the Conspiracy

2          Defendants argue that the SAC fails to state a claim that is "plausible on its face." (Doc. 241,

3    Moving papers p. 17.)  Defendants argue that it is implausible that UPI would increase its tin mill

4    products to supracompetitive levels just because U.S. Steel ended its competitive pricing because

5    U.S. Steel was not the sole competitor.  In the SAC, UPI had other competitors and as such UPI

6    could not freely increase its prices; and did so only after all competitors ended "freight equalization."

7     Defendants argue that "[t]he existence of this plausible, alternative explanation renders Plaintiff's

8    claims  unsustainable under *Twombly*."  (Doc. 241, Moving papers p. 18-19.)

9          Defendants also argue that it is implausible that UPI waited three years after obtaining

10   monopoly power in 2006 to raise prices in 2009.  Defendants argue that the allegations are internally

11   inconsistent because a pricing chart shows prices were raised in 2009. Defendants argue that the

12   more plausible explanation is that pricing decisions of independent competitors allowed UPI to raise

13   prices.  (Doc. 241, Moving paper p.19.)  Defendants also argue that the various versions of the

14   complaint allege inconsistent  and varying conspiracies throughout the years.

15         Plaintiff argues that *Twombly* does not require that the alleged antitrust conspiracy be the

16   most likely explanation and that defendants' argument that there exists "a more plausible, alternative

17   explanation" is not the legal standard.  Plaintiff argues that the Market Allocation Agreement is

18   plausible.  Plaintiff argues that it has alleged numerous "plus factors" which show the plausibility of

19   the alleged conspiracy and agreement. The structure of the Relevant Market makes collusion

20   plausible, collusion is possible because of the concentrated supply controlled by defendants, the

21   inelastic demand for tin mill products would force customers to purchase from defendants.

22         The Court need not make unwarranted deduction or unreasonable inference from the

23   allegations.  But as long as the theory "is not facially implausible, the court's skepticism is reserved

24   for later stages of the proceedings." *In re Gilead Sciences Sec. Litigation*, 536 F.3d 1049, 1057 (9th

25   Cir. 2008).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the

26   court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*

27   at 1949.

28         Here, the Court has found that the Market Allocation Agreement factually insufficient.

23

1  Without the specificity of pleading that Agreement, the Court cannot determine its plausibility.

2  Therefore, the Court does not reach this issue.

3  **D.      Plaintiff's Claims under the Sherman Act**

4       Plaintiff explains in its opposition that the agreement had two parts.  All defendants and co-

5  conspirator POSCO agreed to fully allocate customers of Tin Mill Products in the Western United

6  States of UPI.  All defendants and POSCO agreed to use UPI's resulting monopoly power to increase

7  the prices of Tin Mill Products in the Western United States to supracompetitive levels.  These two

8  aspects form both the §1 and §2 violations of the Sherman Act.

9       **1.      Section of the Sherman Act - Conspiracy**

10       Section 1 of the Sherman Act prohibits "[e]very contract, combination...or conspiracy in

11  restraint of trade or commerce among the several States." 15 U.S.C. §1.  To state a claim under

12  Section 1 of the Sherman Act, 15 U.S.C. § 1, claimants must plead not just ultimate facts (such as a

13  conspiracy), but evidentiary facts which, if true, will prove: (1) a contract, combination or conspiracy

14  among two or more persons or distinct business entities; (2) by which the persons or entities

15  intended to harm or restrain trade or commerce, (3) which actually injures competition.  *Kendall v.*

16  *Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008).

17       **2.      Section 2 of the Sherman Act - Monopolization**

18       Unlike Section 1, Section 2 of the Sherman Act prohibits antitrust activity of a single entity.

19  Section 2 makes it an offense for any person to "monopolize, or attempt to monopolize, or combine

20  or conspire with any other persons, to monopolize any part of the trade or commerce among the

21  several states." 15 U.S.C. § 2.  To prove a conspiracy to monopolize in violation of § 2, Plaintiff

22  must show four elements: (1) the existence of a combination or conspiracy to monopolize; (2) an

23  overt act in furtherance of the conspiracy; (3) the specific intent to monopolize; and (4) causal

24  antitrust injury.  *Paladin Associates, Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir.

