1
2
3
4
5
6
7          **IN THE UNITED STATES DISTRICT COURT**

8          **FOR THE EASTERN DISTRICT OF CALIFORNIA**

9

10   STANISLAUS FOOD PRODUCTS          CASE NO. CV F 09-0560 LJO SMS
     COMPANY,
11                                     **ORDER ON JOINT MOTION TO DISMISS**
                                       (Doc. 272)
12                  Plaintiff,

13        vs.

14   USS-POSCO INDUSTRIES, et al.,

15                  Defendant.
     _____/

16          By motion filed on April 18, 2011, defendants USS-POSCO Industries ("UPI"), U.S. Steel Corp,

17   Pitcal, Inc., POSCO-California Corp, and POSCO American Steel Corp. (collectively "defendants")

18   filed a joint motion to dismiss the plaintiff's third amended complaint ("TAC").  The motions were filed

19   under seal and redacted portions of the motions were subsequently filed.  Plaintiff Stanislaus Food

20   Products filed an opposition to the motions on May 23, 2011.  The opposition also was filed under seal

21   with a redacted version later filed.  The defendants filed a joint reply brief on June 3, 2011. Pursuant to

22   order, the motion was set without a hearing date.  Having considered the moving, opposition, and reply

23   papers, as well as the Court's file, the Court issues the following order.

24                              **FACTUAL BACKGROUND**

25          Plaintiff Stanislaus Food Products ("plaintiff" or "Stanislaus") is a Modesto tomato canner.

26   Stanislaus processes and "fresh packs" tomatoes into tin-plated cans.  Since 2001, Stanislaus has

27   purchased millions of one-gallon tin-plated cans pursuant to a Container Supply Agreement ("Container

28

                                          1

Agreement") with non-party Silgan Containers Corporation ("Silgan"). (Doc. 268, TAC ¶21.)[1] Silgan buys "Tin Mill Products" (tin-plated steel) and manufactures the Tin Mill Products into tin-plated cans which are sold to canners, such as Stanislaus. (Doc. 268, TAC ¶29 .) Defendant USS-POSCO Industries ("UPI") is the manufacturer of the Tin Mill Products. UPI produces cold-rolled sheets, galvanized sheets and tin-plated and tin-free steel from "hot rolled" steel at its plant in Pittsburgh, California. (Doc.268, TAC ¶23.) UPI then sells the tin-plated steel to Silgan to make tin cans which Silgan in turn sells to Stanislaus. UPI is the only Tin Mill Products producer in the Western United States.

This action alleges antitrust conspiracies by defendants to monopolize the Tin Mill Products market and to price-fix Tin Mill Products.

**Alleged Co-Conspirators**

The hot-rolled steel, also known as "hot-band steel," is supplied to UPI by co-defendant U.S. Steel and non-party Pohang Iron & Steel Co., Ltd. ("POSCO") of South Korea. U.S. Steel is a Delaware corporation with its principal place of business in Pittsburgh, Pennsylvania. (Doc. 268, TAC ¶22.) POSCO is a Korean corporation. (Doc. 268, TAC¶27.) UPI is a joint venture formed in 1986 by U.S. Steel and POSCO, through their holding companies. (Doc. 268, TAC ¶6.) The nominal general partners of UPI are Defendants Pitcal, Inc. and POSCO-California Corporation ("POSCAL"). Each of these UPI general partners is wholly owned subsidiary of either U.S. Steel or POSCO. Defendant Pitcal, Inc. is a wholly-owned subsidiary of U.S. Steel. POSCAL is a wholly-owned subsidiary of Defendant POSCO American Steel Corporation ("POSAM"), which is in turn a wholly-owned subsidiary of POSCO. (Doc. 268, TAC ¶23-26.) Ultimately, U.S. Steel and POSCO each own a 50% interest in UPI. (Doc. 268, TAC ¶6.)

**Tin Mill Products Market**

UPI is the only Tin Mill Products manufacturer in the Western United States. (Doc. 268, TAC ¶23.) Companies outside the Western United States have higher transportation costs for their Tin Mill Products. Until 2006, U.S. Steel sold Tin Mill Products in the Western United States by competitively pricing its products compared to UPI. Both U.S. Steel and POSCO own and operate facilities separate

---

[1] The redacted version of the Third Amended Complaint is referenced in this order, unless otherwise noted.

from UPI that produce Tin Mill Products. (Doc. 268, TAC ¶38.) Plaintiff alleges that until 2006, U.S. Steel competed directly with UPI for sales of Tin Mill Products in the Western United States. (Doc. 268, TAC ¶47.) After 2006, the competition ceased pursuant of the Market Allocation Agreement.

### Market Allocation Agreement

Plaintiff alleges that beginning in 2005, the CEOs of U.S. Steel and POSCO talked about steel capacity and output. "On information and belief, Mr. Surma and Mr. Lee discussed coordination between U.S. Steel and POSCO to reduce the supply of Tin Mill Products in the Western United States." (Doc. 268, TAC ¶59.) The CEOs are both members of the International Iron and Steel Institute ("IISI"). Plaintiff alleges that in October 2006, "On information and belief, at this meeting, Mr. Surma and Mr. Lee discussed eliminating competition in the Relevant Market, including coordinating supply restrictions of Tin Mill Products in the Western United States, in order to increase the prices of Tin Mill Products artificially." (Doc. 268, TAC ¶60.) Plaintiff alleges that on June 27, 2006, the International Trade Commission extended an antidumping order which precluded Japanese steel makers from entering the Western United States steel market. (Doc. 268, TAC ¶66-67.) Plaintiff states that after the antidumping order was extended "defendants finalized the Market Allocation Agreement."

Plaintiff alleges that "the Market Allocation Agreement itself was negotiated and finalized during the 2006 meetings of UPI's Management Committee." (Doc. 268, TAC ¶68.) Plaintiff alleges "on information and belief" who was present at the meeting, representing which of the defendants. (Doc. 268, TAC ¶69.) Plaintiff alleges that:

> "The overarching purpose of the Agreement was to allocate the Relevant Market fully to UPI in order to create a monopoly and control prices so that UPI (under the direction and control of U.S. Steel, through Pitcal, and POSCO, through POSAM and POSCAL) could control and increase the prices of Tin Mill Products in the Western United States to artificially high levels." (Doc. 268, TAC ¶73.)

