IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STANISLAUS FOOD PRODUCTS COMPANY,<br><br>          Plaintiff,<br><br>   vs.<br><br>USS-POSCO INDUSTRIES, et al.,<br><br>          Defendant.<br>_____/ | CASE NO. CV F 09-0560 LJO BAM<br><br>**ORDER ON PLAINTIFF'S MOTION TO COMPEL 2010 AND 2011 DOCUMENTS; SETTING HEARING FOR JUNE 22, 2012** |

In a series of informal discovery dispute conferences held with the Court in March, April and May, 2012, the parties to this antitrust litigation have met and conferred, narrowed document requests and produced numerous documents. Currently before the Court is plaintiff's motion to compel documents pursuant to Rule 34 and Local Rule 251 in four categories for the years 2010 and 2011, which the parties were unable to resolve. Documents in the categories have been produced by defendants for the years of 2005 through 2009, but plaintiff seeks the documents for the years 2010 and 2011.

The parties filed a Joint Statement of Discovery Dispute (Doc. 386) outlining their positions and cross-referenced the Court to various documents filed during the extended informal discovery resolution process. The motion to compel came on regularly for hearing on May 25, 2012, in Department 8 of the above-entitled court. Plaintiffs Stanislaus Food Products Co. Counsel appeared by Eric Fastiff and Marc Pilotin. Defendants Counsel Allan Steyer, Lucas Gilmore and Scott Macrae appeared for USS-POSCO

1

Industries; Alexander Thomas, Mandy Jeffcoach and Gavin Eastgate appeared for U.S. Steel; and Reginald Steer appeared for POSCO - California & America. All counsel appeared telephonically. Having considered the joint statement, and the exhibits referenced in the joint statement, as well as the arguments of counsel and the Court's file, the Court issues the following order.

**Overview**

Plaintiff Stanislaus Food Products is a tomato canner which purchases certain types of tin cans to can its products. Since 2001, Stanislaus has purchased millions of one-gallon tin-plated cans from non-party Silgan Containers Corporation ("Silgan"). Silgan buys "Tin Mill Products" (tin-plated steel) and manufactures the Tin Mill Products into tin-plated cans which are sold to canners, such as Stanislaus. Defendant USS-POSCO Industries ("UPI") is the manufacturer of the Tin Mill Products. UPI produces cold-rolled sheets, galvanized sheets and tin-plated steel from "hot band" steel. UPI purchases its hot band steel from defendant U.S. Steel. UPI then sells the tin-plated steel to Silgan to make tin cans which Silgan in turn sells to Stanislaus. UPI is the only Tin Mill Products producer in the Western United States.[1]

This action alleges antitrust conspiracies by defendants to allocate the Tin Mill Products market to UPI so as to increase the prices of Tin Mill Products.

**Threshold Issue - Scope of Discovery**

Plaintiff alleges the "Market Allocation Agreement" was in violation of Section 1 of the Sherman Act. Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1.[2] Market allocation agreements are "classic per se antitrust violation[s]." *See United States v. Brown*, 936 F.2d 1042, 1045 (9th Cir.1991). Courts have treated as unlawful market allocation agreements assigning particular territories to particular vendors, assigning certain customers to certain vendors, and capping

---

[1] UPI is a joint venture of U.S. Steel and POSCO, through their holding companies. American Steel Corporation ("POSAM"), is a wholly-owned subsidiary of POSCO. For purposes of this motion, POSCO and POSAM are used interchangeably, although they are separate entities.

[2] The TAC also alleges state law claims similar to Section 1 of the Sherman Act. The Section 2 Sherman Act claim alleged in the TAC, for a conspiracy to monopolize, has been dismissed. 15 U.S.C. § 2. (See Doc. 286.)

