IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STANISLAUS FOOD PRODUCTS COMPANY,<br><br>   Plaintiff,<br><br>   vs.<br><br>USS-POSCO INDUSTRIES, et al.,<br><br>   Defendants.<br>_____ / | Case No. 1:09-cv-00560-LJO-BAM<br><br>ORDER GRANTING DEFENDANTS'<br>MOTION FOR SUMMARY JUDGMENT<br><br>(Doc. 476) |

Currently pending before the Court is the motion for summary judgment filed on December 13, 2012, by Defendants USS-POSCO Industries ("UPI"), POSCO America Steel Corporation ("POSCO America"), POSCO-California Corporation ("POSCAL"), Pitcal, Inc. ("Pitcal"), and United States Steel Corporation ("U.S. Steel") (collectively "Defendants"). Plaintiff Stanislaus Food Products Company ("Plaintiff" or "Stanislaus") has filed an opposition to the motion, and Defendants have filed a reply. The parties have also filed additional briefing in accordance with the Court's January 18, 2013, order. After careful consideration of the parties' submissions and the record in this case, the Court GRANTS Defendants' motion for summary judgment.

I.   **BACKGROUND**

   **A.   Overview**

For the basic purposes of this case, the manufacturing of tin-plated cans consists of two parts. First, "hot band steel" is converted into "tin mill products." Second, the tin mill products are formed into tin-plated cans. This case concerns an alleged antitrust conspiracy among several manufacturers

1

of tin mill products in the western United States.[1]

**B.     The Parties**

U.S. Steel manufacturers hot band steel and tin mill products. U.S. Steel manufacturers its tin mill products at its three tin mills located in Indiana. U.S. Steel is the largest seller of tin mill products in the United States. In 2009, U.S. Steel accounted for between ▮▮▮▮▮ percent of the total domestic shipments of tin mill products in the United States.

Non-party Pohang Iron & Steel Co., Ltd. ("POSCO") is a South Korean steel manufacturer and producer of hot band steel. In December 2006, POSCO sold its Korean tin mill to a Chinese tin mill company, which POSCO is a minority investor in. The physical assets associated with that sale were moved to China in 2007.

U.S. Steel and POSCO formed UPI as a joint venture in 1986. U.S. Steel owns a 50% interest in UPI through its wholly-owned subsidiary, Pitcal, and POSCO owns a 50% interest in UPI through its wholly-owned subsidiaries, POSCO America and POSCAL. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ manages the business and affairs of UPI. UPI is located in Pittsburg, California, and is the only tin mill products manufacturer located in the western United States.

Tin-plated can manufacturers, which produce cans for packaging food, are major purchasers of tin mill products. They include non-parties Silgan Containers Corporation ("Silgan"), Ball Packaging Corporation ("Ball"), Crown Cork and Seal, USA, Inc. ("Crown"), and the Van Can Company ("Van Can"). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Plaintiff, which owns and operates a tomato cannery in Modesto, California, purchases ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

**C.     The Supply Contracts**

**1.     U.S. Steel-Silgan Agreement**

In ▮▮▮ U.S. Steel and Silgan reached an agreement ("the U.S. Steel-Silgan Agreement") for the supply of tin mill products. Under the agreement, U.S. Steel was required to supply (and Silgan was

---

[1] As used in this case, the western United States refers to the geographic region west of the Rocky Mountains, which includes the states of California, Oregon, Washington, Nevada, Idaho, Montana, Arizona, Utah, Wyoming, Colorado, and New Mexico.

2

1  required to purchase) ███████████████████████████████████████
2  ███████████████████████████████ The agreement ████████████████
3  ████████████████████████████████████████████████████████████
4  ████████████████████████████████████████████████████████████
5  ████████████████████████████████████████████████████████████
6  ████████████████████████████████████████████████████████████
7  ████████████████████████████████████████████████████████████
8  ██████████████████████████
9             **2.**    ████████████ **Agreements**
10     In █████████████████████████████████████████████████████
11  for the supply of tin mill products.  The agreement established a base price for the tin mill products and
12  included provisions for future price adjustments.  ████████████████████████
13  ██████████████████████████████████████████████████████████ with
14  similar-type terms.
15             **3.**    ████████████ **Agreements**
16     In ██████████████████████████████████████████████████████ for
17  the supply of tin mill products.  Under the agreement, ████████████████
18  ████████████████████████████████████████████████████████████
19  ████████████████████████████████████████████████████████████
20  ████████████████████████████████████████████████████████████
21  ██████████████████████
22             **4.**    **UPI-Silgan Agreements**
23     In ████████████████████████████████████████████████ regarding
24  the supply of tin mill products.  Under the agreement, ██████████████
25  ████████████████████████████████████████████████████████████
26  ████████████████████████████████████████████████████████████
27  ████████████████████████████████████████████████████████████
28  ████████████████████████████████████████████████████████████