25  2003).

26       **3.      Allegations regarding the elements**

27       Defendants challenge the first through third claims as failing to allege a viable conspiracy to

28  monopolize.  Defendants argues that plaintiff fails to allege two elements -Defendants argue plaintiff

24

has failed to allege facts regarding (1) the existence of a conspiracy to monopolize and (2) specific

intent to monopolize.  (Doc. 241, Moving papers p. 21.)  Defendants argue that the allegations of the

conspiracy in the SAC are "conclusory and superficial" and repeat their arguments regarding the

*Twombly* as to the Market Allocation Agreement.   (Doc. 241, P&A p. 21.)  Defendants argue that

the monopolization fails because plaintiff alleges there were other competitors in the market and that

the prices were the result of independent actions, and not by any conduct by defendants specifically

designed to monopolize a market.

(A)        <u>Specific Intent and AntiCompetitive Acts</u>

To prevail on a conspiracy to monopolize, plaintiff must show "specific intent to monopolize

and anticompetitive acts designed to effect that intent." *Hunt-Wesson Foods, Inc. v. Ragu Foods,*

*Inc.*, 627 F.2d 919, 926 (9th Cir.1980), *cert. denied*, 450 U.S. 921 (1981).  "[S]pecific intent to

monopolize and anticompetitive acts designed to effect that intent" are required for a conspiracy to

monopolize claim. *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d at 1154; *Syufy Enterprises v.*

*American Multicinema, Inc.*, 793 F.2d at 1001 ("But we know of no authority that a Section 2

conspiracy may be established without some showing that more than one of the alleged

co-conspirators had at least some awareness that the underlying conduct was anticompetitive or

monopolistic").

A "specific intent to monopolize" means an intent to exclude competition or control prices.

*Carpet Seaming Tape Licensing Corp. v. Best Seam. Inc.*, 616 F.2d 1133, 1141-42 (9th Cir. 1980)

(specific adverse impact on the market); see *American Tobacco Co. v. United States*, 328 U.S. 781,

789 (1945) (object of a combination or conspiracy to monopolize is the exclusion of actual and

potential competitors).  A specific intent to destroy competition or build monopoly is essential.

*Times-Picayune Pub. Co. v. U.S.*, 345 U.S. 594, 626, 73 S.Ct. 872, 890 (U.S. 1953) Thus, plaintiff

must allege "specific intent" to ultimately seize monopoly power within the relevant market.

Plaintiff argues that it has satisfied the requirements to allege the existence of a conspiracy to

monopolize, by alleging the Market Allocation Agreement.  That argument, and the adequacy of the

Market Allocation Agreement, has been addressed, *infra*.

1       (B)     <u>Allegations of Independent Market Conditions</u>

2       Plaintiff also argues that it has alleged specific intent to monopolize.  (Doc. 252, Opposition

3 p. 22 and n.15.) In its opposition, plaintiff points to the purpose of the Market Allocation Agreement.

4 Plaintiff alleges that the purpose of the Market Allocation Agreement was to allocate all customers

5 in the Western United States to UPI. (Doc. 235, SAC ¶48-52.)  U.S. Steel ended all sales of Tin Mill

6 Products to the Western United States. (Doc. 235, SAC ¶¶12, 60-62, 63.)  POSCO also did not sell

7 Tin Mill Products within the Western United States.  Through joint control of UPI, U.S. Steel and

8 POSCO set UPI's Tin Mill Products prices at supracompetitive prices.  (SAC ¶43, 52, 60-67.)

9       Defendants argue specific intent is improperly alleged because the market conditions, not any

10 improper agreement, resulted in the price increase.  Defendants argue that plaintiff alleges that from

11 UPI's formation in 1986 until 2006, UPI faced competitors in the Tin Mill Products market,

12 including U.S. Steel.  (Doc. 241, Moving papers p. 21; Doc. 235 SAC ¶44.)  Defendants argue that

13 plaintiff alleges that there were other competitors in the market and plaintiff makes no effort to

14 explain what happened to the competitive, other companies and how that influence the Market

15 Allocation Agreement.

16       Defendants further argue that plaintiff's allegations are internally inconsistent on the price

17 increase of Tin Mill Products.  Defendants note that plaintiff alleges a dramatic price increase in

18 2006.  But, plaintiff's allegations include a chart of prices which shows price increases starting only

19 in 2009, three years later.  (Doc. 241, Moving papers p. 4.)  Defendants argue that plaintiff alleges

20 that as a result of <u>independent</u> market conditions defendants acquired monopoly power.