Pursuant to the Market Allocation Agreement, U.S. Steel agreed to:

-   exit the Relevant Market by no longer competing in the Western United States,
-   promised to eliminate discounts U.S. Steel had offered its customers in the Western Unites States for quarter inch width surplus and for freight equalization pricing. (Doc. 268, TAC ¶74.)

1   Pursuant to the  Market Allocation Agreement, POSCO (POSAM and POSCAL) agreed to:

2       -     refrain from selling into the Western United States Tin Mill Products produced by

3             POSCO.  (Doc. 268, TAC ¶76.)

4   Pursuant to the  Market Allocation Agreement, UPI agreed to raise Tin Mill Products prices.  (Doc. 268,

5   TAC ¶78.)   Plaintiff alleges that "U.S. Steel, UPI, Pitcal, POSCAL, POSAM, and POSCO thereby

6   agreed to eliminate the diversity of entrepreneurial interests that prevailed prior to 2006 (U.S. Steel's

7   actual competition and POSCO's potential competition)."   (Doc. 268, TAC ¶79.)

8         Plaintiff alleges that the Market Allocation Agreement was implemented and enforced by UPI,

9   U.S. steel and POSCO through meeting held periodically.  (Doc. 268, TAC ¶¶84-87.)  Plaintiff alleges

10  that "The existence and content of these meetings and communications have been kept strictly

11  confidential by Defendants and co-conspirator POSCO." (Doc. 268, TAC ¶¶88.)

12  **Claims in the TAC**

13        The Third Amended Complaint alleges the following claims for relief:

14      (1)     First Claim - California Cartwright Act, Cal.Bus. & Prof. Code §16720;

15      (2)     Second Claim -  Section 1 of the Sherman Act, 15 U.S.C. §1 (Restraint of Trade);

16      (3)     Third Claim -  Section 2 of the Sherman Act, 15 U.S.C. §2 (Conspiracy to Monopolize);

17      (4)     Fourth Claim for Relief - Unfair Competition, Cal.Bus & Prof Code §17200.

18  This motion challenges each of plaintiff's claims.

19  **ANALYSIS AND DISCUSSION**

20  **A.**     **Rule 12(b)(6) - Motion to Dismiss for Failure to State a Claim**

21        A motion to dismiss pursuant to Fed R. Civ. P. 12(b)(6) is a challenge to the sufficiency of the

22  pleadings set forth in the complaint.  A Fed. R. Civ. P. 12(b)(6) dismissal is proper where there is either

23  a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal

24  theory." *Balisteri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990).  In considering a motion

25  to dismiss for failure to state a claim, the court generally accepts as true the allegations of the complaint

26  in question, construes the pleading in the light most favorable to the party opposing the motion, and

27  resolves all doubts in the pleader's favor.  *Lazy Y. Ranch LTD v. Behrens,* 546 F.3d 580, 588 (9th Cir.

28  2008); *Jenkins v. McKeithen*, 395 U.S. 411, 421, *reh'g denied*, 396 U.S. 869 (1969).

To survive a motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1974 (2007) ("*Twombly*"). A claim has facial plausibility,"when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, – U.S. –, 129 S.Ct. 1937 (2009). "[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009).

A court is "free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations." *Farm Credit Services v. American State Bank*, 339 F.3d 765, 767 (8th Cir. 2003) (citation omitted). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. 554,127 S. Ct. 1955, 1964-65 (internal citations omitted). Moreover, a court "will dismiss any claim that, even when construed in the light most favorable to plaintiff, fails to plead sufficiently all required elements of a cause of action." *Student Loan Marketing Ass'n v. Hanes*, 181 F.R.D. 629, 634 (S.D. Cal. 1998). In practice, "a complaint . . . must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562, 127 S.Ct. at 1969. If a plaintiff fails to state a claim, a court need not permit an attempt to amend a complaint if "it determines that the pleading could not possibly be cured by allegation of other facts." *Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990).

**B.     Overview of Sherman Act Claims**

Plaintiff alleges the Market Allocation Agreement violates §1 and §2 the Sherman Act.  15 U.S.C. §§ 1, 2. Section 1 prohibits restraint of trade: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared to be illegal."  To prevail on a cause of action for violation of 15 U.S.C. § 1, a plaintiff must show, "(1) there was an agreement, conspiracy, or combination between two or more entities; (2) the agreement was an unreasonable

5

1  restraint of trade under either a per se or rule of reason analysis; and (3) the restraint affected interstate

2  commerce." *American Ad Management, Inc. v. GTE Corp.*, 92 F.3d 781, 784 (9th Cir. 1996).

3       Plaintiff also alleges violation of Section 2 of the Sherman Act.  Section 2 makes it illegal to "to

4  monopolize ... any part of the trade or commerce . . ." 15 U.S.C. § 2. Plaintiff alleges a conspiracy to

5  monopolize.  To prove a conspiracy to monopolize in violation of § 2, Plaintiff must show four

6  elements: (1) the existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance

7  of the conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury.  *Paladin*

8  *Associates, Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003).

9  **C.      Challenge to the TAC under *Twombly***

10      The defendants challenge the complaint on the procedural grounds that the pleadings are

11 inadequate under *Twombly*.  Defendants argue that the allegations of an agreement to restrain trade in

12 violation of Section 1 are inadequate.  The basis for the conspiracy claim is the "Market Allocation

13 Agreement." Defendants challenged the adequacy of allegations of the Market Allocation Agreement

14 on three grounds: (1) plaintiff does not allege direct evidence of an agreement to restrain trade, and

15 circumstantial evidence fails to support a reasonable inference of conspiratorial agreement, (2)

16 contradictory allegations render the Market Allocation Agreement implausible, (3) plaintiff's claims are

17 not "plausible on their face."

18      **1.      Standards of Specificity**

19      "[A] district court must retain the power to insist upon some specificity in pleading before

20 allowing a potentially massive factual controversy to proceed." *Bell Atlantic Corp. v. Twombly*, 550

21 U.S. 544, 558, 127 S.Ct. 1955, 1967 (2007).  The complaint must allege "enough facts to state a claim

22 to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. A claim of Sherman Act violation

23 requires enough factual allegations to suggest an illegal agreement was made.