2

total sales volume of the market and assigning participants fixed shares of that total volume. *See California ex rel. Brown v. Safeway*, *Inc.*, 615 F.3d 1171, 1182 (9th Cir. 2010) (compiling cases). The common thread to these decisions is that in allocating the market, firms ensure that customers attempting to purchase products in the relevant market will have fewer firms competing for their business. *Id.*

Plaintiff alleges that the defendants entered into a "Market Allocation Agreement." At its core, the Market Allocation Agreement was an agreement between U.S. Steel and POSCO, two competitors and also joint venturers in UPI, to no longer compete in the Tin-Mill Products market in the Western United States. (Third Amended Complaint "TAC" ¶13.)

In reviewing the parties' Joint Statement re Discovery Dispute, and related documents, it became clear that the parties have a fundamental difference of opinion as to the scope of the challenged Market Allocation Agreement. The parties dispute what is the plaintiff's "claim" regarding the Market Allocation Agreement.[3] The threshold issue is whether plaintiff is alleging (1) an agreement to allocate the market as prohibited by Section 1 (both plaintiff and defendants agree this conduct is alleged), **and** (2) a price fixing agreement/conspiracy after the market was allocated (plaintiff argues the TAC so alleges, while defendants vehemently assert the TAC lacks any such price fixing allegations). At the hearing, the parties discussed the allegations in the TAC regarding the Market Allocation Agreement. Plaintiff argues that U.S. Steel agreed to allocate the Tin Mill Products market to UPI and U.S. Steel then "exited" the market in 2006 and defendants agreed to fix prices. Defendants contend that the sole challenged antitrust conduct is U.S. Steel "exiting the market."

The alleged wrongful conduct at issue in the litigation, of course, is critical to determining the scope of permissible discovery. See Fed.R.Civ.P 26(b)(1). Each party generally has the right to discover "any nonprivileged matter that is relevant to any party's **claim** or **defense**." Fed.R.Civ.P 26(b)(1) (emphasis added). Relevant information may be discoverable if it "appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P 26(b)(1).

In the TAC, Plaintiff alleges the purpose of the Market Allocation Agreement:

"The overarching purpose of the Agreement was to allocate the Relevant

---

[3] Certainly, the TAC alleges violation of Section 1 of the Sherman Act. The more precise and uncertain issue is what is the wrongful conduct being challenged.

3

> Market fully to UPI in order to create a monopoly and control prices so that UPI (under the direction and control of U.S. Steel, through Pitcal, and POSCO, through POSAM and POSCAL) could control and increase the prices of Tin Mill Products in the Western United States to artificially high levels." (Doc. 268, TAC ¶73.)

Pursuant to the Market Allocation Agreement, U.S. Steel agreed to:

- exit the Relevant Market by no longer competing in the Western United States,

- promised to eliminate discounts U.S. Steel had offered its customers in the Western Unites States for quarter inch width surplus and for freight equalization pricing. (Doc. 268, TAC ¶74.)

Pursuant to the Market Allocation Agreement, POSCO (POSAM and POSCAL) agreed to:

- refrain from selling into the Western United States Tin Mill Products produced by POSCO. (Doc. 268, TAC ¶76.)

Pursuant to the Market Allocation Agreement, UPI agreed to raise Tin Mill Products prices. (Doc. 268, TAC ¶78.) Plaintiff alleges that "U.S. Steel, UPI, Pitcal, POSCAL, POSAM, and POSCO thereby agreed to eliminate the diversity of entrepreneurial interests that prevailed prior to 2006 (U.S. Steel's actual competition and POSCO's potential competition)." (Doc. 268, TAC ¶79.) (See also, Doc. 286, Order on Joint Motions to Dismiss.)