1
2   In ▮▮▮ UPI and Silgan ▮▮▮
3   ▮▮▮
4   ▮▮▮
5   ▮▮▮
6   ▮▮▮
7   ▮▮▮
8   ▮▮▮
9   ▮▮▮
10  ▮▮▮
11      **5.** ▮▮▮ **Agreement**
12  In ▮▮▮ regarding
13  the supply of tin mill products. The agreement ▮▮▮
14  ▮▮▮
15      **6.** ▮▮▮ **Agreement**
16  In ▮▮▮ for the supply of
17  tin mill products. The agreement ▮▮▮
18  ▮▮▮
19      **D.    The Alleged Conspiracy**
20      In 2008, UPI secured record margins and profits for its tin mill products. For example, ▮
21  ▮▮▮
22  ▮▮▮
23  ▮▮▮
24      Plaintiff asserts that this was the result of a Market Allocation Agreement that UPI, U.S. Steel,
25  POSCO, and their subsidiaries reached on December 6, 2006. The agreement, according to Plaintiff,
26  entailed the following. First, POSCO agreed that it would not enter and compete in the market for tin
27  mill products in the western United States. Second, U.S. Steel agreed that it would exit the market for
28  tin mill products in the western United States entirely by: (1) eliminating "quarter-inch width surplus"

discounts; (2) eliminating "freight equalization" pricing; (3) not otherwise pricing its tin mill products competitively against UPI in the western United States; and (4) reducing its output of tin mill products in the United States. Third, UPI agreed that it would use its monopoly power to raise its prices for tin mill products in the western United States substantially, thereby securing record profits for UPI and its owners, POSCO and U.S. Steel.

### E. Procedural History

Plaintiff filed suit in the Stanislaus County Superior Court alleging federal and state antitrust causes of action. On March 27, 2009, the action was removed to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. Following a series of motions to dismiss, the action is now proceeding on the following three claims: (1) unreasonable restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1; (2) violation of California's Cartwright Act, Cal. Bus. & Prof. Code § 16720, *et seq.*; and (3) unfair competition under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq*.

On December 13, 2012, Defendants filed the instant motion seeking summary judgment on all of Plaintiff's claims. Plaintiff filed an opposition on January 8, 2013, and Defendants filed a reply on January 15, 2013. In addition, upon request from the Court, Plaintiff filed further briefing on January 23, 2013, and Defendants filed further briefing on January 25, 2013. The Court took the matter under submission pursuant to Local Rule 230(g).

## II. LEGAL STANDARD

Summary judgment is appropriate when the pleadings, the disclosure materials, the discovery, and the affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one which may affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that a reasonable trier of fact could return a verdict in favor of the nonmoving party. Id.

A party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes

demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Where the movant will have the burden of proof on an issue at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). "On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." Id. (citing Celotex, 477 U.S. at 323).

If the movant has sustained its burden, the nonmoving party must "show a genuine issue of material fact by presenting *affirmative evidence* from which a jury could find in [its] favor." FTC v. Stefanchik, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis in the original). The nonmoving party must go beyond the allegations set forth in its pleadings. See Fed. R. Civ. P. 56(c). "[B]ald assertions or a mere scintilla of evidence" will not suffice. Stefanchik, 559 F.3d at 929. Indeed, the mere presence of "some metaphysical doubt as to the material facts" is insufficient to withstand a motion for summary judgment. Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Id. at 587.

In resolving a summary judgment motion, "the court does not make credibility determinations or weigh conflicting evidence." Soremekun, 509 F.3d at 984. That remains the province of the jury. See Anderson, 477 U.S. at 255. Instead, "[t]he evidence of the [nonmoving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor." Id. Inferences, however, are not drawn out of the air; the nonmoving party must provide a factual predicate from which the inference may justifiably be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

**III. DISCUSSION**

    **A. Construction of Plaintiff's Allegations**

Before the merits of Defendants' motion for summary judgment can be determined, the Court must construe Plaintiff's allegations regarding U.S. Steel. Specifically, the Court must determine what precisely Plaintiff alleges U.S. Steel agreed to do (or not do) as part of the alleged conspiracy. This is

6

because, as the Court noted in its January 18, 2013, order requesting additional briefing, the parties' submissions reveal that they sharply disagree on the issue.

The starting point for the parties' disagreement appears to be paragraph 74 in the third amended complaint ("TAC"). That paragraph provides:

> 74. Pursuant to the Market Allocation Agreement, U.S. Steel (acting directly and through its alter ego Pitcal) agreed to exit the Relevant Market by no longer competing in the western United States. This agreement included, but was not limited to, a promise that U.S. Steel would eliminate discounts U.S. Steel had offered its customers in the Western United States for decades prior to the Market Allocation Agreement: "quarter-inch width surplus" and "freight equalization" pricing. U.S. Steel abided by its promise and eliminated these discounts. U.S. Steel refused to otherwise price its Tin Mill Products competitively against UPI, thereby exiting fully from the Relevant Market and eliminating competition. U.S. Steel reduced the supply of Tin Mill Products, and operated its Indiana-based tin mills substantially below capacity. . . . Customers in the Western United States thereafter had no choice by to purchase all their Tin Mill Products from UPI.