21       The statute targets "the willful acquisition or maintenance of that power as distinguished

22 from growth or development as a consequence of a superior product, business acumen, or historic

23 accident." *Pacific Bell Telephone Co. v. Linkline Communications, Inc.*, - U.S. -,  129 S.Ct. 1109,

24 1118 (2009).   Specific intent is sufficiently met by proof that a group of competitors took concerted

25 action to drive independent competitors out of business. *TV Communications Network v. Turner*

26 *Network Television, Inc.*, 964 F2d 1022 (10th Cir. 1992), citing *Matsushita Elec. Ind.*, 475 U.S. 574.

27       Here, the Court agrees with defendant that plaintiff has not alleged specific intent.  "Specific

28 intent" allegation is conclusory.  Plaintiff alleges that the "U.S. Steel entered into this [Market

1   Allocation Agreement] with the specific intent to eliminate competition and monopolize the

2   Relevant Market." (Doc. 235 SAC ¶49.) Similar allegations are alleged of the remaining

3   defendants. (Doc. 235 SAC ¶50-52) ("[defendant] entered into this agreement with the specific

4   intent to eliminate competition and monopolize the Relevant Market.") Plaintiff's conclusory

5   allegation of specific intent does not allege the facts in which defendants intended and did drive out

6   independent competitors. Indeed, plaintiff alleges that other competitors existed in the market.

7   Plaintiff alleges that "Since its formation and until 2006, UPI faced competitors in the market for Tin

8   Mill Products in the Western Unites States. One competitor was U.S. Steel itself." (Doc. 235 SAC

9   ¶44.) The allegations do not state that (or how) the Market Allocation Agreement drove out

10  independent competition. The SAC fails to allege the defendants acted with specific intent of

11  driving out competition.

12  **E.      Cartwright Act**

13          Defendant UPI argues that plaintiff's California Cartwright Act claim fails for the same

14  reasons as under the Sherman Act.

15          The Cartwright Act is California's antitrust statute. Bus. &Prof Code §§16700-16770. Cases

16  decided under the Sherman Act are applicable to interpreting the Cartwright Act. *See Marin County*

17  *Bd. Of Realtors, Inc. v. Palsson*, 16 Cal.3d 920, 130 Cal.Rptr.1 (1976). Indeed, the analysis under

18  California's antitrust law mirrors the analysis under federal law because the Cartwright Act was

19  modeled after the Sherman Act. *County of Tuolumne v. Sonora Community Hosp.*, 236 F.3d 1148,

20  1160 (9th Cir. 2001). Therefore, the analysis and conclusions would be the same under the

21  Cartwright Act, as under the federal claims.

22          Defendants argue that plaintiff's California Cartwright Act claim fails because plaintiff lacks

23  standing. Plaintiff lacks standing since plaintiff has not suffered an "antitrust injury" because

24  plaintiff does not participate in the relevant market. Plaintiff does not participate in the defendants'

25  market for tin-mill products. Defendants further argue that plaintiff lacks standing because "the

26  injury Plaintiff alleges it suffered is purely derivative of the injury allegedly suffered by Silgan."

27  (Doc. 241, Moving papers p.15.)