24      In *Twombly*, the Supreme Court found allegations that the defendant telephone companies

25 "entered into a contract, combination or conspiracy to prevent competitive entry in their respective local

26 telephone and/or high speed internet services markets and have agreed not to compete with one another

27 and otherwise allocated customers and markets to one another" insufficient because no evidentiary facts

28 were pleaded which could prove the conspiracy. *Twombly*, 550 U.S. at 565.  The Court stated, in dicta,

that "the pleadings mentioned no specific time, place, or person involved in the alleged conspiracies." 550 U.S. at 565 n. 10 ("the complaint here furnishes no clue as to which of the four [defendants] (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place."). Allegations of an agreement would normally include details about the formation of that agreement. See *Twombly*, 550 U.S. 565 n. 10.

In *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008) , a class of retailers failed to plead sufficient evidentiary facts to survive dismissal under *Twombly* of a price-fixing claim against Visa, MasterCard and banks belonging to the two systems.  Plaintiffs alleged that the defendants had conspired to fix the bank fees charged to retailers for processing credit card sales.  The court found that plaintiffs offered no evidentiary facts as to the banks individually beyond the collective legal conclusion that the "banks" knowingly participated in the alleged scheme.  *Id.* at 1048.  The court stated that plaintiffs allegation of an agreement that the "Banks knowingly, intentionally and actively participated in an individual capacity in the alleged scheme" to fix the fees, was factually insufficient.  *Kendall*, 518 F.3d at 1048.  Without more factual content the "banks," which were large institutions with hundreds of employees, entering into contracts and agreements daily, would have no idea how to begin to respond to the allegations of a conspiracy.  *Id.* at 1047. The court held the complaint was properly dismissed because plaintiffs did not allege factual specifics that would "answer [such] basic questions [as]: who, did what, to whom (or with whom), where, and when?" *Id.* at 1049.

*Twombly* and *Kendall* do not require that plaintiff prove its case or include every factual detail in support of its claims in their complaints. Rather, *Twombly* and *Kendall* requires plaintiff to include sufficient facts supporting the existence of a conspiracy, beyond the conclusory allegation that a conspiracy did exist.

### 2.    Adequacy of Pleading the "Market Allocation Agreement"

This is the third and last time this Court has or will consider the adequacy of plaintiff's pleading of the Market Allocation Agreement.  In this Court's previous order, the Court found the allegations of Market Allocation Agreement were conclusory and non-specific.  The Court granted the motion to dismiss on the grounds that no specific agreements among and between defendants were alleged. Plaintiff had alleged all defendants agreed to all agreements, notwithstanding their different corporate

1    roles in and between themselves.  The Court found that specific allegations of the terms of the Market

2    Allocation Agreement are particularly significant in this case and dismissed for lack of specificity.  The

3    Court now turns to whether plaintiff has plead the Market Allocation Agreement adequately.

4           As alleged in the TAC, the Market Allocation Agreement comprises a long term, complex

5    arrangement between former competitors, turned joint venturers.  At its core, the Market Allocation

6    Agreement was an agreement between U.S. Steel and POSCO, two competitors and also joint venturers

7    in UPI, to no longer compete in the Tin-Mill Products market in the Western United States.  (TAC ¶13.)

8    The Agreement required U.S. Steel to no longer compete in the Western United States for its own

9    profits, but rather for  U.S. Steel to exit the market and "share" in tin mill products through profits from

10   UPI.  The TAC states the dates the Market Allocation Agreement was negotiated: January 9, 2006, June

11   12, 2006 and December 6, 2006.  (Doc. 268, TAC ¶14.)  These dates coincide with UPI Management

12   Committee meetings.[2]  The TAC alleges the persons involved in the agreement and the roles each person

13   undertook, but on information and belief.  (Doc. 268, TAC ¶14.)  The TAC details which person were

14   involved in which discussions.  (Doc. 268, TAC ¶56-60, 69.)

15          The TAC alleges specific terms of the Market Allocation Agreement:[3]

16   _____

17       [2] Defendants argue that "other than sheer speculation, it is not clear what basis Plaintiff could possibly have to allege
     that these meetings had anything to do with an alleged Market Allocation Agreement."  (Doc. 272, Joint Brief p.9 n.6.)

18   Defendants further argue that "the allegations are also false in fact."  *Id.*  The Court is not here concerned the falsity or
     speculation as to what occurred at the meetings.  These are issues of proof for a different stage of proceeding.  Here, the Court

19   determines whether the plaintiff has sufficiently stated an agreement.  *Twombly,* 550 U.S. at 556 ("it simply calls for enough
     fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement").

20

21       [3] Generally, an agreement among competitors to allocate territory is a per se violation of Section 1 of the Sherman
     Act.  *Palmer v. BRG of Georgia*, 498 U.S. 46, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990) (per curiam).  For instance, in *Palmer,*

22   plaintiffs were students who sued providers of bar review courses, BRG and HBJ.  Plaintiffs contended that the price of
     BRG's course was enhanced by an unlawful market allocation agreement.  BRG had entered into an agreement whereby HBJ

23   agreed to turn its Georgia bar review operations over to BRG and to grant BRG an exclusive license to market bar review
     courses under HBJ's "BarBri" trade name.  *Id.* at 47, 111 S.Ct. 401.  The Supreme Court reversed denials of summary
     judgment by both the trial and appeals court, and found the agreement per se unlawful.  The Court held that:

24          Here, HBJ and BRG had previously competed in the Georgia market; under their allocation agreement,
            BRG received that market, while HBJ received the remainder of the United States.  Each agreed not to

25          compete in the other's territories.  Such agreements are anticompetitive regardless of whether the parties
            split a market within which both do business or whether they merely reserve one market for one and

26          another for the other.  Thus, the 1980 agreement between HBJ and BRG was unlawful on its face.