Defendants argue that the Market Allocation Agreement is alleged to be an agreement to allocate the market for Tin Mill Products. U.S. Steel exited the market and allocated it to UPI. Defendants argue that the TAC cannot be read as alleging a "price fixing agreement" in violation of Section 1. Indeed, defendants argue that there are no allegations of price fixing or of a pricing agreement. They argue that the sole illegal agreement is for U.S. Steel to "exit" the market and POSCO to refrain from entering the market. Plaintiff, however, states that the pricing conspiracy of part of the Market Allocation Agreement:

To determine whether, for purposes of this motion, the claim against defendants include a "price fixing" agreement, the Court reviewed the TAC. The relevant TAC allegation dealing with pricing include:

> Para. 13: The purpose and effect of this agreement was to eliminate competition, leaving UPI as the sole monopolist supplier of Tin Mill

> Products to customers in the Western United States, and as a result, control prices.
>
> Para. 54: Exiting the market therefore would only make economic sense if POSCO agreed to allocate the entire Relevant Market to UPI, permitting UPI to control and substantially increase the prices of Tin Mill Products in the Relevant Market.
>
> Para. 60: [A]t this meeting, Mr. Surma and Mr. Lee discussed eliminating competition in the Relevant Market, including coordinating supply restrictions of Tin Mill Products in the Western United States, in order to increase the prices of Tin Mill Products artificially.
>
> Par. 73: The overarching purpose of the Agreement was to allocate the Relevant Market fully to UPI in order to create a monopoly and control price so that UPI (under the direction and control of U.S. Steel, through Pitcal, and POSCO, through POSAM and POSCAL) could control and increase the prices of Tin Mill Products in the Western United States to artificially high levels.
>
> Para. 74: U.S. Steel refused to otherwise price its Tin Mill Products competitively against UPI, thereby exiting fully from the Relevant Market and eliminating competition.
>
> Para.75: U.S. Steel entered into the Market Allocation Agreement with the specific intent to destroy the actual competition U.S. Steel provided in the Relevant Market prior to 2006 and to thereby control prices and to confer monopoly power on UPI.
>
> Para. 78: UPI exercised its wrongfully-obtained monopoly power to dramatically increase the price of Tin Mill Products. . . UPI implemented the terms of the Market Allocation Agreement company-wide, to ensure that UPI priced its Tin Mill Products at supracompetitive, monopoly-levels.
>
> Para. 98: [T]he prices of Tin Mill Products in the Relevant Market have dramatically increased. Absent collusion, U.S. Steel would have competed in the Relevant Market.
>
> Para. 100: If UPI faced competition from U.S. Steel (as UPI had faced for twenty years), UPI would not have increased the prices of its Tin Mill Products to historically unprecedented levels with no cost justification.

Having read the entirety of the TAC, the prior orders on the Motions to Dismiss, the Court interprets the TAC allegations, for purposes of this discovery order only, as follows.[4] The allegations

---

[4] This Court does not intend its interpretation to be binding for any other motion or matter raised in this litigation. The Court interprets the allegations solely for the purpose of determining the proper scope of discovery. The Court is mindful that in prior complaints, the theory on which liability is sought shifted and this theory of the Market Allocation Agreement has had differing versions. (See Doc. 259, Order on Motion to Dismiss Second Amended Complaint filed February 24, 2011,

5

do not allege an agreement to fix prices of Tin Mill Products or a conspiracy to fix prices for Tin Mill Products. Rather, the TAC alleges that "price control" was gained through monopoly power once U.S. Steel exited the market. Once U.S. Steel left the market, UPI then had monopoly power to raise prices because competition no longer existed. The TAC does not allege an "agreement" to fix prices and does not allege a conspiracy to "fix prices." To prevail on a cause of action for violation of 15 U.S.C. § 1, a plaintiff must show, "(1) there was an agreement, conspiracy, or combination between two or more entities; (2) the agreement was an unreasonable restraint of trade under either a per se or rule of reason analysis; and (3) the restraint affected interstate commerce." *American Ad Management, Inc. v. GTE Corp.*, 92 F.3d 781, 784 (9th Cir. 1996). The only "agreement" referred to in the TAC is the agreement whereby U.S. Steel left the Tin Mill Products market so that UPI would be the exclusive producer.[5] Once exclusive, UPI raised its prices. No allegation the Court found stated that this price increase was by "agreement" with U.S. Steel or POSCO. If a price fixing agreement or price fixing conspiracy were part of the Market Allocation Agreement, it would have been explicitly stated as such, given the detailed allegations about the formation and operation of an illegal agreement to "exit the market."[6]

**Standards of Discovery**

Under Rule 26(b), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* To succeed on a motion to compel, the moving party bears the burden of demonstrating that it is entitled to the requested discovery and has satisfied the proportionality and other requirements of Rule 26. See

---

p. 22.) Prior versions of the complaint were reviewed to assist in interpretation of the TAC.