(Doc. 267, TAC, ¶ 74.)

Defendants interpret this paragraph, as the Court for the most part did in its previous orders, as alleging that U.S. Steel agreed to exit the western United States *completely* by: (1) eliminating quarter-inch width surplus discounts; (2) eliminating freight equalization pricing; (3) not otherwise pricing its tin mill products competitively against UPI in the western United States; and (4) reducing its output of tin mill products in the United States. Consistent with this view, Defendants maintain that summary judgment is appropriate because (1) U.S. Steel eliminated quarter-inch width discounts years before the alleged conspiracy began; (2) U.S. Steel did not offer freight equalization pricing; and (3) pursuant to its long-term national supply contract with Silgan, U.S. Steel not only continues to supply the western United States but it also does so at a lower price than UPI.

In its opposition, Plaintiff steps back from its allegation that U.S. Steel fully exited the market for tin mill products in the western United States. Plaintiff concentrates instead on its allegation that U.S. Steel agreed as part of the conspiracy to avoid pricing its tin mill products competitively against UPI, an allegation that Plaintiff notes is plainly asserted in paragraph 74. (Doc. 482 at 6.) As support for this allegation, Plaintiff offers what it believes to be circumstantial evidence of price coordination between U.S. Steel and UPI, including correspondence between several high-level U.S. Steel and UPI executives purportedly regarding pricing.

7

In their reply, Defendants protest that Plaintiff has crafted an entirely new theory of liability in its opposition to avoid summary judgment. Defendants essentially argue that whereas the main thrust of Plaintiff's TAC is the allegation that U.S. agreed to allocate the entire tin mill products market in the western United States to UPI (i.e., a run-of-the-mill market allocation conspiracy), the central theme presented in Plaintiff's opposition is the new assertion that U.S. Steel conspired with UPI in some sort of price fixing scheme. (See Doc. 515 at 1.)

From the Court's perspective, having exhaustively reviewed the record, there are three theories of liability at issue. The first theory of liability is the "exit theory." This is the theory that is actually asserted in the TAC. Under the exit theory, U.S. Steel agreed to exit the market for tin mill products in the western United States *completely*. Once U.S. Steel left the market, UPI used its monopoly power to raise its prices for tin mill products in the western United States substantially, thereby securing record profits for UPI and its owners. In the words of the TAC:

> 13. The purpose and effect of this agreement was to *eliminate* competition, leaving UPI as the sole monopolist supplier of Tin Mill Products to customers in the Western United States[.]
>
> 73. The Market Allocation Agreement contained specific terms and roles for each participant. The overarching purpose of the Agreement was to allocate the Relevant Market *fully* to UPI in order to create a monopoly power and control price so that UPI . . . could control and increase the prices of Tin Mill Products in the Western United States to artificially high levels.
>
> 74. Pursuant to the Market Allocation Agreement, U.S. Steel . . . agreed to *exit* the Relevant Market by no longer competing in the Western United States. . . . Customers in the Western United States thereafter had *no choice but to purchase all their Tin Mill Products from UPI*.

(Doc. 267 ¶¶ 13, 73, 74) (emphasis added).

The second theory of liability is a "partial allocation" theory. This is the theory that is pursued by Plaintiff in its opposition. Under this theory, whether U.S. Steel sold "*de minimus*" amounts of tin mill products in the western United States is irrelevant. The focus of this theory is *not* that U.S. Steel completely exited the market; it is the accusation that U.S. Steel did not aggressively compete against UPI on price to gain market share in the western United States despite the fact that UPI was charging supra-competitive prices. (See Doc. 482 at 1) ("Discovery has confirmed Stanislaus's allegations. When UPI charged high TMP prices despite falling input costs, USS did not price competitively against UPI

to capture business."). Because UPI was left unchallenged, U.S. Steel effectively "allocated" to UPI a dominant, but not complete, position in the market.

Although Plaintiff argues that its partial allocation theory is entirely consistent with the TAC, the Court finds otherwise. First, as explained above, the overwhelming thrust of the TAC is that U.S. Steel fully exited the western United States. Second, although it cannot be denied that Plaintiff alleged in the TAC that U.S. Steel avoided pricing its products competitively against UPI, that allegation was always tethered to, and thus qualified by, the allegation that U.S. Steel completely exited the market in the western United States:

> 13. Pursuant to the Market Allocation Agreement, U.S. Steel agreed with POSCO and UPI *to exit the Relevant Market by ending competitive pricing* against UPI . . . . The purpose and effect of this agreement was to eliminate competition, leaving UPI as the sole monopolist supplier of Tin Mill Products to customers in the Western United States, and, as a result, control prices.
>
> 74. U.S. Steel *refused to otherwise price its Tin Mill Products competitively against UPI, thereby exiting* fully from the Relevant Market and eliminating competition.

(Doc. 267 ¶¶ 13, 74) (emphasis added). Disassociating the two allegations and solely emphasizing the lack of competitive pricing creates a different theory of liability.