28          As stated in this Court prior order, the Cartwright Act permits indirect purchasers to have

27

standing. Pursuant to §16750 of the Cartwright Act, an action may be brought by a person injured "regardless of whether such injured person dealt <u>directly or indirectly</u> with the defendant." Bus&Prof. Code §16750 (emphasis added).  Unlike the federal Sherman Act, the Cartwright Act grants indirect purchasers standing to sue, as well as direct purchasers.  *Clayworth v. Pfizer, Inc.*, 49 Cal.4th 758, 763, 111 Cal.Rptr.3d 666, 671 (2010); *see also Knevelbaard*, 232 F.3d at 991, citing *Cellular Plus, Inc. v. Superior Court*, 14 Cal.App.4th 1224, 1234, 18 Cal.Rptr.2d 308 (1993) ("[t]he exact parameters of 'antitrust injury' under section 16750 have not yet been established" but that "the scope of that term is broader" than under federal law.)  California courts have held that a plaintiff whose injuries "were not secondary, consequential, or remote, but the direct result of the unlawful conduct and were the kind of injuries the antitrust laws seek to prevent" has antitrust standing.  *Cellular Plus, Inc. v. Superior Court*, 14 Cal.App.4th at 1233.  Thus, an indirect purchaser has standing under the Cartwright Act.  Plaintiff's status as an indirect purchaser does not preclude plaintiff's claim.

 Given the analyses and conclusions regarding the federal claims, the Court incorporates those rulings for the state Cartwright Act antitrust claim as well.  To the extent that the motion has been granted for lack of standing, that ruling is inapplicable to the Cartwright Act.

 Further, defendants argue that the claim should be dismissed because it does not satisfy the "high degree of particularity" required for pleading a Cartwright Act violation, citing *Freeman v. San Diego Assn of Realtors*, 77 Cal.App.4th 171 (1999).  (Doc. 241, Motion p. 23.)  Defendants rely upon California's pleading standards which require a certain level of "particularity" for pleading antitrust violations.

 The Federal Rules of Civil Procedure govern the sufficiency of a pleading in federal actions.  In federal court actions based on state law claims, state law determines whether the claims exist and what defenses are recognized.  The manner in which such claims or defenses are raised, however, is governed by the Federal Rules. *See Taylor v. United States*, 821 F.2d 1428, 1433 (9th Cir. 1987) (state law affirmative defenses waived if not pleaded).  Federal pleading standards do not require a "high degree of particularity."  The standard for pleading was stated in *Twombly*: the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

1    To the extent the Court found the pleading inadequate, that ruling applies to the Cartwright Act

2    claim.

3    **F.      Unfair Competition Claim.**

4          Plaintiff's count 4 alleges a claim under California's Unfair Practices Act, also called the

5    Unfair Competition Act ("UCL").  The purposes of the UCL are "to safeguard the public against the

6    creation or perpetuation of monopolies and to foster and encourage competition, by prohibiting

7    unfair, dishonest, deceptive, destructive, fraudulent and discriminatory practices by which fair and

8    honest competition is destroyed or prevented."  Cal.Bus.&Prof.Code § 17001.  "The UC[L] works by

9    'borrowing' violations of other laws and treating those transgressions, when committed as a business

10   activity, as  'unlawful business practices.'"  *Stevens v. Superior Court*, 75 Cal.App.4th 594, 602

11   (1999).  These "unlawful business practices"  are "independently actionable under section 17200 et

12   seq. and subject to the distinct remedies provided thereunder."  *Id.*

13         The UCL claim predicates liability based on the Sherman Act and the Cartwright Act.  (See

14   Doc. 235, SAC ¶112-113.)  Plaintiff alleges that the agreements, combination and conspiracies

15   alleged in the Sherman Act claims and the Cartwright Act claims "constitute unlawful and unfair

16   business practices."  (Doc. 235, SAC ¶114-115.)

17          Given the analyses and conclusions regarding the federal and state claims, the Court

18   incorporates those rulings for the UCL claim as well.

19   /////

20   /////

21   /////

22   /////

23   /////

24   /////

25   /////

26   /////

27   /////

28   /////

**CONCLUSION**

For the foregoing reasons, the motion to dismiss the second amended complaint is GRANTED with leave to amend in strict conformance with this order.

Plaintiff shall have 20 days from the date of service of this order to file an amended complaint. Frankly stated, this Court, due to its crushing caseload, does not have the time or resources to spend re-doing what it has already done. If the third amended complaint is non-compliant with this order, there will be no more opportunities to amend absent an order from the Ninth Circuit.

IT IS SO ORDERED.

**Dated:** __**February 24, 2011**__        __**/s/ Lawrence J. O'Neill**__
                                           UNITED STATES DISTRICT JUDGE