27   *Id.* at 49-50, 111 S.Ct. 401.  In *Palmer,* plaintiff has presented evidence of an agreement called a "covenant not to compete"
     in Georgia and a separate reciprocal agreement for non-competition in the rest of the United States.  The court said that these

28   agreements were formed for the purpose and the effect of raising prices for bar review courses.  Pursuant to *Palmer,* such

                                                         8

1   (1)   U.S. Steel would not sell tin mill products in the Western United States;

2   (2)   U.S. Steel eliminated discounts offered for quarter-inch width surplus and freight

3         equalization pricing.

4   (3)   U.S. Steel agreed to not otherwise price its tin mill produce competitively against UPI

5   (4)   U.S. Steel agreed to reduce the supply of tin mill products by reducing capacity output

6         at its Indian-based tin mills (Doc. 268 TAC ¶74.)

7   The TAC alleges the term of the Market Allocation Agreement with POSCO:

8   (1)   POSCO agreed to refrain from selling into the Western United States Tin Mill Products

9         produced in POSCO's own tin mills.  (Doc. 268, TAC ¶76.)

10   Here, the TAC alleges the location and dates of meetings where the Market Allocation Agreement was

11   negotiated and finalized.  (Doc. 268, TAC ¶68.)  The TAC alleges the terms of the Market Allocation

12   Agreement, and the specific individuals who implemented the Market Allocation Agreement. (Doc. 268,

13   TAC ¶73-78.)  The TAC alleges how defendants monitored and enforced the agreement.  (Doc. 268,

14   TAC ¶82-86.)

15       The allegations are not generalized conclusions as to actions by defendants. In *Twombly*, the

16   plaintiff plead conclusions parroting the language of the Section 1: "defendants "ha[d] entered into a

17   contract, combination or conspiracy to prevent competitive entry ... and ha[d] agreed not to compete with

18   one another." *Twombly*, 127 S.Ct. at 1955.  Here, the allegations specify which defendant engaged in

19   which activity.  Specific agreements among and between defendants are alleged.  Allegations of an

20   agreement would normally include details about the formation of that agreement. See *Twombly*, 550 U.S.

21   565 n. 10. Accord *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) ("There are no facts

22   alleged to support [the conclusion that a conspiracy existed]. Even after the depositions taken, the

23   complaint does not answer the basic questions: who, did what, to whom (or with whom), where, and

24   when?") The TAC's allegations state the location and dates of meetings where the Market Allocation

25   agreement was negotiated and finalized (TAC ¶ 68); the terms of the Market Allocation Agreement, and

26   the specific individuals who implemented the Market Allocation Agreement (TAC ¶¶ 73-78); and how

27

28   an agreement to allocate the market is illegal under Section 1.

1    Defendants monitored and enforced each other's compliance with the Market Allocation Agreement.

2    (TAC ¶¶ 82-86.)  Thus, the allegations are not generalized conclusions.

3        **3.      Sufficient Factual Content**

4        Defendants argue that plaintiff's direct evidence of a conspiracy is speculative.  They argue

5    plaintiff pleads no facts that the December 6, 2006 meeting was any different than any other

6    Management Committee meeting. Defendants argue that plaintiff does not plead facts of documents

7    evidencing an unlawful agreement, any guilty pleas or verbal admissions by a defendant. (Doc. 272,

8    Joint Brief p. 10.)

9        Plaintiff argues that it "need not provide Defendants with a witness list, testimony, and

10   documentary evidence." (Opposition p.8.) Plaintiff points out that the cases relied upon by defendants

11   are summary judgment cases which have a different standard of proof.

12       The Court agrees with plaintiff.  The cases relied upon by defendants are summary judgment

13   cases where the plaintiff failed to prove the direct agreement.  *See e.g.*, *In re Baby Food Antitrust*

14   *Litigation*, 166 F.3d 112 (3rd Cir. 1999) (cited in Joint Brief p. 10, 12.)  This case is at the pleading stage,

15   and plaintiff is not required to plead what exactly was said or happened at the Management Committee

16   meetings.  It would be surprising that plaintiff had access, pre-discovery, to detailed activities.  Plaintiff

17   has plead that the agreement was formed at these meetings in sufficient detail for defendants to establish

18   who agreed to do what activity, when it was supposed to be done and how the activity was to be

19   accomplished.  These allegations are more than bare allegations.  *Kendall v. Visa U.S.A., Inc.*, 518 F.3d

20   1042, 1047 (9th Cir. 2008) ("A bare allegation of a conspiracy is almost impossible to defend against,

21   particularly where the defendants are large institutions with hundreds of employees entering into

22   contracts and agreements daily.")  The proof of this agreement is for different stage of this case.

23       **4.      Plausibility of the Agreement**

24       Aside from the allegations of a direct agreement, the TAC also alleges circumstantial evidence

25   of conspiracy.  Plaintiff argues that *Twombly* does not require that the alleged antitrust conspiracy be the

26   most likely explanation and that defendants' argument that there exists "a more plausible, alternative

27   explanation" is not the legal standard.  Plaintiff argues that the Market Allocation Agreement is

28   plausible. Plaintiff argues that it has alleged numerous "plus factors" which show the plausibility of the

alleged conspiracy and agreement. The structure of the Relevant Market makes collusion plausible, collusion is possible because of the concentrated supply controlled by defendants, and the inelastic demand for tin mill products would force customers to purchase from defendants.

*Twombly* did not explicitly use the term "plus factors" in formulating its pleading standard. "Plus factors" are pleading additional circumstantial evidence, that must exist to ensure "that the inference of conspiracy is reasonable in light of the competing inferences of independent action." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Here, plaintiff argues that it has alleged "plus factors" that there was a highly concentrated supply, inelastic demand, high barriers to reentry, among other things. If there are sufficient other "plus factors," an inference of conspiracy can be reasonable. *In re Citric Acid Litigation,* 191 F.3d 1090, 1102 (9th Cir. 1999) (considering parallel pricing as a "plus factor," for an inference of a conspiracy).