[5] The justification of U.S. Steel to exit the market is because U.S. Steel is a general partner of UPI, and would continue to share in sales. UPI is a joint venture formed in 1986 by U.S. Steel and POSCO/POSAM, through their holding companies.

[6] Defendants argue that since plaintiff challenges a Market Allocation Agreement based upon the "exit of the market," any sales U.S. Steel made in the market after the purported "exit" disproves the Market Allocation Agreement. Defendants argue that U.S. Steel consistently made sales of Tin Mill Products in the relevant market through the present. Plaintiff, however, argues that U.S. Steel's *de minimus* sales in the relevant market confirms that U.S. Steel did not compete in the market. Whether "*de minimus*" sales is the same as "exiting the market" for purposes of Section 1 liability is not a legal issue the Court need resolve for purposes of this discovery motion.

6

*Crossbow Technology Inc. v. YH Technology*, Case No. C–03–04360, 2007 WL 926876, at *2 (N.D.Cal. Mar.26, 2007). Pursuant to Fed.R.Civ.P. 26(b)(2)(C)(iii), the principle of proportionality, the court "must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues."

**Specific Documents Requested**

Plaintiff moves to compel production of specific 2010 and 2011 documents and data that "show to whom Defendants sold, at what price and at what quantity," and whether Defendants priced their products competitively to maximize sales. Plaintiff seeks discovery of documents for 2010 and 2011 in four categories:

1. Transactional data regarding sales of Tin Mill Products and Selling prices of hot-band steel U.S. Steel and POSCO sold to UPI;
2. Contracts with purchasers of Tin Mill Products, amendments, and communications regarding those contracts;
3. Tin Mill Product Production and Production Capacity;
4. Communications among defendants regarding Tin Mill Products or the hot-band steel sold to UPI.

The Court turns to consideration of each category of documents.

**1.   Transactional data regarding sales of Tin Mill Products and Selling prices of hot-band steel U.S. Steel and POSCO sold to UPI**

   a.   *Transactional data regarding sales of Tin Mill Products*

All defendants state that they have agreed to produce transactional data for Tin Mill Products for 2010 and 2011. Transactional data shows to whom the defendant sold the Tin Mill Products, at what price it was sold and at what quantity. All Defendants previously produced transactional data, to the

extent they have it, from at least 2005 through 2009.[7]

b. *Transactional data regarding Hot-Band Steel*

Plaintiff requests the hot-band steel transactional data to "demonstrate the profits in the Relevant Market that U.S. Steel and POSCO chose to forgo pursuant to the unlawful agreement, rather than compete." (Doc. 386 p.3.) Plaintiff alleges that the price of hot-band steel, as the main input into Tin Mill Products, remained stable yet Tin Mill Products' prices increased dramatically.

The Court notes that defendants have represented that transactional data for hot-band steel from certain years have been produced. Therefore, plaintiff has some of the data that it requires. The defendants also argue the burden of producing this and other information for the years 2010 and 2011.[8] Here, the TAC does not allege an illegal agreement or conspiracy for hot-band steel. Hot-band steel is but one input into the manufacture of Tin Mill Products, albeit a major input. The costs associated with an input into manufacture of Tin Mill Products are not at issue. Profits associated with hot-band steel are not at issue. Defendants have demonstrated that burden and expense outweigh the likely benefit of production. The request for transactional data for hot-band steel for 2010 and 2011 will be denied.