Finally, the third theory of liability invokes a pure, free-standing agreement to fix prices. This theory is implied, although not explicitly asserted, in Plaintiff's opposition papers. Under this theory, U.S. Steel directed UPI to raise its prices for tin mill products in the western United States. U.S. Steel and UPI then colluded to maintain the high prices so that UPI could reap record profits. (See Doc. 482 at 7) ("[U.S. Steel], with POSCO's agreement, directed UPI to raise its prices, which ultimately led UPI to charge 'record' TMP prices.").

**B.    The Actionable Theories of Liability**

The question, then, is: On which, if any, theories of liability may Plaintiff proceed? The first theory of liability is plainly asserted in the TAC, and therefore there can be no dispute that Plaintiff may proceed on the exit theory. The second and third theories, in contrast, are not adequately asserted in the TAC. However, this is not determinative. When new theories of liability are asserted in a party's opposition to summary judgment, the Ninth Circuit has instructed courts to consider the possibility of allowing an amendment to the pleadings:

9

> The complaint . . . does not [necessarily] control the issues properly before [the] court. We have previously held that, when issues are raised in opposition to a motion [for] summary judgment that are outside the scope of the complaint, the district court should have construed [the matter raised] as a request pursuant to rule 15[] of the Federal Rules of Civil Procedure to amend the pleadings out of time.

Apache Survival Coalition v. United States, 21 F.3d 895, 910 (9th Cir. 1994) (internal quotation marks and citations omitted). See also In re Stratosphere Corp. Sec. Litig., 66 F. Supp. 2d 1182, 1201 (D. Nev. 1999) ("When new issues or evidence supporting a legal theory outside the scope of the complaint is introduced in opposition to summary judgment, a district court should construe the matter as a request to amend pleadings under Federal Rule of Civil Procedure 15[]."). The factors a court must consider when deciding whether leave to amend is appropriate under Rule 15 are: (1) undue delay; (2) bad faith; (3) prior amendments; (4) prejudice to the opposing party; and (5) futility. See Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1051-52 (9th Cir. 2003).

Turning first to Plaintiff's partial allocation theory, undue delay is apparent. Plaintiff counters that this theory has always been the one it sought to proceed on. Plaintiff notes that it consistently made this clear during discovery. But Plaintiff's argument cuts both ways. It should have been apparent to Plaintiff that the Court and Defendants viewed this case under the prism of the exit theory. In its order on Defendants' motions to dismiss, the Court noted that the "linchpin" of Plaintiff's claims appears to be whether U.S. Steel "actually left" the western United States. (Doc. 286 at 12 n.5.) Defendants then moved for summary judgment on this ground, arguing that U.S. Steel had not.[2] (Doc. 304.) Plaintiff should have known at that point that amendment was prudent.

Nevertheless, undue delay alone is not a sufficient justification for denying leave to amend; the critical consideration is prejudice. See Eminence, 316 F.3d at 1052; Bowles v. Reade, 198 F.3d 752, 758 (9th Cir. 1999). Plaintiff's partial allocation theory appears to be more of a refinement of the exit theory, as opposed to an entirely new theory of liability. The only difference is that instead of alleging U.S. Steel completely exited the market, Plaintiff now contends that U.S. Steel remained in the market but allowed UPI to have an uncontested, dominant position in the market. Defendants have not shown that this refinement has caused any actual prejudice in their ability to defend against Plaintiff's claims. Therefore, the Court will assume the amendment exists on this theory for the remaining analysis herein.

---

[2] The motion was not decided on the merits. It was withdrawn to allow Plaintiff time for discovery.

As for the third theory of liability (the pure price fixing theory), the Court finds amendment of the pleadings inappropriate. In a discovery matter before U.S. Magistrate Judge Barbara A. McAuliffe, Plaintiff specifically argued that the TAC alleged a price fixing agreement between U.S. Steel and UPI. Judge McAuliffe disagreed:

> Having read the entirety of the TAC, the prior orders on the Motions to Dismiss, the Court interprets the TAC allegations, for purposes of this discovery order only, as follows. The allegations do not allege an agreement to fix prices of Tin Mill Products or a conspiracy to fix prices for Tin Mill Products. Rather, the TAC alleges that "price control" was gained through monopoly power once U.S. Steel exited the market. Once U.S. Steel left the market, UPI then had monopoly power to raise prices because competition no longer exited. *The TAC does not allege an "agreement" to fix prices and does not allege a conspiracy to "fix prices."* . . . The only "agreement" referred to in the TAC is the agreement whereby U.S. Steel left the Tin Mill Products market so that UPI would be the exclusive producer. Once exclusive, UPI raised its prices. No allegation the Court found stated that this price increase was by "agreement" with U.S. Steel or POSCO. If a price fixing agreement or price fixing conspiracy were part of the Market Allocation Agreement, it would have been explicitly stated as such, given the detailed allegations about the formation and operation of an illegal agreement to "exit the market."

(Doc. 388 at 5-6) (emphasis added).