Defendants argue that plaintiff's allegation of an unlawful agreement reached at UPI's Management Committee meeting is pure speculation and conjecture. (Doc. 272, Joint Brief p. 11.) Defendants note that plaintiff admits the "information was confidential" and plaintiff has no knowledge of the contents of the meeting. Defendants analogize plaintiff's allegations with the allegations rejected in *LaFlamme v. Societe Air France*, 702 F.Supp.2d 136, 147-48 (E.D.N.Y. 2010). Defendants argue that in *La Flamme*, the court dismissed plaintiff's purposed "direct evidence" of agreement because it was "based on a bald, conclusion allegation" that "it appeared that defendants decided to adopt the terms" of an agreement. *Flamme*, 702 F.Supp.2d at 147. Defendants argue that "plaintiff has taken the date of an ordinary meeting it knows occurred, but knows nothing else about, and attempted to pass it off as the date of an illegal agreement." (Doc. 272, Joint Brief p.13.)

The Court acknowledges that it does not infer a conspiracy merely because plaintiff identified an opportunity to conspire. *In re Citric Acid Litig.*, 191 F.3d at 1103 (refusing to "infer participation in the conspiracy from the opportunity to do so. Such meetings, at least in and of themselves, do not tend to exclude the possibility of legitimate activity.").

The Court, however, will not delve into the truth of the allegations. On a motion to dismiss, the well pleaded factual allegations are assumed to be true. *Lazy Y. Ranch LTD v. Behrens,* 546 F.3d 580, 588 (9th Cir. 2008). None of the allegations regarding the Market Allocation Agreement (¶¶68, 73-78,

82-86) are made upon information and belief.  Plaintiff alleges who was present at the meetings in which the Market Allocation Agreement was entered on information and belief.  And while "these allegations cannot alone support Plaintiffs' claims, [ ] such participation demonstrates how and when Defendants had opportunities to exchange information or make agreements." *In re Static Random Access Memory (SRAM) Antitrust Litigation*, 580 F.Supp.2d 896, 903 (N.D.Cal.2008).  It is an issue of proof as to the truth of the allegations.  *See Les Shockley Racing, Inc. v. National Hot Rod Ass'n*, 884 F.2d 504, 510 (9th Cir.1989) ("[T]he Sherman Act reflects an important federal policy in preventing excessive concentration in relevant markets.")

Circumstantial evidence is sufficiently alleged.  U.S. Steel ceased competing in the Western United States despite what plaintiff alleges are prices that tripled historic profit margins.  (Doc. 268, TAC ¶96.) Plaintiff argues that U.S. Steel competed with UPI in the Western United States for the sale of Tin Mill Products.  U.S. Steel was UPI's primary competitor and there were no other competitors.[4] In 2006, the International Trade Commission decided to continue an "antidumping" order against Japanese steel producers, which UPI and U.S. Steel endorsed.  (Doc. 268, TAC ¶61-67.)  This antidumping order restricted entry of other foreign competitors.  No other competitors were in the market - only UPI and U.S. Steel  - therefore no one was able to undercut UPI and U.S. Steel's prices.  (Doc. 268, TAC ¶61.)  With the exclusion of potential Japanese competitors, UPI and U.S. Steel could agree to allocate the market to UPI.  U.S. Steel would no longer compete in the Western United States and instead, with no competition in the market, UPI could raise prices.  U.S. Steel would benefit by exiting the market because it would  participate in UPI's profits as UPI's joint venturer.

In these pleadings, plaintiff has at least set the stage, time frame and rationale for U.S. Steel leaving the Western United States market.[5]  The Court acknowledges that some of the allegations in the complaint alleging the Market Allocation Agreement are made on "information and relief," and particularly as to which persons were involved in making the Market Allocation Agreement.  However,

---

[4] Defendants argue that plaintiff's own allegations acknowledge other competitors because plaintiff refers to Mittal as a "giant" in steel manufacturing.  Plaintiff argues that Mittal is a "giant," but not in the Western United States which is the relevant market in this case.  This argument is addressed *infra* regarding contradictory allegations.

[5] It remains to be proved whether U.S. Steel actually left the Western U.S. in 2006, as currently alleged, or much earlier in 1986, as previously alleged.  This fact appears to be a linchpin in the Market Allocation Agreement.

1  the Court finds that the allegations of the agreement and the circumstantial evidence are sufficient factual

2  content, reasonable inferences from that content for an alleged unlawful agreement.

3  **5.    Contradictory Allegations**

4  Defendants argue that the TAC's contradictory allegations fails to allege a claim that is "plausible

5  on its face." (Doc. 272 Joint Brief p. 14-16.)  First, defendants point to contradictory allegations that

6  there were no steel makers other than U.S. Steel which could affect the prices in the Western United

7  States, yet the TAC contains allegations that Mittal was a "giant" in the industry.  Second, plaintiff failed

8  to state a starting date of the alleged conspiracy.  Third, despite the unlawful agreement in 2006, prices

9  were not raised until three years later in 2009.

10  Plaintiff argues that *Twombly* does not require that the alleged antitrust conspiracy be the most

11  likely explanation and that defendants' argument, that there exists "a more plausible, alternative

12  explanation," is not the legal standard.  Plaintiff argues that the Market Allocation Agreement is

13  plausible.  Plaintiff argues that it has alleged numerous "plus factors" which show the plausibility of the

14  alleged conspiracy and agreement.

15  The Court need not make unwarranted deductions or unreasonable inferences from the

16  allegations.  But as long as the theory "is not facially implausible, the court's skepticism is reserved for

17  later stages of the proceedings."  *In re Gilead Sciences Sec. Litigation*, 536 F.3d 1049, 1057 (9th Cir.

18  2008).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

19  draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct.

20  at 1949.

21  (A)    Allegations of Mittal as a Competitor

22  The Court rejects defendants argument that the TAC is not plausible because of inconsistencies

23  relating to Mittal, a purported competitor.  The TAC alleges that the only "meaningful" competition UPI

24  faced in the Western United States was from U.S. Steel.  The TAC alleges that Mittal was "never been

25  more than a minor player in the Western United States." (TAC ¶115.)  Defendants point out that this

26  allegation is inconsistent with another allegation because else where in the TAC, Mittal is referred to

27  as a "giant." (Doc. 268, TAC ¶104 ("the elimination of freight equalization between these two giants

28  increased the price of tin-mill products . . .").)  The Court does not find it implausible as plaintiff alleges

13

1   "Mittal has never significantly affected the price of Tin Mill Products in the Relevant Market" because

2   "Tin Mill Products were only a 'small component of Mittal's product offering.'" (Doc. 268, TAC ¶115.)