**2.  Contracts with purchasers of Tin Mill Products, amendments, and communications regarding those contracts**

Stanislaus requests Defendants' contracts with their Tin Mill Products' customers, any amendments, and communications between Defendants and their customers regarding those contracts.

---

[7] U.S. Steel states that it produced every sale of Tin Mill Products to every customer in the United States, for a (5) five-year period from January 1, 2005 through December 31, 2009. This includes tens of thousands of lines of data, which, if printed, would amount to an estimated 80,000-plus pages. In addition, U. S. Steel has produced approximately 22,685 pages (13,363 documents) of email, electronic, and paper, and it continues to produce documents on a rolling basis. POSAM states it has produced POSAM and U.S. Steel's hot-band shipments to UPI from 1989 through 2007. UPI states that has already produced approximately 553,850 pages, which includes transactional data for the years 2008, 2009, and 2011 and will be producing 2010 transactional data. (Doc. 386.)

[8] For instance, U.S. Steel argues that it searches for data would reach additional custodians who may have had no contact with the products, customers or processes at issue in this case until recently, years after U. S. Steel allegedly exited the market. Moreover, U. S. Steel would be forced to spend hundreds of thousands of dollars collecting, processing, and reviewing immense amounts of information that would provide no insight as to any of Plaintiff's claims or allegations. POSAM argues that POSAM's counsel would be required to review over 78,000 e-mails, attachments, and other documents from 2010 and 2011, many of which are entirely in Korean. UPI argues that expanding the production of documents to include the period after January 1, 2010 would require UPI to review, redact, and process more than 83,000 additional documents, which would require an estimated 1,500 hours in attorney and paralegal time. (Doc. 386.)

8

Plaintiff argues these contracts, amendments, and communications are related to Stanislaus's allegations regarding the long-term contracts that constrained Defendants' ability to implement the Market Allocation Agreement immediately and fully. Plaintiff argues that, "The contracts are also relevant to determining how the prices Defendants charged for Tin Mill Products were determined." (Doc. 386 p. 3.)

Defendants oppose production of the contracts as they implicate third party's rights and contain highly confidential information which defendants would be disclosing to their customers' competitors. Defendants note that certain contracts have been provided through 2009.

The Court finds that "how" the prices defendant charged for Tin Mill products were determined is not relevant to market allocation. Liability is not based upon "how" prices were determined, but rather on allocating the market. Further, in light of the third party privacy and confidentiality concerns raised, production of the contracts is not warranted. Federal courts generally recognize a right of privacy that can be raised in response to discovery requests.[9] *See generally Johnson by Johnson v. Thompson*, 971 F2d 1487, 1497 (10th Cir. 1992). Finally, the defendants have agreed, and the Court will order, that transactional data for Tin Mill Products be produced. This transactional data will provide the pricing information charged for each Tin Mill Products sale, which is the foundational information plaintiff needs. The Court finds that plaintiff have not overcome their burden to establish the contractual data is relevant, given the prior production of contracts and the interest in the privacy and confidential information contained in the third party contracts.

### 3. Tin Mill Production and Capacity

Stanislaus requests discovery regarding Defendants' Tin Mill Product production and Tin Mill Product capacity because U.S. Steel and POSCO had excess capacity and could have produced Tin Mill Products to compete with UPI. (TAC ¶¶ 8, 43-46, 75, 76, 99, 101, 130.) Plaintiff seeks these documents because plaintiff factually alleged that excess capacity existed.

---

[9] The Court also considers the possible increased burden on the Court from requests for protective orders which may result from disclosing third party information. For instance, third party Silgan sought a protective order when its contract was produced as part of discovery. (See Doc. 338 and Doc. 342 (motion withdrawn).) Judicial economy is a factor considered in light of the marginal relevance of the documents. Further, the pricing information may be obtained from alternate documents which will be produced.