Not only does this Court agree with Judge McAuliffe's analysis and conclusion, but this Court also finds that Judge McAuliffe's order gave Plaintiff clear notice that the Court did not view the TAC as alleging any separate, free-standing price fixing claim. At that point, while discovery was still open, Plaintiff should have moved to amend the pleadings to the extent that it sought to pursue such a claim. Plaintiff did not. Instead, Plaintiff waited until the filing of dispositive motions to sneak in allegations of price fixing in its opposition. Not only does this constitute undue delay, but this also appears to be an act of gamesmanship.

Moreover, in light of Judge McAuliffe's order, Defendants believed, fairly, that this action did not include any free-standing claim for price fixing. Therefore, if Plaintiff is given leave to amend on this theory, discovery would need to be reopened so that Defendants could prepare a defense. This is prejudicial, and amendment must be denied for this reason as well. See Solomon v. North Am. Life & Cas. Ins. Co., 151 F.3d 1132, 1139 (9th Cir. 1998).

In sum, Plaintiff may proceed on the "exit" theory or "partial allocation" theory. Plaintiff may not, however, proceed on a price fixing theory of liability. That theory is not fairly alleged in the TAC and amendment of the pleadings to include such a claim is inappropriate.

**C.     Section 1 of the Sherman Act**

Section 1 of the Sherman Act makes illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States[.]" 15 U.S.C. § 1. To establish a claim under § 1, the plaintiff must show (1) that there was an agreement, conspiracy, or combination among two or more individuals or distinct business entities; (2) that the agreement or conspiracy unreasonably restrained trade under either a per se rule or a rule of reason analysis; and (3) that the plaintiff suffered an antitrust injury. See Kendall v. Visa U.S.A., Inc., 518 F.3d 1042, 1047 (9th Cir. 2008); McGlinchy v. Shell Chem. Co., 845 F.2d 802, 811 (9th Cir. 1988). Here, Defendants argue that they are entitled to summary judgment on Plaintiff's § 1 claim because there is no evidence of an agreement to allocate the market.

**1.     Standards for Proving an Agreement**

An agreement to restrain trade can be proved by either direct or circumstantial evidence. See 7-UP Bottling Co. v. Archer Daniels Midland Co. (In re Citric Acid Litig.), 191 F.3d 1090, 1093 (9th Cir. 1999). Direct evidence, in contrast to circumstantial evidence, is evidence that is explicit and requires no inferences to establish the existence of an agreement. Id. For example, testimony from percipient witnesses that defendants agreed at a certain meeting to fix prices or not to compete constitutes direct evidence of an agreement to restrain trade. See, e.g., Toledo Mack Sales & Serv. v. Mack Trucks, Inc, 530 F.3d 204, 219-20 (3d Cir. 2008); In re Urethane Antitrust Litig., Case No. 04-01616-JWL, 2012 U.S. Dist. LEXIS 180365, at *42-44 (D. Kan. Dec. 18, 2012). Such evidence is sufficient in of itself to defeat summary judgment. See In re Coordinated Pretrial Proceedings in Petroleum Pros. Antitrust Litig., 906 F.2d 432, 441 (9th Cir. 1990).

Where, as here, there is no direct evidence and the plaintiff relies completely on circumstantial evidence to prove the existence of an agreement to restrain trade,[3] the evidence considered as a whole must "tend[] to exclude the possibility that the alleged conspirators acted independently." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986). In other words, to survive a motion for summary judgment, the plaintiff must show that "the inference of conspiracy is reasonable in light

---

[3] The parties appear to be in accord that this case hinges on the strength of Plaintiff's circumstantial evidence and the inferences that can be drawn therefrom. (See Doc. 464 at 14-15; Doc. 482 at 4.)

12

of the competing inferences of independent action or collusive action that could not have harmed [the plaintiff.]" Id. See also In re Citric Acid Litig., 191 F.3d at 1097 ("[T]he crucial question [on summary judgment] is whether all the evidence considered as a whole can reasonably support the inference that [the defendants] conspired [to retrain trade.]").

When making this determination, the Supreme Court has cautioned courts against drawing an inference of conspiracy from purely ambiguous evidence, that is evidence that is as consistent with a legitimate business practice as it is with unlawful conduct. See Matsushita, 475 U.S. at 588. Imposing antitrust liability in such circumstances would deter otherwise pro-competitive conduct, which would run counter to the central goal of antitrust law: promoting competition. See In re Citric Acid Litig., 191 F.3d at 1094. Thus, the Supreme Court has made it clear that "conduct as consistent with permissible competition as with [an] illegal conspiracy [cannot], standing alone, support an inference of antitrust conspiracy." Matsushita, 475 U.S. at 588. Heeding this warning, the Ninth Circuit has outlined a two-part test circumscribing the use of ambiguous evidence:

> First, the defendant can rebut an allegation of conspiracy by showing a plausible and justifiable reason for its conduct that is consistent with proper business practice. The burden then shifts back to the plaintiff to provide specific evidence tending to show that the defendant was not engaging in permissible competitive behavior.

In re Citric Acid Litig., 191 F.3d at 1094 (internal citations omitted); Sun Microsystems Inc. v. Hynix Semiconductor Inc., 622 F. Supp. 2d 890, 896 (N.D. Cal. 2009).