3                    (B)      Allegations of the Starting Date of the Agreement

4        Defendants argue that plaintiff states that the alleged conspiracy began in December 2006, but

5   alleges, inconsistently, that part of the conspiracy, elimination of freight equalization began in April

6   2006. Defendants note that there is inconsistency in the starting date of the conspiracy. The TAC quotes

7   a Silgan official's testimony, Mr. Owen, who testified that freight equalization stopped in April 2006:

8           "According to the TAC, Mr. Owen's testimony was given in April 2006.
            As a result, based on Plaintiff's own allegations, U.S. Steel could not
9           have agreed with POSCO in December 2006 to 'eliminate discounts'
            because, according to the Owen testimony that Plaintiff quotes, U.S. Steel
10          had unilaterally already stopped these discounts at least eight months
            earlier, in April 2006." (Doc. 272, Joint Brief p.15.)

11

12       The Court does not find the allegation, quoting Mr. Owen's testimony, fatally inconsistent with

13  the remaining allegations.  (TAC ¶74.)  Plaintiff alleges the Market Allocation Agreement was

14  negotiated over a period of several months, including prior to April 2006.  Moreover, the TAC alleges

15  that elimination of freight equalization was one of several components of the Market Allocation

16  Agreement.  It is not inconceivable that this component was agreed to early on and implemented

17  immediately upon agreement.  Further, the TAC quotes testimony of an executive of Silgan, Mr. Owen,

18  without any foundational information necessary to substantiate his knowledge and meaning.  The Court

19  is reluctant to dismiss a conspiracy claim because hearsay evidence may be marginally inconsistent with

20  other allegations.  The Court, therefore, does not find the Market Allocation Agreement implausible

21  based upon testimony of Mr. Owen.

22                   (C)      Delay in Implementing the Market Allocation Agreement

23       Defendants argue that the TAC contains contradictory allegations of a 3-year delay in price

24  increases.  Defendants note that plaintiff again alleges that the conspiracy was formed in 2006, but that

25  UPI did not increase its prices until 2009.  (Doc. 268, TAC ¶¶15, 93, 109.)

26       Plaintiff points to allegations which explain the reason for the delay in raising prices.  The

27  standard in the industry was multi-year contracts between purchasers of Tin Mill Products and suppliers

28  of Tin Mill Products. (Doc. 268, TAC ¶102.)  In 2006, UPI and U.S. Steel were in the midst of multi-

                                                     14

1   year supply contracts to supply Tin Mill Products to their customers.  Plaintiff alleges that once those

2   contracts expired, on or about 2009, U.S. Steel did not renew its contracts, and UPI then increased

3   prices.  (Doc. 268, TAC ¶102.)

4        The Court does not find these allegations implausible to explain the delay in raising prices.

5   While <u>not likely</u>, it is <u>not</u> <u>im</u>plausible that the agreement had a delayed timing component.  UPI and U.S.

6   Steel might have agreed to delay implementation of price increases because they were indeed in long

7   term contracts which would subject them to contractual liability if breached.  It is not implausible.  It

8   will be subject to proof at a later stage of proceedings.

9   **D.    Adequacy of Plaintiff's Claims under Section 2 of the Sherman Act - Conspiracy to**

10       **Monopolize**

11       Section 2 makes it an offense for any person to "monopolize, or attempt to monopolize, or

12  combine or conspire with any other persons, to monopolize any part of the trade or commerce among

13  the several states."  15 U.S.C. § 2.  Plaintiff alleges a conspiracy to monopolize. (See TAC ¶¶151-159;

14  Doc. 280, Opposition p. 24.) To prove a conspiracy to monopolize in violation of § 2, Plaintiff must

15  show four elements: (1) the existence of a combination or conspiracy to monopolize; (2) an overt act in

16  furtherance of the conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury.

17  *Paladin Associates, Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003).

18       **1.    Arguments regarding Specific Intent**

19       Defendants argue that plaintiff failed to allege two elements - specific intent to monopolize and

20  the existence of a conspiracy to monopolize.  (Doc. 272, Joint Brief p. 20.)  Defendants argue that there

21  is no allegation that "defendants intended and did drive out independent competitors," citing this Court's

22  February 23, 2011 order.  (Doc. 272, Joint Reply p. 20.)  Defendants point out the alleged "specific

23  intent" rests solely upon the allegation that U.S. Steel left the relevant market.  Thus, defendants argue

24  there is no anticompetitive conduct designed to exclude other competitors.  There is no allegation of a

25  "single instance when a defendant drove out or somehow excluded an independent competitor from the

26  market."  (Doc. 272, Joint Brief p.23.)

27       Plaintiff argues that "the Market Allocation Agreement excluded U.S. Steel (and POSCO) from

28  the market <u>by agreement</u> thus by design leaving UPI as the monopolist supplier." (Doc. 280, Opposition

1  p. 25 (emphasis in original).)   This exclusion by agreement, plaintiff argues, "is the essence of a

2  conspiracy to monopolize claim." *Id.*

3      **2**.      **Specific Intent and AntiCompetitive Acts**

4      To prevail on a conspiracy to monopolize, plaintiff must show "specific intent to monopolize and

5  anticompetitive acts designed to effect that intent." *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627

6  F.2d 919, 926 (9th Cir.1980), *cert. denied*, 450 U.S. 921 (1981).   "[S]pecific intent to monopolize and

7  anticompetitive acts designed to effect that intent" are required for a conspiracy to monopolize claim.

8  *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1154 (9th Cir.) (section 2 claim failed for lack

9  of evidence that the purpose of conduct was "to stifle competition"), *cert. denied*, 540 U.S. 940 (2003).