9

The production and capacity of U.S. Steel and POSCO to produce Tin Mill Products, however, is irrelevant to the elements of the claim for violation of Section 1. Production and Capacity are irrelevant because the Market Allocation Agreement alleges that U.S. Steel exited the market and POSCO refrained from entering the market. Whether these defendants had production and capacity to compete is not at issue. If U.S. Steel wished to reduce its capacity, it is not alleged to be in violation of Section 1. Plaintiff does not allege there was an agreement or conspiracy to restrict output. *See*, *e.g.*, *In re Linerboard Antitrust Litigation*, 203 F.R.D. 197 (E.D.Pa.2001) (defendants conspired to restrict the output of linerboard in order to support increases in the price of linerboard with the objective of increasing the price).

    **4.    Communications among Defendants regarding Tin Mill Products or the hot-band steel sold to UPI**

Stanislaus alleges that the Market Allocation Agreement requires "active monitoring and enforcement" that "began on approximately December 6, 2006 and continues to the present." Plaintiff acknowledges that some pre-2010 communication have been produced which supports plaintiff's allegations. Plaintiff argues that U.S. Steel and POSCO directed UPI to enter into new agreements with customers, directed UPI to sharply increase its prices, and agreed not to undercut UPI's monopoly prices with competition. Plaintiff also argues that in denying defendants' motion for summary judgment, Judge O'Neill ordered Stanislaus be allowed to conduct discovery to rebut or confirm facts alleged in a declaration submitted by defendants. In that declaration, a U.S. Steel representative stated the ongoing nature of U.S. Steel's sales of Tin Mill Products. (Doc. 386.)

In so ruling, however, Judge O'Neill was not ruling upon a discovery motion, and ruled based upon Rule 56(d) factors because the summary judgment motion was premature. Here, the Court must consider the particular discovery at issue. The communications are arguably relevant because plaintiff alleges an ongoing effort to monitor compliance with the Market Allocation Agreement, such that the agreement was continuing. The discovery at issue, however, is enormous both in terms of its scope and the effort required to identify, review and produce. (*See supra*, footnotes 7 and 8.) The defendants have represented that the communications sought would be massive. In addition, since litigation had commenced in 2010 and 2011, production of communications would involve a comprehensive document

review for privileged communications.

At the hearing, plaintiff offered to identify a limited number of custodians from whom discovery would be requested in this category. While plaintiff stated this offer had been extended to defendants previously, the defendants disavowed knowledge of this offer.

It appears the parties have not met and conferred adequately. Therefore, the Court requires the parties to meet and confer. Plaintiff shall identify two custodians for each defendant from whom documents in this category are sought. Such designation shall be made no later than June 4, 2012. Defendants shall evaluate the potential documents and report back to the Court on cost, burden and proportionality and whether documents will be produced. Rule 26(b)(2)(C). Defendants shall file a joint brief no later than June 18, which shall be limited to 10 pages. Plaintiff may file a reply no later than June 20, 2012, which shall be limited to four pages. The Court sets a hearing for June 22, 2012 at 8:30 a.m. The parties may appear telephonically by arranging a one line conference call.

**ORDER**

For the foregoing reasons, the Court GRANTS and DENIES the motion to compel 2010 and 2011 documents as follows:

1. The Court GRANTS the motion to compel transactional data regarding sales of Tin Mill Products and DENIES the motion to compel selling prices of hot-band steel U.S. Steel and POSCO sold to UPI;

2. The Court DENIES the motion to compel the contracts with purchasers of Tin Mill Products, amendments, and communications regarding those contracts;

3. The Court DENIES the motion to compel the Tin Mill Product Production and Production Capacity;

/////
/////
/////
/////
/////
/////

11

1     4.     Plaintiff shall designate no later than June 4, 2012 two defendant custodians for each defendant from whom communications regarding Tin Mill Products is sought; defendant shall file a response to the designation no later than June 18, 2012; plaintiff shall file a reply no later than June 20, 2012. The Court sets a hearing for June 22, 2012 at 8:30 a.m.

IT IS SO ORDERED.

**Dated:**   **May 29, 2012**            /s/ **Barbara A. McAuliffe**
                                                                   UNITED STATES MAGISTRATE JUDGE