**2.    Existence of "Exit" or "Partial Allocation" Agreement**

**a.    Motive**

When the proof of an agreement to restrain trade consists only of circumstantial evidence, the starting point for evaluating the evidence is determining whether there is a plausible economic motive for the alleged agreement. This is because, as the Supreme Court explained, "[l]ack of motive bears on the range of permissive conclusions that might be drawn from ambiguous evidence [of an agreement to restraint trade.]" Matsushita, 475 U.S. at 596-97. If the defendant has no rational economic motive to conspire, the plaintiff "must come forward with more persuasive evidence to support [its] claim than would otherwise be necessary" to survive a motion for summary judgment. Id. at 587. In other words, the less rational the conspiracy, the more persuasive the plaintiff's circumstantial evidence must be to

13

1  avoid summary judgment. Cf. Champagne Metals v. Ken-Mac Metals, Inc., 458 F.3d 1073, 1084 (10th
2  Cir. 2006) ("[T]he more economically rational a conspiracy is in a given situation, the broader the range
3  of inferences that can be drawn from the evidence.").

4      The question posed by this case is whether it was economically rational for UPI, POSCO, and
5  U.S. Steel to conspire to allocate the market for tin mill products in the western United States to UPI.
6  Such an agreement would plainly be in the interest of UPI, which would be permitted to dominate the
7  market and set supra-competitive prices. Such an agreement would also be in the interest of POSCO
8  because POSCO, as 50% owner of UPI, would share in UPI's record profits; all POSCO had to agree
9  to do was not compete in a market that it did not compete in anyway. As for U.S. Steel, however, its
10 interests in the tin mill products market are more complex and therefore its motives underlying any of
11 its actions are less apparent.

12     Any determination of U.S. Steel's motives must reflect the fact that U.S. Steel sells its tin mill
13 products pursuant to *national* supply contracts and ███████████████████
14 ███████████████████████████████████████
15 ███████████████████████████████████████
16 ███████████████████████████████████████
17 ███████████████████████████████████████ Thus,
18 in order for U.S. Steel to "not compete against UPI on price," U.S. Steel would either need to refuse to
19 sell to a customer entirely or would need to set its national price for that customer at a level that does
20 not undercut UPI's supra-competitive prices in the western United States. In effect, U.S. Steel would
21 be required to surrender a portion of its national business and competitiveness. If U.S. Steel did not, a
22 customer would simply forego purchasing from UPI at its supra-competitive rate and would purchase
23 from U.S. Steel instead at a lower rate. This would defeat the purpose of the conspiracy.

24     Whether forfeiting competitiveness at the national level would have made economic sense for
25 U.S. Steel would have depended on the *national* market structure for tin mill products at the time. Key

---

[4] There does appear to be a spot market, which could add yet another level of complexity to this matter. However, the record is entirely unclear regarding the level of U.S. Steel's participation in the spot market. Plaintiff alleges that spot market purchases represented an "insignificant portion" of all tin mill products sales, (see Doc. 267 at 4), and has identified only one such transaction in its opposition. (See Doc.482 at 11.)

14

1  factors would have included (1) the number of competitors in the United States; (2) the ability of those
2  competitors to expand their production in order to capitalize on new business opportunities; and (3) the
3  presence (or absence) of barriers to entering the United States.  For example, if U.S. Steel faced little
4  to no domestic competition; that competition posed little threat of expanding their production; and the
5  barriers to entering the United States were high enough to dissuade foreign competition from entering
6  the market, then it would have made economic sense for U.S. Steel to forfeit a fraction of its national
7  business and competitiveness so that UPI could charge supra-competitive prices in the western United
8  States.  Any lost business would easily be offset by UPI's record profits.

9        The evidence in the record does not paint such a clear picture.  To be sure, the decision by the
10 International Trade Commission ("ITC") in 2006 to keep in place an antidumping order that prevented
11 Japanese producers from exporting tin mill products into the United States served as a critical barrier
12 to entering the market.  However, it appears that U.S. Steel still faced meaningful competition within
13 the United States; in 2009, U.S. Steel accounted for only between ▮▮▮▮▮▮▮▮▮▮ of the total domestic
14 shipments in the United States.  Thus, even discounting whatever market share UPI might have had, it
15 appears that a notable portion of the market was being supplied by manufacturers other than U.S. Steel
16 and UPI.  These competitors appear to include Arcelor-Mittal, Corus/Tata, Rasselstein, DongBu, JFE,
17 Dofasco, and Severstal/R.G. Steel.

18       In sum, POSCO and UPI clearly had rational economic motives for reaching an agreement to
19 allocate the western United States to UPI.  It is unclear to the Court, however, that such an agreement
20 made economic sense for U.S. Steel.  Therefore, in evaluating Plaintiff's evidence of an agreement as
21 to U.S. Steel, the Court proceeds with caution at the outset.