10      A "specific intent to monopolize" means an intent to exclude competition or control prices.

11 *Carpet Seaming Tape Licensing Corp. v. Best Seam. Inc.*, 616 F.2d 1133, 1141-42 (9th Cir. 1980)

12 (specific adverse impact on the market); see *American Tobacco Co. v. United States*, 328 U.S. 781, 789

13 (1945) (object of a combination or conspiracy to monopolize is "to exclude actual and potential

14 competitors").   A specific intent to destroy competition or build monopoly is essential.   *Times-Picayune*

15 *Pub. Co. v. U.S.*, 345 U.S. 594, 626, 73 S.Ct. 872, 890 (U.S. 1953).   Thus, plaintiff must allege "specific

16 intent" ultimately to seize monopoly power by destroying or excluding competition within the relevant

17 market.   Specific intent is sufficiently met by proof that a group of competitors took concerted action

18 to drive independent competitors out of business.   *TV Communications Network v. Turner Network*

19 *Television, Inc.*, 964 F.2d 1022 (10th Cir. 1992), *cert. denied*, 506 U.S. 999 (1992).

20      Plaintiff argues that it has satisfied the requirements to allege the existence of a conspiracy to

21 monopolize, by alleging the Market Allocation Agreement.   Plaintiff argues that excluding competition

22 was the goal of the Market Allocation Agreement.   Thus, plaintiff's allegation of a "intent to

23 monopolize" is the existence of the Market Allocation Agreement.   (Opposition p. 24.)

24      **3.**      **Lack of Independent Competition**

25      The crux of this "specific intent" challenge is whether independent competitors must have been

26 driven out, excluded or impaired in some fashion by the anticompetitive conduct - the Market Allocation

27 Agreement.   The issue is whether plaintiff has plead itself out of a claim because it alleges that there

28 were <u>no other competitors</u> in the market which UPI and U.S. Steel agreed to allocate.   The TAC alleges

1   that only UPI and U.S. Steel were in the same market.  As such, when U.S. Steel agreed to exit the

2   Western United States, no other competitors were impacted.

3          Plaintiff cites to *Hunt-Wesson Foods* and to *William Inglis* for the proposition that the "Market

4   Allocation Agreement excluded U.S. Steel (and POSCO) from the market by agreement, thus by design

5   leaving UPI as the monopolist suppler."  (Doc. 280, Opposition p. 25.)

6          In *Hunt-Wesson Foods*, 627 F.2d 919 (9th Cir. 1980), *cert. denied*, 450 U.S. 921 (1981), a food

7   manufacturer brought a conspiracy to monopolize claim, among other claims, against a second food

8   manufacturer.  The second food manufacturer moved to dismiss the complaint for failure to allege

9   specific intent.  The Court overruled a motion to dismiss finding that specific intent had been alleged

10  in that defendant had engaged in acts resulting in anticompetitive effects, "with the specific intent to

11  eliminate plaintiff and others as competitors . . all with the intent of keeping or forcing plaintiff out of

12  the business . . . and all with the purpose and effect of obstructing, restraining and excluding competition

13  by the plaintiff and others."  *Hunt-Wesson Foods,* 627 F.2d at 926-927.  Thus, in *Hunt-Wesson Foods*,

14  the plaintiff had alleged that the conduct excluded plaintiff and others as competitors.

15         In *William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.*, 668 F.2d 1014 (9th Cir.

16  1981), *cert. denied*, 459 U.S. 825 (1982), a baking company brought suit against competing independent

17  wholesale bakers alleging antitrust violations. *William Inglis* stated that specific intent may be inferred

18  from "conduct that serves as the basis for a substantial claim of restraint of trade" (such as a market

19  allocation agreement), but only "if those actions are of a kind clearly threatening to competition or

20  clearly exclusionary." *Id.* at 1028; *accord Christofferson Dairy, Inc. v. MMM Sales, Inc.*, 849 F.2d 1168,

21  1174 (9th Cir. 1988) (Proof of specific intent may sometimes be supplied by inference from certain types

22  of conduct. The conduct must, however, amount to an unreasonable restraint of trade under Sherman

23  Act, section 1 standards.)

24         Here, plaintiff does not allege competitors or competition were excluded or impacted.  Indeed,

25  plaintiff alleges that UPI and U.S. Steel were the only competitors in the market.  No other competition

26  existed.  Competition consists of rivalry among competitors. *Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034,

27  1040 (9th Cir. 1987), *aff'd*, 496 U.S. 543 (1990).  Both UPI and U.S. Steel purportedly possessed a

28

17

portion of the market which they agreed to allocate in the Market Allocation Agreement.[6]  UPI and U.S. Steel each had market power that was <u>lawfully</u> in their hands.  No competitors were in the market, excluded from the market or prevented from entering the market because of the Market Allocation Agreement.  *United States Steel Corp. v. Fortner Enters., Inc.*, 429 U.S. 610, 612, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977) (holding that "'increasing sales' and 'increasing market share' are normal business goals, not forbidden by § 2 without other evidence of an intent to monopolize").

Specific intent cannot be inferred from U.S. Steel's "exclusion" from the market.  The purported "exclusion" of U.S. Steel from the relevant market was by agreement.  U.S. Steel voluntarily agreed not to participate in the market.[7]  This is not "exclusionary" conduct.  No exclusionary conduct, predatory conduct or other anticompetitive conduct is alleged as to any competitor, including U.S. Steel.  The agreement to exit the market may be an illicit "agreement" under Section 1 for restraint of trade.  It, however, is not a conspiracy to monopolize under Section 2, because the allegations do not allege exclusion of competitors or prevention of competitors from entering the market.  Offenses under section 1 and section 2 of the Sherman Act are legally distinct even though they may overlap.  *See American Tobacco Co. v. United States*, 328 U.S. 781, 788, 66 S.Ct. 1125, 1128 (1946) (section 1 and section 2 are separate statutory offenses and "require proof of conspiracies which are reciprocally distinguishable from and independent of each other although the objects of the conspiracies may partially overlap"); *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 226 n. 59, 60 S.Ct. 811, 846 n. 59 (1940) ("the crime under § 1 is legally distinct from that under § 2 ... though the two sections overlap in the sense that a monopoly under § 2 is a species of restraint of trade under § 1").

Further, the specific intent element cannot be inferred from the Market Allocation Agreement

---

[6] The TAC alleges, "Pursuant to the Market Allocation Agreement, U.S. Steel (acting directly and through its alter ego Pitcal) agreed to exit the Relevant Market by no longer competing in the Western United States. . . .) (Doc. 268 TAC ¶74.)  Plaintiff alleges that U.S. Steel entered into the Market Allocation Agreement with the specific intent to destroy the actual competition U.S. Steel provided in the Relevant Market . . ." (Doc. 268, TAC ¶75; see also ¶¶76-78 (allegations re POSCO and UPI).)  The TAC does not allege other competition was impacted.