22       **b.  Parallel Behavior**

23       Conscious parallel behavior may, when taken together with "plus" factors, support an inference
24 of conspiracy.  See In re Citric Acid Litig., 191 F.3d at 1102; In re Flat Glass Antitrust Litig., 385 F.3d
25 350, 360 n.11 (3d Cir. 2004) ("[To infer a conspiracy based on] consciously parallel behavior, a plaintiff
26 must show (1) that the defendants' behavior was parallel; (2) that the defendants were conscious of each
27 other's conduct and that this awareness was an element in their decision-making process; and (3) certain
28 'plus' factors.").  Examples of plus factors include evidence of a market structure that is conducive to

15

1  collusion, suspicious communications between the defendants, and behavior that would be contrary to
2  the defendants' self-interests in the absence of a conspiracy.  See Apex Oil Co. v. Di Mauro, 822 F.2d
3  246, 253-55 (2d Cir. 1987); see also Wilcox v. First Interstate Bank, N.A., 815 F.2d 522, 525-26 (9th
4  Cir. 1987) (listing potential plus factors).

### i.    2009 Contract Prices

Plaintiff points to U.S. Steel's 2009 contract prices ▮▮▮▮▮ as evidence of parallel behavior.  For its sales to the western United States, U.S. Steel charged ▮▮▮▮▮ ▮▮▮▮▮ ▮▮▮▮▮ As further context for these prices, Plaintiff stresses that U.S. Steel negotiated its contracts ▮▮▮▮▮ at a time when hot band steel prices were declining sharply.  Therefore, in Plaintiff's view, U.S. Steel's prices were entirely inconsistent with "fair" market price.

The problem with Plaintiff's evidence regarding U.S. Steel's prices ▮▮▮▮▮ is that it does not show U.S. Steel failing to compete against UPI on price.  The prices U.S. Steel charged to these ▮▮▮▮▮ were *lower* than that charged by UPI.  Although Plaintiff argues that U.S. Steel's prices should have been even lower given the falling price of hot band steel, Plaintiff's argument is misguided.  The issue in this case is the claim that U.S. Steel agreed to allocate the market by not competing against UPI on price; there is no free-standing price fixing claim.  Therefore, the relevant point of reference is UPI's prices, not any supposed "fair" market price.  From the perspective ▮▮▮▮▮ it did not matter how much lower U.S. Steel's prices were in comparison to UPI.  As long as U.S. Steel's prices were in fact lower, ▮▮▮▮▮ have purchased, as any rational business would have, from U.S. Steel to the detriment of UPI.  This does not show an allocation of the market to UPI; if anything, it shows U.S. Steel *taking* market share from UPI.

### ii.    Spot Market Sale

Plaintiff also points to a sale U.S. Steel made to ▮▮▮▮▮ as evidence of parallel behavior.  ▮▮▮▮▮ tons of tin mill products to be shipped to the western United States.  The sale was made outside ▮▮▮▮▮ ▮▮▮▮▮ When U.S. Steel CEO John Surma first learned of the order,

16

1 he inquired, ███████████████ (Doc. 492-7 at USS_ST0000506.) In response, U.S. Steel
2 Executive Christopher Navetta said, ████████████████████████████████████
3 ████████████████████████ (Id.)

4     U.S. Steel's spot market sale to ███████████ o weak evidence of a conspiracy. The sale
5 does show U.S. Steel discussing UPI in the context of a pricing decision, but it remains ambiguous as
6 to whether Mr. Surma's question was simply one of fact regarding the general state of the market or one
7 implicating a conspiracy. Moreover, it does not appear that spot market sales were common or were a
8 significant part of U.S. Steel's overall sales. Indeed, the evidence shows that U.S. Steel made most of
9 its sales pursuant to national supply contracts. ████████████████████████████
10 ██████████ Therefore, the evidence as a whole shows U.S. Steel competing against UPI on price,
11 even if that was not true with respect to this one minor sale.

12                **iii.    Exchanges of Information**

13     Plaintiff offers evidence that suggests that U.S. Steel was aware of UPI's pricing strategy. For
14 example, in October 2008, Mr. Smith emailed Mr. Navetta that ████████████████████
15 ████████████████████████████████████████████████████████████
16 ████████████████████████ Thereafter, at the request of Mr. Smith, Mr. Navetta forwarded
17 this information to Mr. Surma and U.S. Steel COO John Goodich. Both Mr. Surma and Mr. Goodich
18 were involved in U.S. Steel's negotiations ██████████

19     Exchanges of information among high-level executives who have pricing authority bolster an
20 inference of conspiracy. See In re Flat Glass Antitrust Litig., 385 F.3d at 369. However, "to survive
21 summary judgment, there must [also] be evidence that the exchanges of information [actually] had an
22 impact on pricing." In re Baby Food Antitrust Litig., 166 F.3d 112, 125 (3d Cir. 1999). Here, there is
23 no evidence that Mr. Smith's information regarding ████████████████████████████
24 ████████████████████████████████████████████████████████████
25 ████████████████████████████████████████████████████ Moreover,
26 it is undisputed that throughout the alleged conspiracy U.S. Steel charged ██████████████
27 ████████████████████████ Therefore, the Court finds Plaintiff's evidence of information
28 sharing regarding ██████████ irrelevant.