[7] In evaluating the allegations of competitors in the market, the Court does not ignore plaintiff's prior, inconsistent allegation.  Plaintiff previously alleged that U.S. Steel exited the Western United States market in 1986 when UPI was formed as a joint venture between U.S. Steel and POSCO.  Plaintiff had alleged U.S. Steel exited in 1986 because it would not compete against its joint venture.  See Doc. 216, FAC ¶70-72.  In the TAC, plaintiff alleges U.S. Steel exited the market much later, in 2006.  In light of the inconsistent allegation of facts which are easily verifiable and verifiable without the need for discovery, this particular allegation is highly implausible.

because of the remoteness in time between the acts and what plaintiff alleges is the resulting anticompetitive effects. When U.S. Steel exited the market in 2006, UPI's monopoly power purportedly came into existence. UPI could then raise prices. However, as noted above, the prices were not raised to supracompetitive prices for another three years after U.S. Steel purportedly left the market. The conspiracy to monopolize through the Market Allocation Agreement did not result in anticompetitive effects for three years. The conspiracy "finalized" in 2006, but prices were not increased until three years later in 2009.[8] There is no "link" between acts and anticompetitive effect in which to infer intent. The focus on an anticompetitive effect is essential, because "it is inimical to the antitrust laws to award damages for losses stemming from acts that do not hurt competition." *Rebel Oil Co. Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995), *cert. denied*, 516 U.S. 987 (1995).

Specific intent to monopolize cannot be inferred when no independent competition is excluded from or effected by the conduct and where the anticompetitive effect is delayed for an extended time. Here, the conduct did not have any effect upon competition because plaintiff does not allege competition was excluded or prevented, and no price increase occurred for over 3 years. Accordingly, this Court finds that, although granted multiple occasions to amend, plaintiff cannot allege specific intent to monopolize. Therefore, this claim will be dismissed with prejudice.

**E.    Cartwright Act**

The parties agree that plaintiff's California Cartwright Act claim either falls or succeeds on the success or failure of the claims under the Sherman Act. (See Doc. 280, Opposition p. 23 ("the TAC satisfies the elements of a Cartwright Act claim if it satisfies the elements of a Section 1 claim under the Sherman Act."); (Doc. 281, Reply p.7-8 ("plaintiff seems to concede that its Cartwright Act and UCL claims rise or fall with its Sherman Act claim.).)

The Cartwright Act is California's antitrust statute. Bus. &Prof Code §§16700-16770. Cases decided under the Sherman Act are applicable to interpreting the Cartwright Act. *See Marin County Bd. Of Realtors, Inc. v. Palsson*, 16 Cal.3d 920, 130 Cal.Rptr.1 (1976). Indeed, the analysis under

---

[8]   The section 1 claim, conspiracy to restrain trade, is not fatally flawed even though it contains the same allegations of delay in increasing prices. Proof is different for a Section 1 and a Section 2 claim. To prove a Section 2 conspiracy to monopolize, one must show a specific intent to monopolize. By comparison, a case brought under § 1 of the Sherman Act only requires proof of an anticompetitive agreement.

California's antitrust law mirrors the analysis under federal law because the Cartwright Act was modeled after the Sherman Act. *County of Tuolumne v. Sonora Community Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001). Therefore, the analysis and conclusions would be the same under the Cartwright Act, as under the federal claims.

Given the analyses and conclusions regarding the federal claims, the Court incorporates those rulings for the state Cartwright Act antitrust claim as well. To the extent that the motion has been granted or denied on the Sherman Act claims, that ruling is incorporated for the Cartwright Act.

**F.        Unfair Competition Claim.**

Plaintiff's count 4 alleges a claim under California's Unfair Practices Act, also called the Unfair Competition Act ("UCL"). The purposes of the UCL are "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition, by prohibiting unfair, dishonest, deceptive, destructive, fraudulent and discriminatory practices by which fair and honest competition is destroyed or prevented." Cal.Bus.&Prof.Code § 17001. "The UC[L] works by 'borrowing' violations of other laws and treating those transgressions, when committed as a business activity, as 'unlawful business practices.'" *Stevens v. Superior Court*, 75 Cal.App.4th 594, 602 (1999). These "unlawful business practices" are "independently actionable under section 17200 et seq. and subject to the distinct remedies provided thereunder." *Id.*

The UCL claim predicates liability based on the Sherman Act and the Cartwright Act. Given the analyses and conclusions regarding the federal and state claims, the Court incorporates those rulings for the UCL claim as well.

/////

/////

/////

/////

/////

/////

/////

/////

20

1

## CONCLUSION

2      For the foregoing reasons, the Court rules on the defendants' motion to dismiss the third

3  amended complaint as follows:

4      (1)   The motion to dismiss the First Claim for California Cartwright Act, Cal.Bus. & Prof.

5            Code §16720 is DENIED in part, to the extent that it is predicated on Section 1 of the

6            Sherman Act and GRANTED in part, to the extent it is predicated on Section 2 of the

7            Sherman Act;

8      (2)   The motion to dismiss the Second Claim for Section 1 of the Sherman Act, 15 U.S.C. §1

9            (Restraint of Trade) is DENIED;

10     (3)   The motion to dismiss the Third Claim for Section 2 of the Sherman Act, 15 U.S.C. §2

11           (Conspiracy to Monopolize) is GRANTED with prejudice;

12     (4)   The motion to dismiss the Fourth Claim for Relief for Unfair Competition, Cal.Bus &

13           Prof Code §17200 is DENIED in part, to the extent that it is predicated on Section 1 of

14           the Sherman Act and GRANTED in part, to the extent it is predicated on Section 2 of the

15           Sherman Act.

16  Defendants shall have 30 days from the date of entry of this order to file an answer.

17  IT IS SO ORDERED.

18  **Dated:    July 7, 2011**              _____/s/ Lawrence J. O'Neill_____
                                                UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

26

27

28