### c. Expert Opinion

Plaintiff notes in its opposition that its expert, Dr. Gordon Rausser, has opined that Defendants' behavior is "consistent with collusion, rather than competition." (Doc. 482 at 15.) However, the two-page portion of Dr. Rausser's report that Plaintiff directs the Court's attention to is nothing more than a broad overview of Plaintiff's argument.[5] Therefore, Dr. Rausser's unsubstantiated opinion that Defendants' behavior is "consistent with collusion, rather than competition" adds little, if anything, to the Court's analysis of whether a conspiracy existed.

### d. ███ Opinion

Defendants place dispositive weight on the fact that ████████████████████ ████████████████████████████████████████████████████ (See Doc. 489-2 at 112:8-20.) However, there is no context or explanation for ███████ statements. For example, ███ does not testify about (or at least Defendants have not cited and pointed the Court's attention to) ████████████████████████████████████████████████████ ███████████ such evidence would not preclude the possibility that the agreement existed but U.S. Steel was cheating. See United States v. Beaver, 515 F.3d 730, 739 (7th Cir. 2008) ("[Section] 1 of the Sherman Antitrust Act does not outlaw only perfect conspiracies to restrain trade. It is not uncommon for members of a price-fixing conspiracy to cheat on one another occasionally, and evidence of cheating certainly does not, by itself, prevent the government from proving a conspiracy."). Therefore, the Court views ███████ testimony not as dispositive evidence, but as circumstantial evidence that further detracts from any inference of conspiracy.

### e. Sum of the Evidence

For a plaintiff to survive a motion for summary judgment, the evidence taken as a whole must "tend[] to exclude the possibility that the alleged conspirators acted independently" and show that the inference of conspiracy is a reasonable one. Matsushita, 475 U.S. at 588. See In re Citric Acid Litig., 191 F.3d at 1097. Having considered all the evidence here, the Court concludes that the evidence does

---

[5] The main body of the report is 82 pages long. (Doc. 490-8.) To the extent that Plaintiff is inviting the Court to mine the report for substantive opinions that are not cited in its briefing, the Court declines. See Carmen v. San Francisco Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001) (district court is not expected to examine the file for evidence establishing genuine issue of fact where the evidence is not adequate referenced in its papers).

not support a reasonable inference that there was an allocation of the market, let alone that U.S. Steel and UPI colluded to allocate the market. Particularly problematic for Plaintiff is the fact that U.S. Steel had no clear motive to allocate the market to UPI and the fact that Plaintiff has produced less than a "scintilla" of evidence showing that U.S. Steel priced itself out of the market for the sole benefit of UPI. Stefanchik, 559 F.3d at 929. Accordingly, U.S. Steel and UPI are entitled to summary judgment on Plaintiff's § 1 claim.

The record also does not support a reasonable inference that POSCO and its subsidiaries were part of any agreement to allocate the market. Plaintiff argues that POSCO and its subsidiaries should be held liable because they: (1) had a motive to make UPI profitable; and (2) did not enter the market in the western United States despite the prospect of making substantial profits. All of this is consistent with legitimate business conduct. There is nothing alarming, unusual, or unlawful about a company wanting its joint venture to be profitable. Nor is there anything particularly alarming about POSCO's not entering an otherwise profitable market. Contrary to Plaintiff's assertions, the record does not show that POSCO actually had the potential to compete; POSCO divested its only tin mill in December 2006. Therefore, in order to compete, POSCO would have first needed to incur significant costs to develop a tin mill business. A rational business could easily decide to simply allow its joint venture to earn profits uninterrupted, as opposed to incurring these significant costs just to compete against its own joint venture. This does not support an inference of conspiracy. See Matsushita, 475 U.S. at 588. Accordingly, POSCO America and POSCAL are entitled to summary judgment on Plaintiff's § 1 claim.

**D.    State Law Claims**

As indicated above, Plaintiff also presents state law claims against Defendants for violations of California's Cartwright Act and California's UCL. These claims rise and fall with Plaintiff's § 1 claim. See County of Tuolumne v. Sonora Community Hospital, 236 F.3d 1148, 1160 (9th Cir. 2001) ("The analysis under California's antitrust law mirrors the analysis under federal law because the Cartwright Act . . . was modeled after the Sherman Act.") (citations omitted); (see also Doc. 286 at 20) ("The UCL claim predicates liability based on the Sherman Act and the Cartwright Act."). Accordingly, because Defendants are entitled to summary judgment on Plaintiff's § 1 claim, they are also entitled to summary judgment on Plaintiff's state law claims.

IV. **CONCLUSION**

For all the reasons set forth above, this Court:

1. GRANTS Defendants' motion for summary judgment;
2. VACATES all pending deadlines and hearings; and
3. DIRECTS the Clerk of Court to enter judgment in favor of Defendants.

IT IS SO ORDERED.

Dated:   **February 15, 2013**       /s/  Lawrence J. O'Neill
                                     UNITED STATES DISTRICT JUDGE